**TOWER LEGAL GROUP, P.C.**
James A. Clark (SBN 278372)
Renee P. Ortega (SBN 283441)
11335 Gold Express Drive, Ste. 105
Gold River, CA 95670
Telephone: (916) 361-6009
Facsimile:  (916) 361-6019
Email: james.clark@towerlegalgroup.com
Email: renee.ortega@towerlegalgroup.com

[Attorneys for Plaintiffs]

**THE SHARMAN LAW FIRM**
Paul Sharman *PHV pending
11175 Cicero Drive, Suite 100
Alpharetta, GA  30022
Telephone: (678) 242-5297
 Facsimile: (678) 802-2129
 Email: paul@sharman-law.com
 (*Pro Hac Application Pending)

## UNITED STATES DISTRICT COURT

## NOTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERA BOZZINI and ADRIAN GONZALES, individually and as a representative of a Putative Class of Participants and Beneficiaries, on behalf of the FERGUSON ENTERPRISES, LLC, 401(K) RETIREMENT SAVINGS PLAN f/k/a FERGUSON ENTERPRISES, INC, 401(K) RETIREMENT SAVINGS PLAN,<br><br>                Plaintiffs,<br><br>        v.<br><br>FERGUSON ENTERPRISES, LLC, f/k/a FERGUSON ENTERPRISES, INC.; RETIREMENT PLAN COMMITTEE OF FERGUSON ENTERPRISES, LLC 401(K) RETIREMENT SAVINGS PLAN; WILLIAM BRUNDAGE; RICHARD WINCKLER; CAPFINANCIAL PARTNERS, LLC, d/b/a CAPTRUST FINANCIAL ADVISORS; AND DOES 1-50,<br><br>                Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT** |

1

**<u>TABLE OF CONTENTS</u>**

2

INTRODUCTION ……………………………………………………………… 4

3

JURISDICTION AND VENUE…………………………………………….……7

4

THE PARTIES…………………………………………………………………......7

5

Plaintiffs………………………………………………………………..……………7

6

Defendants………………………………………………………………..…………8

7

STANDING………………………………...…………………………………..……………...9

8

DAMAGES ……………………………………………………………………..14

9

FUND MANAGER'S TRANSACTION COSTS DEFINED …………………………........14

10

DEFINED CONTRIBUTION 401(K) PLANS AND IMPACT OF EXCESSIVE FEES.. …18

11

THE ESTABLISHMENT OF THE TRUST ( the "PLAN") AND THE DOCUMENTS

12

RELIED UPON FOR THE COMPLAINT'S ALLEGATIONS …………………………21

13

FACTUAL ALLEGATIONS……………………………………………………….......22

14

      A.     EXCESSIVE FEES BEYOND NECESSARY AND REASONABLE WERE

15

           PAID TO PLAN ADVISOR...………………………..…......................36

16

      B.     SHARE CLASS VIOLATIONS …………………….…...........................37

17

      C.    FAILURE TO LOYALLY SELECT AND MONITOR TRUST INVESTMENTS –

18

           and - FAILURE TO PRUDENTLY INVESTIGATE, SELECT AND MONITOR

19

           TRUST INVESTMENTS……………………………………………..   40

20

      D.    DEFENDANTS' FLAWED DECISION-MAKING VIOLATED THEIR

21

           DUTY OF PRUDENCE AND LOYALTY……………………………   49

22

      E.    PAST PERFORMANCE IS NO GUARANTEE OF FUTURE RESULTS ……. 50

23

      F.    CAPTRUST/CAPFINANCIAL WAS PAID MILLIONS FROM WORKERS

24

           TO BABYSIT THE PLAN  ………………………………………………… 51

25

      G.    DEFENDANTS CONTINUALLY CHOSE AND KEPT LOWER YIELDING

26

           INVESTMENTS OVER IDENTICAL VERSIONS FOR MANY YEARS ….. 53

27

      H.    DEFENDANTS' ACTIONS ALSO AFFECTED FUTURE SALARY

28

           DEFERRAL CONTRIBUTIONS …………………………………………..   54

CLASS ACTION COMPLAINT

I.    REPEATED FAILURES TO ACT—IF THE MANAGERS CAN'T
BEAT THEM, BUY THEM ……………………………………………… 58

J.    THE TRUST LOST $45,248,526 FOR FAILURE TO PRUDENTLY
& LOYALLY SELECT AND MONITOR THE MAINSTAY WINSLOW
LARGE CAP GROWTH FUND ………………………………………… 59

K.    DEFENDANTS SHOULD MONITOR FOR EVIDENCE OF A LACK OF
"CARE" OR "SKILL" …………………………………………….. 61

L.    THE TRUST LOST OPPORTUNITY COSTS WERE $23,817,615 DUE TO
REPEATED FAILURES TO PRUDENTLY AND LOYALLY
SELECT/MONITOR THE MFS INTERNATIONAL INTRINSIC VALUE …. 71

M.    THE TRUST LOST $8,142,245 FOR FAILURE TO PRUDENTLY
SELECT/MONITOR THE GOLDMAN SACHS SMALL CAP
VALUE FUND …………………………………………………… 79

N.    CLASS ACTION ALLEGATIONS……………………………………..92

O.    FIRST CAUSE OF ACTION Breach of Fiduciary Duty of Prudence in
Violation of 29 U.S.C. §§ 1104(a)(1)(B) and 1105……………………………...95

P.    SECOND CAUSE OF ACTION Breach of Fiduciary Duty of Prudence in
Violation of 29 U.S.C. §§ 1104(a)(1)(A) and 1105…………………………… 100

Q.    THIRD CAUSE OF ACTION Failure to Monitor Other Plan Fiduciaries ……... 103

R.    FOURTH CAUSE OF ACTION Breach of Fiduciary Duty by Omission …….. 105

S.    FIFTH CAUSE OF ACTION Refusal to Supply Requested Information ……... 107

T.    PRAYER FOR RELIEF…………………………………………………… 112

Plaintiffs Tera Bozzini and Adrian Gonzales (collectively "Plaintiffs"), individually and as representatives of participants and beneficiaries of the FERGUSON ENTERPRISES, LLC, 401(K) RETIREMENT SAVINGS PLAN (the "PLAN"), bring this action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§1001 et seq., on behalf of the Plan against the Plan sponsor, FERGUSON ENTERPRISES, LLC f/k/a FERGUSON ENTERPRISES, INC. ( "FERG" or "FERGUSON"), the RETIREMENT PLAN COMMITTEE OF FERGUSON ENTERPRISES, LLC 401(K) RETIREMENT SAVINGS PLAN (the "COMMITTEE"), WILLIAM BRUNDAGE, in his capacity as IRS Form 5500 Signatory, RICHARD WINCKLER in his capacity as IRS Form 5500 Signatory, CAPFINANCIAL PARTNERS, LLC, d/b/a CAPTRUST FINANCIAL ADVISORS ("CapTrust" "CapFinancial" or "CapSecurities"), and DOES 1-50 (collectively the "Defendants"), for breaching their fiduciary duties in the management, operation and administration of the Plan.

## INTRODUCTION

1.     This action is brought by current and former participants / beneficiaries of the Plan to recover mismanaged 401k retirement funds.  The 401k plan has become the dominant source of retirement savings for most Americans.  Unlike defined-benefit pensions, which provide set payouts for life, 401(k) accounts rise and fall with financial markets, and therefore, the proliferation of 401(k) plans has exposed workers to big drops in the stock market and high fees from Wall Street money managers.  This action is filed to recover in excess of $77,208,386.00 in funds owed back to the Plan on behalf of participants / beneficiaries.  These retirement funds are significant to the welfare of the class.

2.     Federal law affords employers the privilege of enticing and retaining employees by setting up retirement and defined contribution plans pursuant to 26 U.S.C. §401 ("401(k) plans).  These plans provide employees investment options with tax benefits that inure to the benefits of the employees and, necessarily, to the

employers by increasing the "net" compensation their employees receive via tax deferment.  To enjoy this benefit, employers must follow the rules and standards proscribed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et. seq.* ("ERISA").

3.      Defendant FERG chose to accept the benefits of federal and state tax deferrals for their employees via a 401(k) plan, and the owners and executives of both have benefitted financially for years from the same tax benefits.  However, Defendants have not followed ERISA's standard of care.  This lawsuit is filed after careful consultation with experts and publicly available documents to return benefits taken from Plan participants by Defendants.

4.      The Plan at issue is a defined contribution retirement plan or a 401(k) plan, established on August 1, 1986, pursuant to 29 U.S.C. §1002(2)(A) and §1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan.  As of December 31, 2020, the Plan had 30,256 participants with account balances and $2,608,811,158.00 in assets.

5.      The current plan sponsor, since approximately 2019, is FERGUSON ENTERPRISES, LLC. The former plan sponsor was FERGUSON ENTERPRISES, INC.

6.      The plan fiduciaries include, but not limited to, Defendant Retirement Plan Committee of Ferguson Enterprises, LLC 401(K) Retirement Savings Plan, pursuant to the audit report by PBMares in 2020.  ERISA imposes strict fiduciary duties of prudence and loyalty on covered retirement plan fiduciaries. An ERISA fiduciary must discharge his responsibility "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. § 1104(a)(1). A plan fiduciary must act "solely in the interest of [plan] participants and beneficiaries." *Id*. A fiduciary's duties include "defraying reasonable expenses of administering the plan," 29 U.S.C. §

1104(a)(1)(A)(ii), and a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

7.     This case is another example of a large plan filling its 401(k) plan with expensive funds when identical, cheaper funds were available, and overpaying covered service providers, when the Plan had more than sufficient bargaining power to demand low-cost investment management services and well-performing investment funds. Specifically, FERG, the Committee, individual Defendants, and CapTrust, breached their fiduciary duties of prudence and loyalty to the Plan by:

   a.  Offering and maintaining higher cost share classes when identical lower cost class shares were available and could have been offered to participants;

   b.  Overpaying for covered service providers by paying variable direct compensation fees through the trust, which exceeded costs incurred by plans of similar size with similar services;

   c.  Imprudently choosing and retaining expensive mutual funds while less expensive index funds were available and could have been offered to participants;

   d.  other breaches of fiduciary duties.

8.     Plaintiffs were injured during the Relevant Time Period by the Defendants' lack of loyalty, imprudent skill and flawed processes in breach of their fiduciary duties. As a result of Defendants' actions, participants paid additional unnecessary operating expenses with no value to the participants and resulting in a loss of compounded returns.

9.     Plaintiffs, individually and as the representatives of a putative class consisting of the Plan's participants and beneficiaries, bring this action on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2) and (3) to enforce Defendants' liability under 29 U.S. C. §1109(a), to make good to the Plan all losses resulting from their breaches

of fiduciary duties, and to restore to the Plan any lost profits. In addition, Plaintiffs seek to reform the Plan to comply with ERISA and to prevent further breaches of fiduciary duties and grant other equitable and remedial relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

10.    Plaintiffs bring this action pursuant to 29 U.S.C. §1132(a), which provides that participants or beneficiaries in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, because it is a civil action arising under the laws of the United States, and exclusive jurisdiction under ERISA §502(e)(1), 29 U.S.C. §1132(e)(1).

12.    This Court has personal jurisdiction over Defendants because it transacts business in this District, resides in this District, and/or has significant contacts with this District, one or more Plaintiffs reside and were employed in this District, and because ERISA provides for nationwide service of process.

13.    Venue is proper in this District pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), because the Plan is administered in this District, many violations of ERISA took place in this District, and Defendants conduct business in this District. Venue is also proper in this District pursuant to 28 U.S.C. §1391(b) because Plaintiffs were employed in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## THE PARTIES

*Plaintiffs*

14.    Plaintiff Tera Bozzini ("Bozzini") resides in Contra Costa County, State of California, and was an employee of Defendant Ferguson, located in this District of California. Bozzini was a participant in the Plan under 29 U.S.C. § 1002(7) during

the Relevant Time Period and upon information and belief invested in the some or all of the funds which are at issue in this action. All participants with an account balance experienced harm by way of reductions of their accounts' value each quarter due to unnecessary and excessive trust payments (alienated because of FERG) to CapTrust.

15.     Plaintiff Adrian Gonzales ("Gonzales") resides in San Diego, California, and was an employee of Defendant Ferguson in San Diego, California. Gonzales was a participant in the Plan under 29 U.S.C. § 1002(7) during the Relevant Time Period and upon information and belief invested in some or all of the funds which are at issue in this action.

16.     Plaintiffs have standing under 29 U.S.C. §1132(a)(2) to bring this action on behalf of the Plan because Defendants' reckless and flawed actions caused actual harm to an ERISA plan in which the Plaintiffs participate. Plaintiffs suffered an injury in fact by investing in the under-performing and more expensive mutual fund shares when more prudent options were readily available; by paying excessive fees to covered service providers and investing in a menu of options with high risk and lower yield and under performance versus a meaningful benchmark. Defendants are liable to the Plan to make good the Plan's losses under 29 U.S.C. § 1109(a).

***Defendants***

17.     Defendant FERGUSON ENTERPRISES, LLC ("FERG") is the current sponsor and administrator of the Plan (as of 2019) and maintains its principal place of business at 12500 Jefferson Ave, Newport News, VA 23602.  This entity is registered with the State of California and conducts business in the State of California.  The former sponsor and administrator of the Plan was FERGUSON ENTERPRISES, INC. Upon information and belief, FERGUSON ENTERPRISES, LLC assumed all rights, property, debts and liabilities of FERGUSON ENTERPRISES, INC upon merger and transfer.

18.     The Company Defendants, acting through its Board of the Directors of appointed the Retirement Plan Committee of the Ferguson Enterprises LLC 401(k)

1    Retirement Savings Plan to control and manage the operation and the administration

2    of the Plan.  Accordingly, FERGUSON had a concomitant fiduciary duty to monitor

3    and supervise those appointees.

4         19.    Defendant "DOES" or the names of the individuals on the Board of

5    Directors and PLAN Committee during the Relevant Time Period are unknown at

6    this time and are named as "John Does" until the "DOES" are known and can be

7    named through amendment to this Complaint.

8         20.    Upon information and belief, Defendants WILLIAM BRUNDAGE in

9    his capacity as IRS Form 5500 Signatory, RICHARD WINCKLER in his capacity as

10   IRS Form 5500 Signatory, were/are members of the 401(k) PLAN Committee and in

11   their capacity as officers of the corporation and/or committee members, had

12   discretionary authority to control the operation, management, and administration of

13   the Plan.

14        21.    The Committee contracted with CAPTRUST ("CAPTRUST"), to serve

15   as the Plan's Financial Advisor.

16        22.    FERGUSON, and its Board of Directors, members of the PLAN

17   Committee, the Directors and Officers, signatories to the IRS Form 5500, and

18   CAPTRUST are fiduciaries to the Plan under 29 U.S.C. §1002(21)(A)(i) and (iii)

19   because they have sole authority to amend or freeze or terminate, in whole or part,

20   the Plan or the trust, and have discretionary authority to control the operation,

21   management and administration of the Plan, including the selection and

22   compensation of the providers of administrative services to the Plan and the

23   selection, monitoring, and removal of the investment options made available to

24   participants for the investment of their contributions and provision of their retirement

25   income.

26                                  **STANDING**

27        23.    ERISA permits an individual participant in a retirement savings plan to

28   initiate litigation on behalf of the plan and other participants. 29 U.S.C. § 1132(a)(2)

1   (allowing for "a participant" to bring a civil action "for appropriate relief" under
2   ERISA); *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134 , 142 n.9, 105 S.
3   Ct. 3085 , 87 L. Ed. 2d 96 (1985) (explaining the purpose of the ERISA enforcement
4   statute and describing "Congress' intent that actions for breach of fiduciary duty be
5   brought in a representative capacity on behalf of the plan as a whole"). Generally, a
6   plaintiff has standing to bring an ERISA claim where the plaintiff alleges a causal
7   connection between defendants' actions and actual harm to an ERISA Plan in which
8   the plaintiff participates. *See LaRue v. DeWolff, Boberg & Associates, Inc.*, 552 U.S.
9   248 , 256 , 128 S. Ct. 1020 , 169 L. Ed. 2d 847 (2008) (recognizing that § 1132(a)(2)
10  "does not provide a remedy for individual injuries distinct from plan injuries").

11       24.    A plaintiff may seek relief under ERISA "that sweeps beyond his own
12  injury." Plaintiffs, as class representatives, were affected by the same fiduciary
13  decision making and all the participants'/beneficiaries' accounts have been harmed
14  similarly in this case. The same trust that each of the Plan participants' beneficial
15  interests represents and serves as legal owner for, had its assets sold and the resulting
16  cash removed and paid to CapTrust/CapFinancial. This was done repeatedly under
17  Ferguson's written authorization by way of (1) CapTrust/CapFinancial's flawed
18  services agreement and (2) the Prudential Retirement Insurance and Annuity
19  Company's plan documents executed by Ferguson Enterprises LLC.

20       25.    Trust assets or corpus were removed from every one of the
21  participants'/beneficiaries' accounts (based on Ferguson's certified statements to the
22  IRS/DOL).

23       26.    Claims under ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a)
24  and 1132(a)(2), are brought in a representative capacity on behalf of the Plan. As
25  explained in detail below, the Plan suffered millions of dollars in losses traceable to
26  the Defendants' fiduciary breaches and remained exposed to harm and continued
27  future losses. Those injuries may be redressed by a judgment of this court in favor of
28  the Plaintiffs.

27.    Each of the Plaintiffs also has constitutional standing under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) because each Plaintiff personally suffered concrete and particularized injuries in many ways, including but not limited to the following:

- The named Plaintiffs and all Plan participants suffered financial harm as a result of the imprudent or excessive fee options in the Plan because Plan Fiduciaries' inclusion of those options deprived participants of the opportunity to grow their retirement savings by investing in prudent options with reasonable fees, which would have been available in the Plan if Plan Fiduciaries had satisfied their fiduciary obligations. All participants continue to be harmed by the ongoing inclusion of these imprudent and excessive cost options and payment of excessive covered service providers' fees.

- The named Plaintiffs and all participants in the Plans were financially harmed by the improper inclusion of imprudent and excessively high-fee investment products in the Plan.

- The named Plaintiffs and all participants in the Plans were financially harmed by illicit kickbacks and plan-wide flawed processes and reckless decision-making when the Defendants selected/retained imprudent investment options.

- The named Plaintiffs and all participants in the Plans were financially harmed by Plan Fiduciaries' affirmative misrepresentations that their investments were secure, that Defendants were competent to provide services to them and the Plan, and that participants were not being unreasonably and unnecessarily charged for fees.

28.    The Ferguson Enterprises LLC 401(K) Retirement Savings Plan allows participants/beneficiaries to change their investments every business day. Historical non-private quarterly "allocation reporting" grand totals pages (financial statements; not provided by Ferguson Enterprises LLC upon written request) would help discern

precisely where participants'/beneficiaries' accounts were "allocated" in prior years (what specific investments they held over specific time periods).

29.     Participants/beneficiaries can also allocate their "old" and "new" money (new biweekly salary contributions) to different mutual funds. That means (1) old balances and/or (2) current savings' elections of investments can be changed daily and own different investments over the Class Period. Plaintiffs assert that at some point in the limitations period, they invested in one or more of the investments that paid hidden, unreasonable, and unnecessary portfolio manager's compensation or revenue sharing. Plan Fiduciaries were responsible for costly mutual funds laden with "return-reducing portfolio manager's compensation" that never had a chance of "enhancing returns" and thus rendered them imprudent investments.

30.     Each of the Plaintiffs and participants lost significant retirement savings through their limited set of investments offered via these common breaching fiduciaries' imprudent fund selections/retentions. None of which would have been incurred had Defendants discharged their fiduciary duties to the Plan. Thus, the Plaintiffs have Article III standing to bring these claims.

31.     Section 227 of the Restatement 3rd of Trusts (Prudent Investor Rule), comment h, page 30, echoes the facts and circumstances here. Plaintiffs assert, based on specifics certified by Ferguson Enterprises LLC that it is certainly plausible both of the Defendants' conduct was thoughtless and negligent. Their combined flawed selection and monitoring processes charged the trust and participants'/beneficiaries' accounts daily for unnecessary and detrimental "portfolio manager" compensation.

32.     Restatement (Third) of Trusts rules regarding these types of investments with extra fees "entail investigation and analysis expenses and tend to increase general transaction costs, including capital gains taxation. Additional risks also may result from the difficult judgments that may be involved and from the possible acceptance of a relatively high degree of diversifiable risk. These considerations are relevant to the trustee initially in deciding whether, to what extent, and in what

manner to undertake an active investment strategy and then in the process of implementing any such decisions. If the extra costs and risks of an investment program are substantial, these added costs and risks must be justified by realistically evaluated return expectations."

33.     Defendants ignored higher dividend/interest yielding investments repeatedly. John P. Freeman, "The Mutual Fund Distribution Expense Mess," June 28, 2007, The Journal of Corporation Law, states: "Trust investment law in the prior Restatements was founded on the classic dictum of Harvard College v. Amory, admonishing trustees in general and flexible terms "to observe how men of prudence, discretion and intelligence manage their own affairs, <u>not in regard to speculation</u>, but in regard to the permanent disposition of their  funds, considering the <u>probable income</u>, as well as the <u>probable safety of the capital to be invested</u>." Restatement Second of Trusts ("Restatement Second") section 227.

34.     Thus, trustees are: "to make such investments and only such investments as a prudent man would make of his own property having in view the preservation of the estate <u>and the amount and regularity of the income</u> to be derived." Language similar to that of Restatement Second is now found in statutes and judicial opinions in most American jurisdictions."

35.     Plaintiffs are filing under ERISA Section 502(a)(2) (incorporating § 409(a)), which states that fiduciaries who are found liable for a breach of their fiduciary duties must make good to the plan for any losses resulting from that breach. 29 U.S.C. §§ 1109(a), 1132(a)(2). Therefore, although the Secretary of Labor, participants, beneficiaries, and fiduciaries all have standing to bring a civil action against an ERISA fiduciary, any resulting awards are paid to the plan as a whole, rather than to the party who brings the suit.

**DAMAGES**

36.    A cardinal rule is that uncertainties in fixing damages must be resolved against the breaching fiduciary. That rule long predates ERISA and, for that matter, the founding of the United States of America.

37.    To restate for emphasis, but for the Defendants' irresponsible and imprudent investment strategy that "involves extra management, tax, and transaction costs or a departure from an efficiently diversified portfolio," the Defendants' "strategy should be justifiable in terms of…a realistically evaluated prospect of enhanced return [from the strategy]. (Edward C. Halbach, Jr., the Reporter for the Restatement and Walter Perry Johnson professor of law emeritus at the University of California law school, in "Trust Investment Law in the Third Restatement," Real Property, Probate and Trust Journal, Volume 27, Fall 1992, pages 407-65; see Section 227 of the Restatement 3rd of Trusts (Prudent Investor Rule), comment f, page 25).

38.    Portfolio managers incur transaction costs for buying and selling stocks. Because they sell 100% of their previously purchased stocks every 1.5 years, in the aggregate, these managers' sell/buy orders delete the value of the investors' accounts. Transaction costs result from the purchase and sale of investments such as stocks and bonds by mutual fund managers. These costs are not included in a fund's expense ratio and are often hidden from participants.

**FUND MANAGERS' TRANSACTION COSTS DEFINED**

39.    The Securities and Exchange Commission has identified four major types of transaction costs that fund managers incur: (1) Commissions: Charges that a broker collects to act as agent for a customer in the process of executing and clearing a trade. (2) Spread Costs: Costs incurred when a fund buys a security from a dealer at the "asked" price (slightly above current value) or sells a security to a dealer at the "bid" prices (slightly below market value). The difference between the bid price and the asked price is known as the "spread." (3) Market Impact Costs: Costs incurred

1  when the price of a security changes as a result of the managers effort to purchase or

2  sell the security. (4) Opportunity Costs: costs related to managers' missed or

3  incomplete trades.

4    40.    Of these four types of transaction costs, only commissions are directly

5  measured and disclosed by investment funds subject to the Investment Company Act

6  of 1940. The remaining three costs are difficult to measure and remain undisclosed

7  to investors and participants/beneficiaries.

8            **THE MAGNITUDE OF MANAGERS' TRANSACTION COSTS**

9    41.    Plaintiffs demonstrate the transaction cost in the first fund assessment

10 (Mainstay Winslow Large Cap Growth). In published documents, regulators and

11 fund management companies recognize that fund managers' transaction costs are

12 high and relevant to investors, and most estimate that these costs can be equal to or

13 larger than a fund's expense ratio. In fact, Plexus Group Inc., a leader in the

14 Transaction Cost Analysis (TCA) industry, calls transactions cost "one of the largest

15 erosions of investment value that investors face." The Securities and Exchange

16 Commission (SEC) notes that transaction costs "can greatly exceed the explicit

17 costs."

18   42.    There have been numerous academic studies that have aimed to quantify

19 explicit and implicit transaction costs within investment alternatives. These studies

20 all indicate that transaction costs are on the order of 1-2% of the net assets of a fund

21 and as such, are often as large or larger than fund managers' fees and other expenses.

22 While there is a consensus that transaction costs are large and relevant to retirement

23 outcomes, many ERISA fiduciaries have not implemented best practices when it

24 comes to calculating how transaction costs affect their participants and incorporating

25 these costs into determining the reasonableness of investment fees.

26   43.    The Defendants repeatedly selected/retained mutual funds with (1) high

27 management fees and (2) high transaction costs using other peoples' money (the Plan

28 and Trust's money). The Defendants gambled with the Plan participants' money

against the "potent evidence that the application of expertise, investigation, and diligence in efforts to "beat the market" would fail. Ferguson and CapTrust/CapFinancial have done this since at least January 1, 2009 (based on the Plan sponsor's certified government annual reports and audited financials at www.efast.dol.gov).

44.     Reporter's General Note on Section 227 of the Restatement 3rd of Trusts (Prudent Investor Rule), page 75:

> "Economic evidence shows that, from a typical investment perspective, the major capital markets of this country are highly efficient, in the sense that available information is rapidly digested and reflected in the market prices of securities. As a result, fiduciaries and other investors are confronted with potent evidence that the application of expertise, investigation, and diligence in efforts to "beat the market" in these publicly traded securities ordinarily promises little or no payoff, or even a negative payoff after taking account of research and transaction costs. Empirical research supporting the theory of efficient markets reveals that in such markets skilled professionals have rarely been able to identify underpriced securities (that is, to outguess the market with respect to future return) with any regularity."

45.     Warnings about the need to closely monitor mutual funds' portfolio manager's risks and returns (versus benchmarks) have been published since 1960 in empirical research by (1) Merton Miller, co-recipient of the 1990 Nobel Prize; (2) Paul Samuelson, the second (and first American) recipient of the Nobel Prize in economic sciences (1970); (3) William F. Sharpe, 1990 Nobel Laureate; and (4) Eugene F. Fama, 2013 Nobel laureate in economic sciences.

46.     Investigation and monitoring by the Defendants' was critical under Restatement (Third) of Trusts also because "skilled professionals have rarely been

able to identify underpriced securities (that is, to outguess the market with respect to future return) with any regularity." – Reporter's General Note on Section 227 of the Restatement 3rd of Trusts (Prudent Investor Rule), page 75.

47.   Restatement 3d of Trusts, § 90 (2012) states in devising and implementing strategies for the investment and management of trust assets, responsible plan fiduciaries had and have a duty to minimize costs. Trustees/fiduciaries have a duty to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." *Id.*

48.   Adherence to this duty required the regular performance of an "adequate investigation" of existing investments in the Plan to determine whether any of the Plan's investments were "improvident" or if there was a "superior alternative investment" to any of the Plan's holdings. *Id.*

49.   A fiduciary can be found to have breached the duty to investigate upon a showing that "adequate investigation would have revealed that the investment at issue was improvident." *Rinehart v. Lehman Bros. Holding Inc*., 817 F.3d 56, 67-68 (2d Cir. 2016) (quoting *In re Citigroup ERISA Litigation*, 662 F.3d 128, 138 (2d Cir. 2011)).

50.   Failing to act "solely and exclusively" for the benefit of participants by selecting and retaining investments in the Plan, NOT because they merited inclusion after a thorough investigation, but because they would generate more revenue for the covered service providers, and therefore Defendants would not receive an invoice (or a significantly reduced one) for these services, constitutes a breach of the duty to minimize costs and failure to conduct an adequate investigation.

51.   Ferguson may rely on experts like Captrust/CapFinancial to assist with investigation and evaluation, but Ferguson must ultimately rely on their own independent judgments. *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 300-01 (2000).

52.   A trustee's failure to monitor the investment manager's ongoing

1  behavior once retained is imprudent. *Whitfield v. Cohen*, 682 F.Supp.188, 195
2  (S.D.N.Y. 1988)

3  **DEFENDANTS' FIDUCIARY OBLIGATIONS**

4  53.   ERISA and common law trusts imposes strict fiduciary duties of loyalty
5  and prudence upon Defendants as Plan fiduciaries. 29 U.S.C. §1104(a)(1)(A)
6  requires a plan fiduciary to "discharge his duties with respect to a plan solely in the
7  interest of the participants and beneficiaries" for the "exclusive purpose of (i)
8  providing benefits to participants and their beneficiaries; and (ii) defraying
9  reasonable expenses of administering the plan."

10  54.   29 U.S.C. §1104(a)(1)(B) and common law requires a plan fiduciary to
11  discharge his obligations "with the care, skill, prudence, and diligence under the
12  circumstances then prevailing that a prudent man acting in a like capacity and
13  familiar with such matters would use in the conduct of an enterprise of like character
14  and with like aims."

15  55.   ERISA and common law further imposes an independent obligation
16  upon Defendants as Plan fiduciaries to diversify the investment options of the Plan.
17  U.S. Code §1104(a)(1)(C) requires a plan fiduciary to "discharge his duties with
18  respect to a plan solely in the interest of the participants and beneficiaries… by
19  diversifying the investments of the plan so as to minimize the risk of large losses…"

20  56.   A fiduciary's duties include a continuing duty to monitor investments
21  and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).  29
22  U.S.C. §1132(a)(2) and common law authorizes a plan participant to bring a civil
23  action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109.

24  57.   Section 1109(a) and common law provide "[a]ny person who is a
25  fiduciary with respect to a plan who breaches any of the responsibilities, obligations,
26  or duties imposed upon fiduciaries by this subchapter shall be personally liable to
27  make good to such plan any losses to the plan resulting from each such breach."

28

58.    "One appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of the trust." Restatement (Second) of Trusts § 205(c) (1959); see *Eaves v. Penn*, 587 F.2d 453, 463 (1978).

59.    The Defendants' 401(k) plan may be disqualified from favorable tax treatment for operational failures, which occur if a plan fails to operate in accordance with statutory requirements or if it fails to follow the terms of the plan document.  26 U.S.C.A. §§ 401(a), 501(a). The Defendants have the burden of proof when challenging the Commissioner of Internal Revenue's determination that a defined contribution plan is disqualified from favorable tax treatment.   26 U.S.C.A. §§ 401(a), 501(a).

60.    Defendants' repeated depletion and allocation of trust asset prices (the reduction of daily gross asset values (GAVs) by the funds' expenses resulting in net asset value prices/(NAVs) which is what posts each evening on the record keepers website for participants) and excessive compensation to covered service providers (CSP) show a repeated negligence for tax laws and raises questions beyond the trust's losses as to whether they were even "qualified" to serve as fiduciaries. Their own plan's "birth certificate" or IRS Determination Letter states that tax-exemption "…will depend on its effect in operation…1.401-1(b)(3))."

## DEFINED CONTRIBUTION 401(K) PLANS AND IMPACT OF EXCESSIVE FEES

61.    In a defined contribution plan, participants' retirement benefits are limited to the value of their own individual accounts, which is determined solely by employee and employer contributions plus the amount gained through investment in the options made available in the plan less expenses. See 29 U.S.C. §1002(34). Typically, plan participants direct the investment of their accounts, choosing from the lineup of plan investment options chosen by the plan sponsor.

62.     Because retirement savings in defined contribution plans grow and compound over the course of the employee participants' careers, poor investment performance and excessive fees can dramatically reduce the amount of benefits available when the participant is ready to retire. Over time, even small differences in fees and performance compound and can result in vast differences in the amount of savings available at retirement. As the Supreme Court explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 135 S. Ct. at 1825. Thus, violations and damages continue over time.

63.     The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013).[1]

64.     "As a simple example, if a beneficiary invested $10,000, the investment grew at a rate of 7% a year for 40 years, and the fund charged 1% in fees each year, at the end of the 40-year period the beneficiary's investment would be worth $100,175. If the fees were raised to 1.18%, or 1.4%, the value of the investment at the end of the 40-year period would decrease to $93,142 and $85,198, respectively. Beneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also "lost investment opportunity"; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time. A trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Tibble v. Edison International*, 843 F.3d 1187, 1198 (9th Cir. 2016)

---

[1] https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resourcecenter/publications/401kFeesEmployee.pdf

CLASS ACTION COMPLAINT

65.    The marketplace for retirement plan services is established and competitive.  In 2020, the Plan had 30,256 participants with account balances and $2,608,811,158.00 in assets.  As a result, the Plan has tremendous bargaining power to demand low-cost investment management services and well-performing, low-cost investment funds.  It also had the power to ask for a waiver of many of the fees charged by CSP.

## THE ESTABLISHMENT OF THE TRUST ( the "PLAN") AND THE DOCUMENTS RELIED UPON FOR THE COMPLAINT'S ALLEGATIONS

66.    Each year since the formation of the plan/trust in August 1986, the Defendants' Annual Returns/Reports of Employee Benefit Plan to the U.S. Departments of Treasury and Labor ("Forms 5500" which are "Open to Public Inspection" and downloaded from www.efast.dol.gov) indicated on page 2 that their Plan and Trust's "Funding Arrangement" line 9a(3) was "Trust" and the Plan and Trust's "Benefit Arrangement" line 9b(3) was also via a "Trust."

67.    This trust funding/benefit is echoed by Justice Sotomayer's comments in *Thole v. US Bank* 140 S. Ct. 1615, 1625 (2020) [emphasis added]:

> **"ERISA expressly required the creation of a trust in which petitioners are the beneficiaries: "[A]ll assets" of the plan "shall be held in trust" for petitioners' "exclusive" benefit. 29 U. S. C. §§1103(a), (c)(1); see also §1104(a)(1). These requirements exist regardless whether the employer establishes a defined-benefit or defined-contribution plan.  §1101(a).  Similarly, the Plan Document governing petitioners' defined-benefit plan states that, at "'all times,'" all plan  assets "'shall'" be in a "'trust fund'" managed for the participants' and beneficiaries' "'exclusive benefit.'"  App. 60– 61. ***This arrangement confers on the "participants [and] beneficiaries" of a defined-benefit plan an equitable stake, or a "common interest," in "the financial integrity of the plan." *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U. S. 134, 142, n. 9 (1985)."**

68.    The Defendants failed to provide any Adoption Agreement or Plan governing documents in response to written requests made on behalf of the employees representing the class, so this information will be requested again in discovery.

69.     The underlying allegations in this Complaint are based on the Master Plan Document as well as the Defendants' past Forms 5500 filed with U.S. Departments of Treasury and Labor found at www.efast.dol.gov, and mutual fund prospectuses found at https://www.sec.gov/edgar/searchedgar.

70.     The Form 5500 Series is part of ERISA's overall reporting and disclosure framework, which is intended to assure that employee benefit plans are operated and managed in accordance with certain prescribed standards and that participants and beneficiaries, as well as regulators, are provided or have access to sufficient information to protect the rights and benefits of participants and beneficiaries under employee benefit plans."

## FACTUAL ALLEGATIONS

71.     According to the plan sponsor's government reporting, the responsible plan fiduciaries (RPF) selected/retained the following investments (open-end mutual funds and separate accounts) that Plaintiffs allege were both disloyally and imprudently selected/retained: American Funds Balanced Fund;  American Funds EuroPacific Growth Fund;  Goldman Sachs Small Cap Value Fund;  JP Morgan Mid Cap Value Fund; Mainstay (Winslow) Large Cap Growth Fund; MassMutual Select Mid Cap Growth Fund; Metropolitan West Funds Total Return Fund; Metropolitan West Total Return Fund; MFS International Value Fund; Mid Cap Growth Artisan Partners Account ; Robeco Large Cap Value Account ; Prudential Retirement Insurance & Annuity Co. Small Cap Value Fund; American Funds Balanced Fund; American Funds EuroPacific Growth Fund; Goldman Sachs Small Cap Value; JP Morgan Mid Cap Value Fund; Mainstay Large Cap Growth Fund; MassMutual Select Mid Cap Growth Fund; Metropolitan West Funds Total Return Fund; MFS International Value Fund; Robeco Large Cap Value Account; Small Cap Growth Fund Times Square Account.

72.     Similar to the "/" (slash) between the words "Return" and "Report" in the Treasury and Labor Form 5500 title "Annual Return/Report of Employee Benefit

1    Plan" a slash is used in this complaint by Plaintiffs to note that there is a connection

2    between the two words such as the phrase "selected/retained."

3        73.    Ferguson Enterprises, LLC (plan sponsor and named fiduciary) and its

4    delegates   (the   board,   the   committees,   the   staff,   etc.),   as   well   as

5    CapTrust/CapFinancial   according   to   Ferguson's   returns/reports   obtained   from

6    www.efast.dol.gov), both of the "Defendants," violated their "duty of prudence * * *

7    to  avoid  incurring  unnecessary  expenses,  broadly  defined,  when  administering  a

8    trust." Discussed  in  more  detail  later,  the  Restatement  (Third)  of  Trusts  devoted

9    considerable attention to this duty, clarifying and emphasizing that "cost-conscious

10   management   is   fundamental   to   prudence   in   the   investment   function."

11   (RESTATEMENT (THIRD) OF TRUSTS § 90 cmt. b. See also RESTATEMENT

12   (THIRD)  OF  TRUSTS,  PRUDENT  INVESTOR  RULE  §  227(c)(3)  (AM.  LAW

13   INST. 1992) ("[T]he trustee must incur only costs that are reasonable in amount and

14   appropriate to the investment responsibilities of the trusteeship.").

15       74.    Defendants  acted  imprudently  and  failed  to  act  by  predominantly

16   selecting/retaining  funds  with  high  portfolio  manager's  compensation  and  not

17   "justified by a cost-benefit analysis that incorporates risks and the entire portfolio

18   unless  they  realistically  can  be  expected  to  produce  returns  in  excess  of  their

19   necessarily higher fees or provide a diversification benefit not otherwise available."

20   (RESTATEMENT (THIRD) OF TRUSTS pt. 6, ch. 17, topic 3 intro. note; see also

21   RESTATEMENT (THIRD) OF TRUSTS§ 227 cmt. h (explaining how any choice to

22   engage  in  active  management  must  be  justified  by  a  cost-benefit  analysis  that

23   incorporates risks and the entire portfolio) unless they realistically can be expected to

24   produce returns in excess of their necessarily higher fees or provide a diversification

25   benefit not otherwise available).

26       75.    The mutual fund's "return-reducing portfolio manager's compensation"

27   significantly reduces fund prices daily and affects all future returns to the trust (from

28   reduced recurring dividends/interest). These reductions to the values of the trust's

assets begin accruing when a fiduciary initially selects a mutual fund to be added to the participants'/beneficiaries' limited fund menu.

76.     As the figure below indicates (the largest fund at the beginning of the limitations period), prices of mutual funds are reduced by a portfolio manager's compensation the day such a fund is added. That means the trust corpus is eroded right away (and ultimately the participants'/beneficiaries' accounts (are deducted daily at 4 pm from the GAV (fund's gross asset value) price to arrive at the allocated NAV (net-asset value) of each mutual fund reported at www.sec.gov/edgar)).

77.     From the www.SEC.gov site: Management fees are fees that are paid out of fund assets to the fund's investment adviser (or its affiliates) for managing the fund's investment portfolio. At this stage of litigation, Plaintiffs are ignoring other fund fees because (1) they are mathematically much less than the portfolio manager's compensation portion and (2) revenue sharing like SEC Rule 12b-1 fees, sub-transfer agency fees, etc. are unknown as Ferguson failed to clearly disclose their mutual fund's share classes on their past plan returns' financial statements to the U.S. Departments of Treasury and Labor.

78.     Defendants often respond to complaints like this one that these fund expenses such as (1) SEC Rule 12b-1 fees and (2) subtransfer agency fees were and are being used to benefit the participants'/beneficiaries' accounts in lieu of directly billing each Plan participant in a more transparent manner (via a transaction amount and description a Plan participants can see on each quarterly statement).

79.     There is a huge (1) variance in compensation (some charge 1% or 20% of expected returns and some charge 0.1%) and (2) also in receipt of credits from funds like in this Plan and Trust. The credit for revenue sharing is not uniform and it can be discriminatory against non-highly compensated and less sophisticated Plan participants. Nonetheless, the Defendants will both argue it is not a per se ERISA violation if used properly to offset necessary recordkeeping costs.

| Net-Asset Value | Name |
|---|---|
| 9.18 | MainStay Large Cap Growth A |
| 10.24 | MainStay Large Cap Growth R6 |

80. The figure above shows that revenue sharing affects the NAV or price of a trust asset every day and impacts terminal wealth. Perhaps this disparity degrades the trust or impedes retirement wealth for all investors in the "A" share class above. It can also mean the financial statement reporting to the U.S. Departments of Treasury and Labor was wrong and misleading for all terminated workers and current workers over their working life.

81. Defendants acted recklessly by using trust corpus to buy/retain imprudent funds laden with costly managers' expenses (detrimental to the trust and participants'/beneficiaries' accounts). Wasteful portfolio manager's compensation was taken from the trust's corpus daily for plan investments detailed here: (1) Mainstay Winslow Large Cap Growth; (2) MFS International Intrinsic Value fund; (3) Goldman Sachs Small Cap Value.

82. Because indirect compensation to covered service providers (like Prudential) from revenue sharing is less transparent, these intermediaries may be able to overcharge some of their customers, as discussed by Inderst and Ottaviani (2012) and Stoughton, Wu, and Zechner (2011). (Inderst, R. and M. Ottaviani (2012). How (not) to pay for advice: A framework for consumer protection. Journal of Financial Economics 105, 393–411).

83. "Consistent with this, a 2011 study on 401(k) plans by the Government Accountability Office (GAO) suggests that due to sponsors' and participants' lack of understanding of indirect fees, recordkeepers may not reduce direct fees sufficiently. If direct and indirect payments do not offset each other, recordkeepers may collect more revenue in the presence of indirect compensation and participants may pay higher fees in these plans. Additionally, if recordkeepers are better off when they receive compensation indirectly, they may influence 401(k) sponsors to include and subsequently keep funds on the menu that pay a higher rebate, even when these

CLASS ACTION COMPLAINT

1    funds are dominated by peer options. Therefore revenue sharing may also impose

2    costs on participants through its effect on the menu design." *Id*.

3    ### THE DUTY OF PRUDENT DELEGATION

4    84.    Hiring an outside advisor is not a magic wand that satisfies a fiduciary's

5    duties to the Plan and Plan participants.  While a fiduciary or trustee is not required

6    personally to perform all aspects of the investment function, it must not abdicate its

7    responsibilities and must not delegate unreasonably.  See Restatement (Third) of

8    Trusts cmt. j.

9    85.    As in other matters of delegation, the trustee must not abuse the

10   discretion to delegate.......  In deciding what as well as whether to delegate and in

11   selecting, instructing, and supervising or monitoring agents, the trustee has a duty to

12   the beneficiaries to act as a prudent investor would act under the circumstances. The

13   trustee must exercise care, skill, and caution in establishing the scope and specific

14   terms of any delegation, and must keep reasonably informed in order to monitor the

15   execution of investment decisions or plans.

16   86.    Based on information and belief, Ferguson's chosen/retained fiduciary

17   advisory firm CapTrust/CapFinancial/CapSecurities violated the U.S. Securities and

18   Exchange Commission (SEC) Division of Enforcement rules (Share Class Selection

19   Disclosure Initiative). This initiative warns investors (like trustees/fiduciaries at

20   Ferguson) of behavior to select/keep identical but more expensive share classes of

21   mutual funds.

22   87.    Defendants utilized an imprudent process (1) in their selections and

23   retentions (monitoring) of the Plan's investments and (2) covered service providers.

24   88.    Prudential, like most recordkeeping firms, typically only accepts a

25   board/corporate resolution to add/remove investments from the plan's named

26   fiduciary (Ferguson).

27

28

### CLASS ACTION COMPLAINT

89.     Based on information and belief, CapTrust/CapFinancial acted in a licensed SEC-advisory role for Ferguson (under ERISA's functional fiduciary rules and Restatement of Agency rules).

90.     Experience from Plaintiffs' experts shows that (without contrary advice from other licensed firms), advice recipients will, more often than not, accept intermediaries like CapTrust/CapFinancial's recommendations (since they are licensed and have access to investment software) and, in effect Ferguson Enterprises, LLC will then direct the custodian to move the trust corpus to the proposed fund (changing the employees' 401k menu to the fund CapTrust/CapFinancial has recommended).

91.     However, CapTrust/CapFinancial's functional fiduciary status (by implicit "control" of assets from one fund to another) can be later determined by meeting minutes and resolutions that Ferguson refused to provide to Plaintiffs upon request.

92.     Based on the CapTrust/CapFinancial template "services agreement/contract" Plaintiffs were able to obtain (Ferguson denied their request) CapTrust/CapFinancial was in the position and performed a primary role, using their SEC-license (Series 65) to (1) review and research investments and make periodic recommendations to Ferguson's team/committee; then Ferguson (2) accepted CapTrust/CapFinancial's recommendation and then would subsequently signed written authorization for Prudential's custodian to add or remove a trust investment.

93.     Ferguson and CapTrust/CapFinancial may argue that this complaint groups the two main defendants without distinguishing their conduct. The plaintiffs requested information months ago from Ferguson Enterprises LLC regarding meeting minutes, monitoring reporting, Investment Policy Statement (IPS), and covered service providers' services agreements, but the Plaintiffs' requests were ignored.

94.     Plaintiffs find CapTrust/CapFinancial's typical compensation to serve Ferguson Enterprises LLC 401(K) Retirement Savings Plan was $520,798 during the limitations period. This amount is about $490,000 greater than the average CapTrust/CapFinancial annual compensation from every other client (using the same services agreement). CapTrust/CapFinancial's annual half-a-million-dollar compensation was deducted or alienated (paid to them) from the plan's "investment sells" which raised these funds . These actions were done in violation of the Ferguson plan document's "Nonalienation of Benefits . . ." section

95.     For example, on August 16, 2018, the financial officer "William Brundage" certified to the U.S. Departments of Treasury and Labor the following: "Enter direct compensation paid by the plan. $560,935."

96.     Mr. Brundage also certified an answer of "NO" on that same day to the government's question on line 4d on Schedule H (Form 5500), plan year 2017 ("Were there any nonexempt transactions with any party-in-interest?").

97.     Ferguson's staff members William Brundage, F. Thomas Carmine Jr, and Richard Winckler, all signed/certified this fact with a response of "NO" when completed/filing their plan's Forms 5500 every year for over a decade (since January 1, 2009) to the U.S. Departments of Treasury and Labor ("Were there any nonexempt transactions with any party-in-interest?").

98.     These plan Fiduciaries were authorizing and alienating the trust's assets to transfer over $4M to CapTrust/CapFinancial--even though CapTrust/CapFinancial's services were detrimental and unnecessary to the operation of the plan over these periods.

99.     The Fee Benchmarker® (Advisor Fee Almanac, 6th Edition, 2017) estimates a "reasonable" payment for 100 hours of service each year under the same services agreement (same services) would be at a maximum rate of $300 per hour ($30,000/yr).

100.   The U.S. Department of Labor, the Ferguson master plan document, and ERISA state that the plan sponsor/named fiduciary, Ferguson Enterprises LLC, is ultimately responsible for prudently hiring covered service providers like CapTrust/CapFinancial. Plaintiffs noted from CapTrust/CapFinancial's filings at (1) SEC.gov and (2) from other services agreements (such as Prudential's for other clients) that massive pay deductions to CapTrust/CapFinancial require a chief executive or financial officer at Ferguson to approve.

101.   Ferguson and CapTrust/CapFinancial made one fund change to the 401k menu during the limitations period.

102.   These compensation/fees largely came directly from the Plan and Trust's corpus and participants'/beneficiaries' accounts. Over $4M since hire was deducted and alienated to CapTrust/CapFinancial for spending about 100 hours annually to provide these three related "consulting" services (listed in their standard agreement): "1. Investment Advisory Consulting: --Plan Level Advice; --Investment Menu Development; --Ongoing Investment Due Diligence."

103.   CapTrust/CapFinancial's public disclosures from FINRA and the U.S. Securities and Exchange Commission (SEC) filings disclosed that they had "conflicts of interest" when they "consulted" or "guided" Ferguson in the past. Such conflicts mean they could have received kickbacks or "soft dollar payments" for their recommendations. Kickbacks appear to have occurred after a new mutual fund appeared on the Form 5500 financial statement during the limitations period.

104.   ERISA § 406 requires, with no exemption, that the Defendants and every fiduciary to the plan act "solely and exclusively" for the benefit of participants/beneficiaries. Various affiliated entities such CapFinancial Partners, LLC d/b/a CapTrust Financial Advisors (CapTrust/CapFinancial/CapSecurities) aided Ferguson Enterprises LLC and their fiduciary delegates to channel the Plan and Trust dollars into investments (mutual funds, etc.) for which their respective SEC-prospectuses state routinely pay "finders fees."

105.   There is a causal connection between (1) the funds' SEC-prospectuses and (2) Ferguson Enterprises LLC's Annual Return/Report of Employee Benefit Plan (certified to the U.S. Departments of Treasury and Labor by Ferguson Enterprises LLC's Chief Financial Officers (Bill Brundage and Mike Powell)). This causal connection between the fees and Plan investments was approved by Ferguson Enterprises LLC and is excessive and not based on paying a provider who is, under ERISA and the plan's documents, "necessary for the operation of the plan."

106.   Based on information and belief, Defendants Ferguson, Committee and CapTrust acted in concert and in violation of § 406(b)(3).

107.   The Employee Retirement Income Security Act of 1974, 29 U.S.C. 1001 et seq., requires a fiduciary to discharge his duties "with the care, skill, prudence, and diligence under the circumstances then prevailing" 29 U.S.C. 1104(a)(1)(B).

108.   If the fiduciary fails to do so, a plan participant, beneficiary, or fiduciary, or the Secretary of Labor, may sue on the plan's behalf to remedy the breach of fiduciary duty. 29 U.S.C. 1132(a)(2). A fiduciary is "personally liable to make good to such plan any losses to the plan resulting from each such breach." 29 U.S.C. 1109(a).

109.   As in this case for these three funds' demonstrations, the Defendants acted to add these funds, with high annual costs for "return-reducing portfolio manager's compensation" "* * *  without compelling justification." (See Bryon W. Harmon, Esq. and Laura A. Fisher, Esq.; "The Prudence of Passivity: An Argument for Default Passive Management in Trust Investing" ACTEC Law Journal (The American College of Trust and Estate Counsel), Volume 44, Number 2, Spring 2019).

110.   With actively managed mutual funds, the funds' respective investment managers charged fees based on a percentage of the fund's total assets.  Thus, more dollars are paid from investors to pay portfolio managers compensation as investors

save more salary dollars (regardless of any positive returns over the funds' meaningful benchmarks). The portfolio manager's compensation (investment management fees) is deducted daily from investment returns, thus reducing the net returns on participants' investments, often without their knowledge.

111.  While prudent investment principles allow for active management strategies in appropriate circumstances, the additional risks and costs involved "<u>must be justified by realistically evaluated return expectations</u>. Additionally, "[a] trustee's approach to investing must be reasonably supported in concept and must be implemented with proper care, skill and caution."  Restatement (Third) of Trusts cmt. f.

112.  As a result, in deciding whether to pursue an active management strategy, Ferguson Enterprises LLC and CapTrust/CapFinancial must have determined (at the times they made/reviewed fund selections/retentions) that "gains from the course of action in question can reasonably be expected to compensate for its additional costs and risks." Id. at cmt. h(2).

113.  Care and prudence required both of the Defendants to have had made a periodic review to ensure they had a realistic expectation that deducting daily fees (from a fund's gross asset value (GAV)) for portfolio manager's compensation (thus reducing the trust's assets' returns) would benefit the trust and participants. That is, such a fee for portfolio manager's compensation would be expected to generate net returns greater than the manager's "appropriate broad-based securities market index" or bogey.

114.  "An ERISA fiduciary must discharge his responsibility 'with the care, <u>skill</u>, prudence, and diligence' that a prudent person 'acting in a like capacity and familiar with such matters' would use." *Tibble v. Edison IV*, 135 S. Ct. at 1828 (quoting  29 U.S.C. § 1104(a)(1).)

115.   Investopedia, "a bogey refers to a benchmark for a mutual fund that provides the investor with a representative sample of a market segment for which it can compare performance and other characteristics."

116.   Ferguson's responsible plan fiduciaries' requisite "care" and "prudence" would have been exhibited by following CapTrust/CapFinancial's recommendation after (1) great scrutiny of CapTrust/CapFinancial's recommendation and (2) 'independent' verification. CapTrust/CapFinancial's recommendation should have been made to Ferguson after a thorough investigation that the portfolio manager being considered had a realistic expectation that after deducting his portfolio manager's costs at 4 pm from a fund's gross asset value (GAV) (and thus reducing the trust's assets' returns forevermore), that those fees would benefit the trust and participants.

117.   As many courts have required, Plaintiffs consistently compared the Defendants' fund's underperformance to a "meaningful benchmark" under the facts and "circumstances prevailing at the time of the conduct."

118.   Under the statute, a retirement plan must disclose a range of information about costs and performance, including the administrative expenses it charges to participants and investment-related information explaining the characteristics of the plan's investment options.  Plus, publicly available performance information about an investment may show sufficiently dismal performance that this reality, when combined with 'allegations about methods, Courts have stated this "will successfully allege that a prudent fiduciary would have acted differently."

119.   Whether Defendants' selections were for (1) funds paying portfolio manager's compensation or (2) funds with zero portfolio manager's compensation, prudence requires the Defendants to avoid any investment that is not reasonably expected to generate returns sufficient to cover its costs.

120.   Here, the Defendants not only breached their duties by failing to have a prudent, reasoned process for deciding upon and carrying out their investment

strategy, but also, they failed to monitor the funds they selected for the Plan menu and failed to replace their imprudent selections with prudent ones.

121.   As noted above, in deciding whether to pursue such an expensive and risky active management strategy, Plan Fiduciaries were obligated, first, to determine that "gains from the course of action in question [could] reasonably be expected to compensate for its additional costs and risks."   Restatement (Third) of Trusts § 90 cmt. h(2).

122.   Faced with this data, Plan Fiduciaries should have proceeded with great caution, knowing that using portfolio managers such as those in the three funds' demonstrations that follow was a high-stakes, low-percentage bet.   Nevertheless, Plan Fiduciaries heedlessly made that bet while playing with participants' money.

123.   Defendants repeated their negligent conduct over the years into the limitations period and violated the Prudent Investor Rule of Restatement (Third). The American Law Institute (ALI) replaced the prudent person rule with the prudent investor rule in May 1990.

124.   In 1992 the ALI revised the pertinent portion of the Restatement (Second) of Trusts by publishing the Restatement (Third) of Trusts (Prudent Investor Rule). Section 227 of the Restatement (Third) Trusts provides that the trustee is under a duty to the beneficiaries to invest and manage the funds of the trust as a prudent investor would, in light of the purposes, terms, distribution requirements, and other circumstances of the trust.

125.   In addition, the Defendants must: (l) conform to fundamental fiduciary duties of loyalty (§ 170) and impartiality (§ 183); (2) act with prudence in deciding whether and how to delegate authority and in the selection and supervision of agents (§ 171) and (3) incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship (§ 188).

126.   Prudent conduct under ERISA requires adherence to the modern portfolio theory. That is because the Secretary of Labor may prescribe such

regulations as he finds necessary to carry out the provisions of ERISA. 29 U.S.C. § 1135.  In 1979, the Secretary prescribed regulations under ERISA, further defining a fiduciary's investment duties. 29 C.F.R. § 2550.404a-1. In general, the regulations provide that the fiduciary shall be required to act as a prudent investment manager under the Modern Portfolio Theory rather than under the common law of trusts standard, which examines each investment with an eye toward its individual riskiness.

127.   When the "fiduciary hat" is on, the requirements that decisions be made "solely in the interest" and for "the exclusive purpose" of benefiting participants place a duty on the trustees to avoid placing themselves in a position where there is a conflict of interest between what is in the best interest of the beneficiaries and what is the best interest of the company.  *Varsity Corp. v. Howe*, 516 U.S. 489, 524–25 (1996).

128.   Where ERISA is silent, courts look to trust law. A trustee is obligated not only to make prudent investment decisions but also to monitor and review those investments "in a manner that is reasonable and appropriate to the particular investment action, and strategies involved." Id. at 1828 (quoting Restatement (Third) of Trusts, § 90, Comment b, p. 295 (2007). In other words, "the trustee must 'systematic[ally] conside[r] all the investments of the trust at regular intervals to ensure that they are appropriate." Id . (quoting A. Hess, G. Bogert, & G. Bogert, Law of Trusts and Trustees § 684, pp. 147-148 (3d. ed. 2009). Therefore, even if an initial investment decision were made outside of the six-year statutory period specified by ERISA, 29 U.S.C. § 1113 (1), if plan fiduciaries did not "conduct the sort of review that a prudent fiduciary would have conducted," regarding the investment within that time period, they breached their fiduciary duty of prudence. *Id* . at 1829).

129.   The Defendants have displayed no evidence of following or complying with Restatement (Third) of Trusts since their financial statements were submitted to the U.S. Departments of Treasury and Labor for the 2009 plan year beginning

January 1, 2009.  The Defendants' actions repeatedly violated the two-pronged test of Restatement (Third) of Trusts: "to the extent, an investment strategy involves extra management, tax, and transaction costs or a departure from an efficiently diversified portfolio, that strategy should be justifiable in terms of…a realistically evaluated prospect of enhanced return [from the strategy]." (Edward C. Halbach, Jr., the Reporter for the Restatement and Walter Perry Johnson professor of law emeritus at the University of California law school, in "Trust Investment Law in the Third Restatement," Real Property, Probate and Trust Journal, Volume 27, Fall 1992, pages 407-65; see Section 227 of the Restatement 3rd of Trusts (Prudent Investor Rule), comment f, page 25).

130.  Ferguson's multiple transactions over a decade of directing plan assets to be sold so they could pay their retained and favored financial intermediary (CapTrust/CapFinancial) over half a million dollars (since 2016) for about 100 hours of work each year ($5,000/hour) proves a "lack of care" and "lack of skill" by Ferguson Enterprises, LLC. In fact, this amount is uncommon even for all other Registered Investment Adviser (RIA) firms surveyed, including CapTrust/CapFinancial. It is not permitted by ERISA because it is clearly unreasonable.

131.  Nevertheless, alienating more than $500,000.00 annually from the trust's corpus when CapTrust/CapFinancial aided Ferguson in selecting/retaining expensive and underperforming investments raises obvious questions about whether the Plan's overall costs are reasonable.

132.  Such transactions are exempt from the definition of a prohibited transaction, however, if they are: (1) a "reasonable arrangement[] with a party in interest for . . . services necessary for the establishment or operation of the plan" when "no more than reasonable compensation is paid." Plaintiffs declare that ERISA only permits a plan to contract for "services necessary for the establishment or operation of the plan." Plaintiffs assert that the "duty to monitor," which was

recognized by the Supreme Court in the 2015 decision in Tibble II, applies equally to transactions under § 1106 (citing In re Northrop Grumman Corp. ERISA Litig., 2015 WL 10433713 at *25-26 (C.D. Cal. Nov. 24, 2015)).

133.   Before litigation, Plaintiffs requested the (1) Ferguson and CapTrust/CapFinancial meeting minutes and other forms of communications and duties under (2) CapTrust/CapFinancial's services agreement for the Ferguson Enterprises, LLC 401(K) Retirement Savings Plan--their request was denied. Consequently, Plaintiffs grouped the allegations of flawed selection/retention processes by Ferguson Enterprises, LLC and its designated delegates together with CapTrust/CapFinancial representatives (as its chosen (and functional) fiduciary advisor).

134.   A copy of the CapTrust/CapFinancial agreement was not provided to Plaintiffs upon written request.

135.   Ferguson Enterprises, LLC sent the IRS/Labor Department Forms 5500 (Annual Return/Report of Employee Benefit Plan) and related Schedules C where Plaintiffs infer from Ferguson's mathematical reporting the opposite.

136.   Plaintiffs' experts find facts, based on over 500 of CapTrust's clients' Forms 5500 (www.efast.dol.gov), that CapTrust's average (and median) annual compensation since 2016 was only about $45,000 per year (including Ferguson's plan). Out of all their clients in the USA, Ferguson Enterprises, LLC 401(K) Retirement Savings Plan paid CapTrust/CapFinancial more than their other clients.

## EXCESSIVE FEES BEYOND NECESSARY AND REASONABLE WERE PAID TO PLAN ADVISOR.

137.   ERISA accordingly holds fiduciaries "to a high standard of care and diligence" regarding fees paid to a Plan Advisor (CapTrust):  Fiduciaries must, among other things, "[e]stablish a prudent process for selecting investment options

and service providers"; "[e]nsure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided"; and "[m]onitor investment options and service providers once selected to make sure they continue to be appropriate choices.". The Department of Labor has consistently reminded ERISA fiduciaries of their responsibilities to carefully evaluate fees when selecting plan investment options and then to monitor fees on an ongoing basis. U.S. DOL, EBSA, *A Look at 401(k) Plan Fees*, pp. 1-2 (Aug. 2013), *available at* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf, Employee Benefits Sec. Admin., U.S. Dep't of Labor, Meeting Your Fiduciary Responsibilities 5 (Sept. 2020), https://go.usa.gov/xARbV.

138.   The Department of Labor's regulations are consistent that paying for providers through revenue sharing can, without careful monitoring, lead to unreasonable fees. The Department has directed that, to ensure that fiduciaries do not cause their plan to engage in transactions prohibited by ERISA, see 29 U.S.C. 1106, 1108, fiduciaries who pay providers via revenue sharing must in certain circumstances obtain "a reasonable and good faith estimate of the cost to the covered plan of such recordkeeping services." 29 C.F.R. 2550.408b-2(c)(1)(iv)(D)(2). That estimate must take into account "the rates that the covered service provider, an affiliate, or a subcontractor would charge to, or be paid by, third parties, or the prevailing market rates charged, for similar services for a similar plan with a similar number of covered participants and beneficiaries." Ibid. The Department has explained that "plan fiduciaries need this information, when selecting and monitoring service providers, to satisfy their fiduciary obligations under ERISA." Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 77 Fed. Reg. 5632, 5632 (Feb. 3, 2012).

## SHARE CLASS VIOLATIONS

139.   All share classes of a fund are identical—they use the same managers with the exact same stocks/bonds and report to the SEC in the same prospectuses filed by the same Registered Investment Company (RIC).

140.   Upon information and belief, Defendants failed to select lowest cost share classes for participants/beneficiaries, and fund performance did not warrant active fund managers due to performance against its own performance benchmark. These losses are not offset by revenue sharing.

141.   From Ferguson's 2019 audit report [emphasis added]: "Fees paid by the Plan for investment management services were included as a reduction of the return earned on each fund. Fees paid to the custodian and trustee by the Plan for administrative services during 2019 were approximately $1,976,000, less $343,000 in offsets from the Plan's ERISA expense account. The Plan paid approximately $478,001 to CapTrust Financial Partners for investment advisory services during 2019."

142.   "Revenue sharing has been billed as a "major expense" item that is "the dirty little secret of the mutual fund industry." According to one source, "the sums are enormous," aggregating more than $2 billion annually." (John P. Freeman, "The Mutual Fund Distribution Expense Mess" on 6/28/2007, The Journal of Corporation Law).

143.   However, it is well known in the mutual fund industry that the government authority for approval to launch an open-end mutual fund is the U.S. Securities and Exchange Commission (SEC). The SEC has stated many times publicly the exact opposite. For example, the press release "SEC Launches Share Class Selection Disclosure Initiative to Encourage Self-Reporting and the Prompt Return of Funds to Investors" (https://www.sec.gov/news/press-release/2018-15) referred to [*emphasis* added]:The SEC may file enforcement actions alleging violations of these provisions against investment advisers that fail to disclose to their

clients conflicts of interest, *including those conflicts associated* with the receipt of 12b-1 fees for investing client funds in, or *recommending that clients invest in, a 12b-1 fee paying share class* when a *lower-cost share class was available to clients for the same fund*. A 12b-1 fee is a fee paid by a mutual fund on an ongoing basis from its assets for shareholder services, distribution, and marketing expenses. *Each share class of a fund represents an interest in the same portfolio of securities. Therefore, when there is a lower-cost share class available that does not charge a 12b-1 fee (or charges a lower 12b-1 fee), it is usually in the client's best interest to invest in the lower-cost share class rather than the 12b-1 fee paying share class because the client's returns would not be reduced by the 12b-1 fees. (https://www.sec.gov/enforce/announcement/scsd-initiative)*

144. All share classes have the same "cost basis" for a "position" or stock/bond. Using the Ferguson Enterprises LLC 401(K) Retirement Savings Plan's largest mutual fund, . A six-month price chart from Yahoo on 8/16/2022 proves our and the SEC's assertion. First, all mutual fund's share classes' assets trade omnibus in a single buy or sell order at 4 p.m. daily. The trade is then "settled" and "allocated pro-rata" to each share class. Thus, all share classes have the same "cost basis" for a "position" or stock/bond.

145. Second and more simply, the straightforward line chart below uses the available share classes of the Mainstay Winslow Large Cap Growth fund and supports our and the SEC's statements. The reader can see that in the six-month line chart below, the red line (the SEC-prospectus index and an appropriate broad-based securities market index) stands out (falling 6.2%). The other lines represent the five share classes of the Mainstay Winslow Large Cap Growth fund, and the reader can note they are indiscernible (or identical in price swings) from each other—all share classes fell much more than the fund's index with a loss of 10.9%.



146.   Broadly speaking: "[a] breach of trust is a failure by the trustee to comply with any duty that the trustee owes, as trustee, to the beneficiaries * * * of the trust." Restatement (Third) of Trusts § 93 (2003). Further, the Court in *Tibble II* noted that plan administrators switched to lower-cost institutional funds upon a subsequent review of plan investments. The same occurred here.

**FAILURE TO LOYALLY SELECT AND MONITOR TRUST INVESTMENTS – and - FAILURE TO PRUDENTLY INVESTIGATE, SELECT AND MONITOR TRUST INVESTMENTS**

147.   A request for information relating to the trust, plan and benefits management (including specific share classes of investments selected/retained by both of the Defendants' actions) was denied.

148.   Under the relevant ERISA provisions, "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any

discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A).

149. Subsection one imposes fiduciary status on those who exercise discretionary authority, <u>regardless of whether such authority was ever granted</u>; [s]ubsection three describes those individuals who have actually been granted discretionary authority, <u>regardless of whether such authority is ever exercised</u>. Emphasis added.

150. Plaintiffs requested the Plan and Trust's (1) ERISA Budget Account information (Bookkeeping Spending Accounts (Fee Recapture)) from Ferguson Enterprises LLC as well as CapTrust/CapFinancial's (and Prudential Retirement Insurance and Annuity Company) selling agreements relating to the Plan and Trust's mutual funds' "selling agreement."

151. A mutual fund is an SEC-registered open-end investment company that pools money from many investors and invests the money in stocks, bonds, short-term money-market instruments, other securities or assets, or some combination of these investments. Fund "selling agreements" state what the specific "soft-dollar" fund compensation will be (SEC Rule 12b-1 fees, subtransfer agency fees, shareholder servicing fees or other types of fees (revenue sharing). The amount of revenue sharing received varies from one underlying investment option to another. Some funds disproportionately and non-uniformly pay covered service providers' compensation while the Vanguard Group Inc. funds pay zero revenue sharing to providers and thus, participants/beneficiaries electing these funds may pay no indirect administrative costs.

152. Revenue sharing is not uniform in burdening participants'/beneficiaries' accounts with covered service providers' costs. First, the more assets Plan participants have the higher the revenue sharing cost (since it is part of the expense ratio of the fund and the fund fees are based on assets). Plaintiffs also note 26 CFR § 1.401(a)(4)-4(a):

"This section provides rules for determining whether the benefits, rights, and features provided under a plan (i.e., all optional forms of benefit, ancillary benefits, and other rights and features available to any employee under the plan) are made available in a nondiscriminatory manner. Benefits, rights, and features provided under a plan are made available to employees in a nondiscriminatory manner only if each benefit, right, or feature satisfies the current availability requirement of paragraph (b) of this section and the effective availability requirement of paragraph (c) of this section. Paragraph (d) of this section provides special rules for applying these requirements. Paragraph (e) of this section defines optional form of benefit, ancillary benefit, and other right or feature."

153. Use of revenue sharing also violates "uniform fiduciary standards to prevent transactions which dissipate . . " and:

"The objectives of these provisions are to make applicable the law of trusts; . . to establish uniform fiduciary standards to prevent transactions which dissipate or endanger plan assets; and to provide effective remedies for breaches of trust." Statement of the Honorable Harrison A. Williams, Jr., 120 Cong.Rec. S-15737, August 22, 1974, Reprinted [1974] U.S. Code Cong. Admin.News, pp. 5177, 5186.

154. Relating to fund selling agreements and their soft dollar compensation to covered service providers, Plaintiffs' experts found in publicly available prototypes used by this plan (Prudential's master) that proves they require that the Plan Sponsor acknowledged "receipt of the prospectuses for all mutual fund investments selected by the Plan fiduciary.

155. According to (1) ERISA, (2) Ferguson Enterprises, LLC's IRS-approved tax-exempt prototype plan and (3) certified annual reporting to the U.S. Departments of Treasury and Labor, the participants'/beneficiaries' accounts are

-42-

essentially "bookkeeping" accounts maintained by Prudential. However, the "trust" is the legal owner of all mutual funds and other assets. It is well settled that a trust differs: "from a contract creating a mere personal obligation * * * . The beneficiary of a trust has an equitable interest in the subject matter of the trust." (Restatement (Second) of Trusts § 74 cmt. a (1959); see id. § 197 cmt. b ("The creation of a trust is conceived of as a conveyance of the beneficial interest in the trust property rather than as a contract."). "It is well settled that a trust beneficiary could sue to restore to the trust corpus any losses that she could prove the fiduciary breach caused. Common-law authorities did not require an individual financial loss to the beneficiary. Rather, what mattered was loss to the trust." *Thole v. U. S. Bank N. A.*, 140 S. Ct. 1615 (2020).

156.   Plaintiffs' allegations, when read as a whole, demonstrate circumstantial facts that show the Defendants utilized an imprudent process (1) in their selections and retentions (monitoring) of the Plan's investment and (2) covered service providers.

157.   Based on information and belief, Defendants' chosen/retained fiduciary advisory firm CapTrust/CapFinancial/CapSecurities violated the U.S. Securities and Exchange Commission (SEC) Division of Enforcement rules (Share Class Selection Disclosure Initiative). This initiative warns investors (like trustees/fiduciaries at Ferguson Enterprises LLC) of behavior to select/keep identical but more expensive share classes of mutual funds.

158.   There are specifically certified representations from Ferguson that were explicitly derived from their governmental reports filed at www.efast.dol.gov.   For example, on October 14, 2009, the CFO/Executive Director (Defendant BRUNDAGE) certified, "Under penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including accompanying schedules, statements and attachments, as well as the electronic version of this return/report, and to the best of my knowledge and belief, it is true,

1  correct, and complete."

2  159.  Plaintiffs' arguments stem from Defendant Brundage's, et al, certified
3  and audited statements to the U.S. Departments of Treasury and Labor (auditor:
4  DIXON HUGHES GOODMAN LLP).  Plaintiffs' mathematical proofs provide an
5  inferential argument for a mathematical statement, showing that the stated
6  assumptions are from Ferguson's representations and thus logically guarantee the
7  result. The Plaintiffs' arguments also use Ferguson's audited financials and every
8  proof can, in principle, be constructed using only the original assumptions along with
9  the accepted rules of inference. Proofs are examples of exhaustive deductive
10  reasoning that establish logical certainty, distinguished from empirical arguments or
11  non-exhaustive inductive reasoning, which establish "reasonable expectations."

12  160.  Based on Prudential Retirement Insurance and Annuity Company
13  standard contract and mathematical results derived from the plan sponsor's certified
14  and audited reports to the government, every one of the plan sponsor's and
15  CapTrust/CapFinancial's selected/retained investments (except for 65,571,680
16  dollars of the Ferguson Enterprises LLC 401(K) Retirement Savings Plan's trust
17  corpus (on 1/1/2016) invested in four "VANGUARD GROUP INC." funds) were
18  imprudently and disloyally selected/retained.

19  161.  Using funds with revenue sharing causes administrative costs to vary
20  from one underlying investment option to another, meaning a non-uniform and
21  discriminatory burden is placed on less-sophisticated participants in violation of (1)
22  ERISA and (2) Ferguson's prototype plan document from Prudential. Ferguson
23  displayed evidence (in their investment selections/retentions) of self-dealing when
24  funds were selected (evidence points to a focus on a fund's ability to pay outside
25  intermediaries and not on the merits of the manager/fund). That was more important
26  to fiduciaries at Ferguson--instead of the participants'/beneficiaries' best interests and
27  the interests of the Plan and Trust.

28  162.  Fiduciaries need not set out to enrich themselves in order to violate

-44-

ERISA's duty of loyalty--benefing a third party over the Plan participants is also a violation. The auditor's comments at the end of every audit report depicted CapTrust/CapFinancial "functioning" as a fiduciary under the plan and the compensation was clear.

163.   Some of the Defendants' actions were taken (1) to save themselves costs at the expense of Plan participants and/or (2) to favor its investments over the Plan participants. Either reason is inconsistent with the duty of loyalty. (*Creamer v. Starwood Hotels & Resorts Worldwide, Inc*. 2017 WL 2909408 (C.D. Cal. May 1, 2017) (not necessary to allege that excessive recordkeeping and administrative fees benefitted anyone to state breach of duty claim)).

164.   The Plaintiffs' allegations do not suggest Defendants should have scoured the market to find the cheapest funds available. There was no need to "scour" the market because Plaintiffs allege the same higher cost funds selected/retained by the Defendants (1) appear on the same pages of their respective prospectuses at the SEC's website and (2) were available with cheaper expense ratios at the time of the conduct. (See *Kruger, et al. v. Health, Inc.*, 131 F.Supp.3d 470, 476 (M.D.N.C. 2015) ("Plaintiffs are not arguing that Defendants had a duty to scour the market to find and offer any cheaper investment. Instead, Plaintiffs allege that 'lower cost funds with the identical managers, investments styles, and stocks' should have been considered by the Plan.").

165.   In the *Tibble v. Edison Int'l* line of cases, the district court ultimately recognized that the "decision to invest in retail-class shares instead of institutional-class shares of the same fund violated [the] duty of prudence." *Tibble v. Edison Int'l*, 2017 WL 3523737 (C.D. Cal. Aug. 16, 2017).

166.   All share classes could have been purchased by the Defendants without having any minimum amounts of assets to meet as the funds waived the minimums. According to prospectuses listed at www.sec.gov/edgar for this plan, every RIC (registered investment company) has stated all minimum purchase requirements were

1   waived for "QUALIFIED RETIREMENT PLANS (QRP) AND "OMNIBUS
2   TRUSTS."

3       167.   In fund comparisons that follow, Plaintiffs' experts used benchmarks
4   derived from  29 CFR § 2550.404a-5 ("an appropriate broad-based securities market
5   index)." Such benchmarks are also required (1) by the Prudent Investor Rule
6   (Restatement Third) Modern Portfolio Theory (MPT) and (2) from the SEC
7   reportings filed by the portfolio manager (such a "bogey or benchmark" is also used
8   by the respective RIC (registered investment company) to determine their portfolio
9   manager's compensation).  29 CFR § 2550.404a-5 [emphasis added]:

10                  (d)    Disclosure of investment-related information. The plan
11              administrator (or person designated by the plan administrator to act on
12              its behalf), based on the latest information available to the plan, shall*
13              * * (1) Information to be provided automatically. Except as provided
14              in paragraph (i) of this section, furnish to each participant or
15              beneficiary on or before the date on which he or she can first direct his
16              or her investments and at least annually thereafter, the following
17              information with respect to each designated investment alternative
18              offered under the plan * * * (iii) Benchmarks. For designated
19              investment alternatives with respect to which the return is not fixed,
20              the name and returns of an appropriate broad-based securities market
21              index over the 1-, 5-, and 10-calendar year periods (or for the life of
22              the alternative, if shorter) comparable to the performance data periods
23              provided under paragraph (d)(1)(ii)(A) of this section, and which is
24              not administered by an affiliate of the investment issuer, its
25              investment adviser, or a principal underwriter, unless the index is
26              widely recognized and used.

27       168.   Based on information and belief, CapTrust/CapFinancial quarterly fund
28   monitor reporting appears to shy away from these benchmarks because of regular

underperformance by their recommended investments. When evaluating their recommended funds versus the fund's actual SEC-prospectus benchmark (not focusing on "an appropriate broad-based securities market index" or the benchmark required by 29 CFR § 2550.404a-5), CapTrust/CapFinancial's quarterly reporting is misleading to the reader because it prominently shows their recommended funds compared with other costly underperforming peer mutual funds and not the SEC-prospectus or "best-fit" Modern Portfolio Theory (MPT) (Prudent Investor Rule (Restatement Third)) benchmark indexes.

169. By doing this, CapTrust/CapFinancial can ensure Ferguson's plan's investment recommendations via their written quarterly monitoring reports (Plaintiffs could not obtain these from Ferguson Enterprises LLC) appear better to Ferguson's committee members. Emphasizing a "peer-based" investment scoring system (instead of one focused on "benchmark index" performance) can shield or obfuscate the trust's assets true lag behind the (1) Prudent Investor Rule (Restatement Third) MPT "best-fit" index as well as the (2) 29 CFR § 2550.404a-5 required "broad-based securities market index."

170. Focusing on evaluating the recommended investments' performance versus "peers" was also noted by Plaintiffs' experts as a trick used in the quarterly reporting by (1) one of CapTrust/CapFinancial main competitors headquartered in California as well as (2) an industry leading 401k monitoring report software provider. Plaintiffs' experts had direct communication with the firm's main principal when asked why the reporting avoids performance comparison against the 29 CFR § 2550.404a-5 "appropriate broad-based securities market index" and he stated on the phone: "If I used the benchmark index for primary investment comparison for a 401k plan no one would pay my quarterly subscription fees as most of their recommendations would not fare well (versus their benchmark indexes). Therefore, my large wirehouse broker/advisor clients would stop using my software and they would go to my competition."

171.   Peer fund comparisons in essence occurs when an advisor like CapTrust/CapFinancial compares their recommendations against all the other expensive mutual fund's performance (not unmanaged indexes like the S&P 500). In the CapTrust/CapFinancial monitoring reporting obtained by Plaintiffs' experts this preference is evident.

172.   Plaintiffs provide the following from the summer 2021 reporting that comes out publicly by S&P Dow Jones Indices LLC's "SPIVA Scorecard" (by Berlinda Liu, CFA Director Global Research & Design, berlinda.liu@spglobal.com and Gaurav Sinha, Managing Director Global Research & Design, gaurav.sinha@spglobal.com, data as of June 30, 2021) that summarizes:

173.   "Past performance is no guarantee of future results. Of the 31 distinct benchmarks tracked by this report, 27 finished with a positive return over the year; the exceptions were among longer-term fixed income indices. The positive market performance broadly translated into good absolute returns for active fund managers. But relative returns continued to disappoint; in 15 out of 18 categories of domestic equity funds, the majority of actively managed funds underperformed their benchmarks. The performance was particularly underwhelming in the small-cap space, as 78% of all small-cap funds lagged the S&P SmallCap 600® (see Report 1a)."

174.   Nobel Laureate 1990 William F. Sharpe explains the importance of avoiding peer group comparisons in "The Arithmetic of Active Management" (The Financial Analysts' Journal (Vol. 47, No. 1, January/February 1991. pp. 7-9; and (2) 7)). "'Peer group' comparisons are dangerous. Because the capitalization-weighted average performance of active managers will be inferior…."

175.   In doing so, Ferguson and CapTrust/CapFinancial failed to put first the economic interests of the plan in providing retirement benefits.  "ERISA fiduciaries must always put first the economic interests of the plan in providing retirement benefits.  A fiduciary's evaluation of the economics of an investment should be

focused on financial factors that have a material effect on the return and risk of an investment based on appropriate investment horizons consistent with the plan's articulated funding and investment objectives." Field Assistance Bulletin 2018-01 (Apr. 23, 2018).

## DEFENDANTS' FLAWED DECISION-MAKING VIOLATED THEIR DUTY OF PRUDENCE AND LOYALTY.

176.   The most accurate evaluation of the prudence and loyalty of the Defendants' decision-making conduct at the time of their selections of investments requires that the Plaintiffs use the oldest version or share class of the mutual funds with the longest track record. Each share class is managed by the same manager using the exact same investments regardless of the inception date.  It is important to note that over time due to past performance problems and litigation, fund families have introduced cheaper share classes and continued to reduce expenses slightly. For example, the "A" share class is often the oldest class, and the cheapest "Institutional" or "R6" class of the mutual funds is almost always the youngest or most recent class.

177.   As of July 31, 2022, there were 1,726 "R6" or "R-6" share classes with the median inception date of March 29, 2016—only about six years ago. By using the oldest share class, Plaintiffs ensure their evaluations are based on the largest and longest manager dataset available and so the most comprehensive returns are available to properly assess the skill of the fund manager.

178.   Plaintiffs' long-term review of a fund's portfolio manager's return versus his appropriate broad-based securities market index forms the basis of every investment selections/retentions of Investment Policy Statements (IPS) offered to clients by Fidelity, Vanguard, Prudential, T. Rowe Price, etc.

179.   The exact selection/retention requirements should be contained in the Ferguson Enterprises LLC 401(K) Retirement Savings Plan Investment Policy Statement (IPS) (Plaintiffs requested a copy, but Ferguson Enterprises LLC ignored

1  the request).

2  180.  Portfolio manager compensation costs investors daily and dearly

3  because the expected future real (inflation-adjusted) average return of stocks ranges

4  from three to five percent per year (3% to 5%/year) according to Warren Buffett

5  ("GDP of 3% plus dividends" (if any)).

6  181.  Consequently, when the Defendants' decided to repeatedly select

7  investments with fees of 1% per year, they guaranteed each of their 401k participants

8  choosing the fund was willingly allowing at least 1%/year in fees to be deducted

9  from their expected 3% to 5% future real returns (20% to 33% of their annual

10  expected return). The fiduciary's processes must have ignored the high probability

11  that their chosen managers will never achieve the desired outperformance results.

12  182.  This is likely because Standard and Poor's stated in the 2020 Mid-Year

13  Active vs. Passive Scorecard that: "Through June, more than 87% (87.2%) of all

14  domestic stock fund managers had underperformed the broad S&P Composite 1500

15  Index since June 2005."

16  **PAST PERFORMANCE IS NO GUARANTEE OF FUTURE RESULTS.**

17  183.  "Past performance is no guarantee of future results" is the Securities and

18  Exchange Commission Rule 156 disclosure requirement for every mutual fund.

19  However, on information and belief Defendants used short term managers'

20  performance to choose funds in violation of 17 CFR § 230.156.

21  184.  To prudently select and keep mutual funds with managers' fees,

22  fiduciaries must heed this warning that there is no reliable way to predict when - or

23  which - or even if – winners from the past will win again in the future. Statistically,

24  that was one reason the SEC's research imparted to investors many years ago

25  (reiterated in 17 CFR § 230.156) about the risks of using managers' past returns to

26  make mutual fund "buy decisions."

27  185.  Unlike hedge funds, the portfolio manager's fee/compensation is taken

28  every day (even if the manager is NOT beating her chosen "bogey" or "widely

accepted benchmark)." At 4 pm the RIC (registered investment company) for each mutual fund will deduct their funds' expense ratio (including the revenue sharing such as SEC Rule 12b-1 fees, subtransfer agency fees, shareholder servicing fees or other types of fees. The amount of revenue sharing received varies from one underlying Ferguson Enterprises LLC 401(K) Retirement Savings Plan investment option to another so unsophisticated participants'/beneficiaries' accounts may shoulder the burden of administration costs.

186.   Small differences in investments' costs, such as a manager's fee of fifty basis points per annum, is equal arithmetically to at least ten percent (and possibly seventeen percent (.5/3)) of an investor's expected return per year. "Cognizant of the impact of fees on Plan value, fiduciaries should be vigilant in 'negotiation of the specific formula and methodology' by which fee payments such as 'revenue sharing will be credited to the plan and paid back to the plan or to plan service providers.'" *Sweda v. Univ. of Pa*., 923 F.3d 320, 329 (3d. Cir. 2019) (citing DOL Advisory Opinion 2013-03A, 2013 WL 3546834, at *4).

## CAPTRUST/CAPFINANCIAL WAS PAID MILLIONS FROM WORKERS TO BABYSIT THE PLAN

187.   There was little to no change in plan investment options available for participants to buy over many years spanning from the 2009 plan year to the 2020 plan year. Plaintiffs note one change in recent years. All shares of the trust's holding in the fund "Mid Cap Growth Artisan Partners Account" (listed in the 2015 Form 5500) were sold. Defendants directed the resulting cash then deposited into the trust to purchase shares of the "MassMutual Select Mid Cap Growth Fund" (in the 2016 plan year (based on the 2017 Form 5500)).

188.   Based on information and belief, during this period (sourced from  the certified and audited financial statements approved by Chief Financial Officer of Ferguson Enterprises LLC (Bill Brundage and/or Mike Powell)) also approved a trust asset sale and cash payment to be directed to "CAPTRUST FINANCIAL" of

$560,935 (based on their Schedule C reporting on the Form 5500 filed in the calendar year 2017). This amount equals a 21% pay increase ($98,896/$462,039) the CFO approved for the same services listed in the same signed services agreement with CapTrust/CapFinancial.

189. Defendants did not inform the participants/beneficiaries of better, cheaper, higher yielding, substantially identical investment options on their annual 29 CFR § 2550.404a-5 notices called "Fiduciary requirements for disclosure in participant-directed individual account plans." A fiduciary's duty "includes the responsibility to inform the beneficiaries fully of all facts which would aid them in protecting their interests." *Allard v. Pac. Nat'l Bank*, 99 Wash.2d 394, 404, 663 P.2d 104 (1983) (citing *Esmieu*, 88 Wash.2d at 498, 563 P.2d 203). "Plan administrators have a duty to provide participants with material information respecting the plan, investment options and fees and expenses, on a regular basis."

190. From *Tibble* [emphasis added]: "a trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) (en banc).

191. Repeated failures to inform, as well as ignoring guaranteed trust income from dividends/interest (referred to as "probable income" under Restatement (Third) of Trusts) for substantially identical investments, is a material breach. "A misrepresentation is only actionable if it is material. A misrepresentation is material if the statement would induce a reasonable person to rely upon it." *Ballone v. Eastman Kodak Co.*, 109 F.3d 117, 122–23 (2d Cir. 1997). Something is material "if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision in pursuing . . . benefits to which she may be entitled". *Krohn v. Huron Mem'l Hosp.*, 173 F.3d 542, 547 (6th Cir. 1999).

192. The Plaintiffs' expert's investment analysis that follows was based on

prospectus data and facts available to the Defendants at the time of their combined actions to research, select and retain trust investments. Also, benchmarks used were those required by (1) the Prudent Investor Rule and Modern Portfolio Theory, (2) 29 CFR § 2550.404a-5 and (3) the fund manager's chosen "bogey" or "benchmark" stated in the prospectus at the time of their conduct (obtained via the U.S. Securities and Exchange Commission (SEC) archival repository for mutual funds).

193.   Section 404(a)(1)(B) obligates fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use . . . . " This general standard of prudence applies to all ERISA fiduciaries. (*DiFelice v. Fiduciary Counselors, Inc.* (*DiFelice I*), 398 F.Supp.2d 453, 467 (E.D. Va. 2005): "[T]he general fiduciary obligation of § 404(a) does not require prescience of fiduciaries, but instead measures a fiduciary's performance based on the facts then at their disposal.").

## DEFENDANTS CONTINUALLY CHOSE AND KEPT LOWER YIELDING INVESTMENTS OVER IDENTICAL VERSIONS FOR MANY YEARS

194.   Defendants failed to prudently monitor by retaining lower yielding mutual funds when Defendants could call Prudential and choose substantially identical versions that yielded far more. The Defendants' chosen and maintained fund below (JP Morgan Mid Cap; using the facts available to them at the time of their imprudent monitoring in the 2016 year) yielded 0.85%/yr (versus the substantially identical investment with a yield of 2.22%/yr). This information was in the fund's prospectus at the time (image below from the fund's 2016 prospectus information). The Defendants failed to monitor and failed to act to replace this JPMorgan Mid Cap Value fund. The Defendants "seeded" the lower yielding fund with 37,039,847 dollars of the participants'/beneficiaries' salary savings in 2012 (reported to the government with more assets in the fund from salary savings

(80,665,149 dollars) as of 12/31/2020 (from Form 5500 by Ferguson)).

195.   The Defendants' reckless initial selection practices in 2012 were on display when selecting this "0.84%/yr yielding JPMorgan fund" when they could have bought their fund's SEC-prospectus broad-based securities market index yielding "1.71%/yr." The Defendants' ignorance of the much higher yield in 2012 (at the time of selection) cost the employees in the 401k monthly income in violation of trust law and ERISA.

|   | *Ferg choice 2012; kept | Yield 12-Month | Expense Ratio | Name |
|---|---|---|---|---|
| 1 | Defs' choice | 0.84 | 0.760 | JPMorgan Mid Cap Value Instl |
| 2 | 2013 prospectus | 1.71 | 0.280 | iShares Russell Mid-Cap Value |

196.   The Defendants violated the first principle of Restatement (Third) of Trusts Prudent Investor Rule (Restatement Third) theory. Prominent among the tenets of modern portfolio theory is the concept that the value or price of an asset is a function of two factors:

(1) the rate of total return (ordinary income/dividends and price appreciation) that the asset is anticipated to generate; and

(2) the risk that the actual return will fall short of the anticipated return.

An analysis of the risk that returns will fall short focuses upon assets as integral parts of a whole portfolio rather than each asset in isolation. This focus enhances the importance of the rate of total return and leads to the conclusion that the determination of whether a trustee has discharged its duties must focus upon the manner in which the trustee has made investment decisions. (Restatement (Third) of Trusts § 227 cmt. b (1992)).

197.   At the time of the Defendants' selections/retentions actions and CapTrust's written investment recommendations, we note their choice held about

100 stocks while its "appropriate broad-based securities market index" held over five times more (535 stocks). Therefore, the Defendants' selections/retention processes must be further explored by way of meeting minutes and other forms of communication. Basic discovery items developed at the time of their conduct can offer evidence of why both firms' fiduciaries acted to choose and retain the lower yielding (0.84%/year) JPMorgan fund when its actual SEC-prospectus benchmark yielded much more (1.71%/year).

198.   Plaintiffs avoid labeling any asset as inherently prudent or imprudent, per se. The behavior of the Defendants' selections/retentions action is judged in relation to the circumstances of the situation. (See *Id*.) Because the Prudent Investor Rule (Restatement Third) is a rule of fiduciary conduct rather than of portfolio performance, it purports to diminish the importance of hindsight. (See *Id*.).

## DEFENDANTS' ACTIONS ALSO AFFECTED FUTURE SALARY DEFERRAL CONTRIBUTIONS

199.   The Defendants' actions at the time of failures to prudently select or prudently monitor not only affected the trust's corpus or assets at the time of their conduct but it also affected all future employee contributions and their reinvested income. Specifically, the average annual salary dollars each worker deferred from their paychecks was $5,857.00 in 2016 and $6,525.00, $6,746.00, $7,656.00, $7,623.00 for 2017-2020 each ($195,469,313.80 in total).

200.   The Defendants imprudently directed that the trust's corpus' future dividends/interest deposits ($86 million) must be reinvested into (1) the imprudent funds paying less in yield and with high expenses (for portfolio manager's compensation (1%/yr)). Therefore, $86M at 1% manager's fees equals $860,000 in (1) return reducing manager's fees (that were not necessary or valuable to the trust) plus $420,000 in lost yield opportunity. This misdirection damage was only from the new trust monthly periodic deposits and one portfolio manager's compensation cycle. These dollars were reported by the Defendants as "Income: Investment Gain

1  from Mutual Fund Dividends" ($10,584,963, $12,780,983, $19,845,473,
2  $23,367,572.00, $19,128,963 respectively for the 2016 to 2020 plan years).

3      201.  Choosing a lesser amount of yield at the time they investigated adding
4  this fund to the participants'/beneficiaries' limited menu of choices violates (1)
5  common sense (Is this a legal claim?), (2) Restatement (Third) of Trusts and (3)
6  ERISA's sole and exclusive rule. Choosing and retaining a lower-yielding fund
7  (when substantially identical investment existed at the time (same style and size of
8  stocks)) provides evidence that both firms had a flawed selection and monitoring
9  process.

10     202. Defendants deliberately ignored monthly fund dividend income
11 available to participants/beneficiaries at the time Defendants' invested trust corpus
12 into this JPMorgan fund, which demonstrates a lack of thorough investigation, lack
13 of careful selection process and lack of loyal selection process.  Historically,
14 dividend credits to participants'/beneficiaries' accounts add as much to terminal
15 wealth as the unpredictable appreciation of an asset.

16     203.  "It's common knowledge that stocks return an average of 6% a year (at
17 least going back to 1900).  However, Elroy Dimson, Paul Marsh and Mike Staunton
18 from the London Business School recently revealed that when you remove
19 dividends, stocks' gains drop to a mere 1.7% a year, even lower than Treasury bonds
20 over the same period."  (http://www.zerohedge.com/article/take-out-dividends-and-
21 stocks-return-less-treasuries%E2%80%A6-1900)

22     204.  The Defendants deliberately ignored the value of the trust's potential
23 income from dividends, proving their feckless, imprudent and irresponsible
24 processes.

25     205.  From John P. Freeman, The Mutual Fund Distribution Expense Mess,
26 June 28, 2007, The Journal of Corporation Law: "Asset pricing is based on
27 projections of future return, meaning ''total return,' which consists of both income
28 and changes in market price. These return projections, and thus prices, involve an

assessment not only of the average return to be anticipated from an investment but also of the risk that follows from 'variance,' or departures from that average. Because investors are typically risk-averse, they require extra compensation for increased risk. The prospect of extra reward for the investor who accepts a greater likelihood of volatile returns is expressed through a market price that is lower, relative to a given average return expectation, for risky securities than for those of low risk."

206. Restatement (Second) of Trusts § 228 cmt. A: "'[t]he most fundamental duty owed by the trustee to the beneficiaries of the trust is the duty of loyalty.'" And "[t]he trustee is under a duty to the beneficiary to exercise prudence in diversifying the investments so as to minimize the risk of large losses."

207. Trust law warns trustees to avoid that high volatility or "variance" must be avoided even though we prove the Defendants never even considered ERISA's foundation of trust law. Restatements Second and Third of Trusts emphasize a general requirement of conservatism that continues normally to be inferred from the duty to use caution. According to Professor Halbach, The Prudent Investor Rule does not, however, abandon the trust law's traditional preference for investment conservatism. (the Reporter for the Restatement Third of the Law of Trusts project (American Law Institute); See Restatement Third, supra note 3, § 227 cmt. e.).

208. Insofar as the term "risk" is used, as it often is in economic literature, to refer to variance or volatility of total return, risk management requires careful attention to a particular fund's risk or volatility or "variance" (standard deviation is the square root of the variance) risk.

209. The Defendants repeatedly selected/retained funds using managers who could only keep up with very few stocks. That means the entire fund's dollars were concentrated in a few holdings or positions. This overconcentration is noted in the Plaintiffs' exhibits and reflects a lack of thorough investigation into the merits of their trust investments.

210.   Ferguson Enterprises LLC and CapTrust/CapFinancial failed to perform Restatement (Third) of Trust's "duty to diversify in order to eliminate non-market risk"--the centerpiece of the Restatement (Third) of Trusts Prudent Investor Rule. The duty to diversify induces the trustee to focus upon each asset as an integral part of a portfolio and not in isolation. Therefore, no asset is inherently appropriate or inappropriate per se. Responsible plan fiduciaries can protect against non-market risk by diversifying. Diversification is accomplished by acquiring assets that offset the unique risk that attends each asset separately. (See generally *Id*. § 227 cmt. g (discussing risk and the requirement of diversification). Therefore, the prudent investor rule imposes upon the trustee a duty to diversify to eliminate the risk that is unique to each asset.

211.   "A portfolio's volatility is reduced by increasing the number of securities held and by their tendencies to react differently to economic events ("negative variance correlation"). The average return expectation of the portfolio, however, is not adversely affected by a reduction of diversifiable or nonmarket risk, often somewhat less precisely called "specific" or "unique" risk. Accordingly, pricing rewards only the market (or "systemic" or "systematic") element of risk, which cannot be diversified away; but the market place offers no compensation for the specific risk that results simply from failure to diversify." (derived from Restatement (Third) of Trusts in John P. Freeman, The Mutual Fund Distribution Expense Mess, 6/28/2007, "The Journal of Corporation Law").

## REPEATED FAILURES TO ACT—IF THE MANAGERS CAN'T BEAT THEM, BUY THEM

212.   When the Defendants' chosen fund manager failed to beat their benchmark over and over for many years, the Defendants should have afforded the participants/beneficiaries the chance to save into what the managers could not beat— the managers' own chosen "broad-based securities market index." The costs of most index funds are only four to ten basis points per annum. An appropriate broad-based

securities market index also holds hundreds or thousands of stocks and bonds and, thus, causes much less trust return variance and potential losses to workers invested in an imprudently selected and maintained Plan and Trust investment.

213.   Plaintiffs assert that all trust funds (except those few holding a small number of assets (Vanguard Group Inc. funds)), initially added by Defendants' selection and investigation actions <u>outside of the limitations period</u>, should never have been bought. Their derelict selection process impacted participants'/beneficiaries' salary dollars (based on facts and circumstances prevailing at the time of the Defendants' conduct). Then, continuing into the limitations period, Defendants Ferguson, Committee and CapTrust had a role (meeting minutes can tell precisely when and how the Defendants acted). At this point, based on what Plaintiffs have been provided, an inference is clear—responsible plan fiduciaries failed to ensure the Plan participants had access to the selected/retained investments (two dozen out of 20,000 available) that had a competent portfolio manager where their risk and performance was "thoroughly evaluated" before selection. Then, Plaintiffs relied on responsible plan fiduciaries to periodically monitor their earlier decisions in case removal was necessary.

## **THE TRUST LOST $45,248,526 FOR FAILURE TO PRUDENTLY & LOYALLY SELECT AND MONITOR THE MAINSTAY WINSLOW LARGE CAP GROWTH FUND**

214.   A mutual fund's "return-reducing portfolio manager's compensation" is taken daily (1/365th) at 4pm. These daily economic costs to the Plan and Trust are not contingent on if the portfolio manager has outperformed his benchmark index. Over fifty percent (50%) of portfolio managers quit or are fired after less than four years of tenure running the portfolio of their mutual fund (data from Morningstar® as of 1/1/2009 up to 6/30/2022). This median eight-year manager tenure also follows with the analysis of the Plan and Trust's three large mutual funds that the Defendants selected/retained over the recent years.

215.   A three-judge panel of the Sixth Circuit ruled on June 21, 2022, in Yosaun Smith v. CommonSpirit Health, et al., (case number 21-5964), in the U.S. Court of Appeals for the Sixth Circuit) stated: "Over time, <u>management fees</u>, like taxes, <u>are not trivial features of investment performance</u>," Actively managed funds do in fact "represent a common fixture of retirement plans, and there is nothing wrong with permitting employees to choose them in hopes of realizing above-average returns over the course of the long lifespan of a retirement account," the court noted.

216.   Like in the case here, the three-judge panel of the Sixth Circuit noted, in order to be deemed sufficient, those claims of imprudence "require evidence that an investment was imprudent <u>from the moment the administrator selected it</u>, that the <u>investment became imprudent over time</u>, <u>or that the investment was otherwise clearly unsuitable</u> for the goals of the fund based on ongoing performance." [Emphasis added]

217.   That said, the court cautioned that ERISA "does not allow fiduciaries merely to offer a broad range of options and call it a day."

218.   Plaintiffs do not assert that any fiduciary acted imprudently merely by offering actively managed funds in its mix of investment options. Neither do Plaintiffs believe that investors should be very skeptical of an actively managed fund's ability to consistently outperform its index.

219.   Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident" or if there is a "superior alternative investment" to any of the plan's holdings. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt*., 712 F.3d 705, 718-19 (2d Cir. 2013).

220.   Plaintiffs contend the Defendants must not have read the prospectuses with "care" and "skill" by investing participants/beneficiaries' salary savings into

funds with levels of risk that render [them] "unsuitable for the average retirement investor," the decision acknowledges.

221.   "An ERISA fiduciary must discharge his responsibility 'with the care, <u>skill</u>, prudence, and diligence' that a prudent person 'acting in a like capacity and familiar with such matters' would use." *Tibble v. Edison IV*, 135 S.Ct. at 1828 (quoting  29 U.S.C. § 1104(a)(1).)

222.   Combined with a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015).  "[A] fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds . . . could theoretically, in combination, create a prudent portfolio."  *In re Amer. Int'l Grp., Inc. ERISA Litig. II*, No. 08-cv-5722, 2011 WL 1226459, at *4 (S.D.N.Y. Mar. 31, 2011) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423-24 (4th Cir. 2007)).

## DEFENDANTS SHOULD MONITOR FOR EVIDENCE OF A LACK OF "CARE" OR "SKILL"

223.   In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary") further provides that: "[I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary unless he makes reasonable efforts under the circumstances to

remedy the breach."

224.   Derivative of the trustee's duty of prudence, the Defendants violated the duty to avoid incurring unnecessary expenses when directing trust corpus to buy $70,142,272 of shares in Mainstay Winslow Large Cap Growth fund in 2011 (charging participants/beneficiaries 1.04% per year or $729,480 per year in portfolio manager's compensation).

225.   Based on information and belief, CapTrust/CapFinancial reviewed this fund via quarterly written monitoring reports and recommended to Ferguson to retain this imprudent fund from 2011 at least until January 1, 2021.

226.   The facts and circumstances below prove Defendants Ferguson, Committee and CapTrust had flawed monitoring processes from the SEC-prospectus performance information in 2016. The share classes below performance mirror one another because they are twin sisters (the "I" version simply being an institutional version of the oldest share class ("A" version at the top).

227.   The story below belies the requirements of the U.S. Supreme Court 2015 *Tibble* ruling that fiduciaries must continually closely monitor investments. Over 20 years, the Defendants' choice underperformed the 29 CFR § 2550.404a-5 appropriate broad-based securities market index (Russell 1000 Growth).

228.   Over every period observable below, Plaintiffs find precisely why the U.S. Supreme Court unanimously ruled (on May 18, 2015) that it is necessary to closely monitor every fund--especially those deducting fees from investors' returns to pay for portfolio manager's compensation when they did not enhance returns for their investors (regardless of which share class the responsible plan fiduiaries selected)

| Name | 12-Month Return | 3-Year Total | 5-Year Total | 10-Year Total | 15-Year Total | 20-Year Total | Since Inception Total |
|---|---|---|---|---|---|---|---|
| MainStay Winslow Large Cap Growth A | -25.21 | 25.34 | 78.05 | 240.96 | 297.14 | 561.83 | 902.68 |
| MainStay Winslow Large Cap Growth I | -25.11 | 26.08 | 80.12 | 249.50 | 313.76 | | 471.54 |
| Russell 1000 Growth TR USD | -18.77 | 42.69 | 95.00 | 297.57 | 357.56 | 612.99 | 4,692.36 |

CLASS ACTION COMPLAINT

| Name | Fund Family |
|------|-------------|
| MainStay Winslow Large Cap Growth A | New York Life Investment Management LLC |
| MainStay Winslow Large Cap Growth I | New York Life Investment Management LLC |
| Russell 1000 Growth TR USD | Russell Index |

229.   The Restatement (Third) of Trusts devoted considerable attention to this duty, emphasizing that "cost-conscious management is fundamental to prudence in the investment function." Restatement (Third) of Trusts further contends that trustees must also consider realistically the prospect and likelihood of such activities generating increased returns to assess whether the activities are consistent with the duty of prudence.

230.   Defendants not only spent $729,480 in 2011 and directed twice the 2011 amount ($155,905,214 of the trust's corpus) into the Mainstay Winslow Large Cap Growth at a slightly smaller expense of ninety-seven basis points (or $1,512,280 in 2016) on "return-reducing portfolio manager's compensation" and other fees (all mutual funds' fees fell over the past decade or more due to failures to beat their benchmarks).

231.   Due to this plan's portfolio managers' lack of skill, their "true costs" from mismanagement of their portfolio of stocks were far more significant in harm to the trust than the total annual expense ratio (including the portfolio manager's compensation).

232.   No sensical responsible plan fiduciaries reviewing their fund's prospectus at the moment of initial selection (and during quarterly monitoring periods afterward) would invest or keep other people's money with this fund's managers.

233.   Although a fund's expense ratio is the most consistent indicator of its returns according to William F. Sharpe (1990 Nobel Laureate) the increased risk of new managers and their " * * * transaction costs * * * (see generally W. Scott Simon, THE PRUDENT INVESTOR ACT: A GUIDE UNDERSTANDING (2002),

NOTE 144) from a risky concentration of stocks hit this fund's investors equally hard (at selection: 69 stocks; 32.2% of all assets for all share classes were invested in only ten (10) stocks).

234.   As of May 31, 2022, the Mainstay Winslow Large Cap Growth fund's managers held only 49 stocks while its benchmark held 1,000 stocks (Investopedia: "The term Russell 1000 Index refers to a stock market index that is used as a benchmark by investors. It is a subset of the larger Russell 3000 Index and represents the 1000 top companies by market capitalization in the United States."). It is no wonder the fund causes so much trust variance and potential losses affecting thousands of investors, especially hundreds who cash out/lock in realized losses when separating from service at Ferguson.

| Portfolio Analysis | |
|---|---|
| Portfolio Date | 5/31/2022 |
| Number of Holdings | 49 |

235.   The Mainstay Winslow Large Cap Growth fund selected/retained by Defendants Ferguson, Committee and CapTrust had a median loss to the fund's benchmark of -2.55% (years reviewed from 1/1/2011 to 6/30/2022). This difference is due to (1) the portfolio manager's trading/transaction cost and (2) holding on to four dozen stocks and having a massive variance from a lack of diversification. This lack of skill is astonishing and harmful.

236.   Based on 2009 to 2020 Annual Returns/Reports of Employee Benefit Plan from Ferguson Enterprises LLC, evidence indicates that CapTrust/CapFinancial served as line 2(b) "Service Code(s)" as a "27" (investment advisor to the plan). Each fiduciary at Ferguson Enterprises LLC and CapTrust/CapFinancial who either (1) was named or (2) functioned or (3) exercised or (4) was granted discretionary authority (regardless of whether such authority is ever exercised) demonstrated a "lack of skill" in selecting/retaining the Mainstay Winslow Large Cap Growth.

237.   Records prove Defendants Ferguson, Committee and CapTrust "failed

1   to act" at the time of their conduct, in a manner that shows each member did in fact

2   ". . . discharge his responsibility 'with the care, skill, prudence, and diligence' that a

3   prudent person 'acting in a <u>like capacity and familiar with such matters' would use</u>."

4   (*Tibble v. Edison IV*, 135 S.Ct. at 1828 (quoting  29 U.S.C. § 1104(a)(1)).

5       238.   "These duties are the highest known to the law."  *Howard v. Shay*, 100

6   F.3d 1484, 1488 (9th Cir. 1996). "To enforce them, the court focuses not only on the

7   merits of the transaction, but also on the <u>thoroughness of the investigation into the</u>

8   <u>merits of the transaction</u>."  *Id*.

9       239.   The Defendants' selected/retained the Mainstay Winslow Large Cap

10  Growth without prudently performing an essential "cost v. benefit" analysis to assess

11  if the fund's portfolio managers' compensation (taken from trust corpus daily)

12  "enhanced" the return probability. The Fourth Circuit noted in Tatum, "the

13  evaluation is not a general one, but rather must depend on the character and aim of

14  the particular plan and decision at issue and the circumstances prevailing at the

15  time." 761 F.3d at 358; see also *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct.

16  2459, 2471 (2014) (noting that resolution of the breach issue is "context specific").

17      240.  Plaintiffs' experts reviewed twelve years of the "circumstances

18  prevailing at the time" of the Defendants' selection and retention of trust investments

19  (since 1/1/2009). There was no evidence that Plaintiffs could find, in over twelve

20  years of certified annual reports to the U.S. Departments of Treasury and Labor,

21  based on circumstances prevailing at the time, that the Defendants could have

22  followed Restatement (Third) of Trusts and measured the "gains from the course of

23  action in question" because there were none in existence. Each manager was

24  compensated each business day handsomely to beat his benchmark, but they

25  consistently failed.

26      241.  The Defendants never ensured this fund's portfolio manager was

27  capable or "expected to compensate" the trust or participants'/beneficiaries' accounts

28  for their "additional costs and risks."  The Defendants' selections since 2009, as

evidenced by their certified annual reporting to the U.S. Departments of Treasury and Labor, showed no "credible basis for concluding that the trustee or the manager of a particular activity--possesses or has access to the competence necessary to carry out the program."

242.   Plaintiffs found "investment selections/retentions" criteria contained in public templates from Fidelity, T. Rowe, Fiduciary Analytics, etc., match attorney-recommended processes to select and monitor plan investments. Plaintiffs referred to By Donald Stone, AIF.  Mr. Stone is President of Plan Sponsor Advisors, LLC, an investment consulting firm and registered investment advisor that works exclusively with qualified retirement plans. The article is: "Investment Selection and Monitoring: A Practical Approach to Best Practices" at 401khelpcenter.com:

> "Plan Sponsors often struggle to understand what they need to do to fulfill their duties as a fiduciary. The Employee Retirement Income Security Act of 1974, better known as ERISA, says that plan fiduciaries are held to the standard of a "prudent expert" unless they hire a professional "with knowledge of such matters" to assist them (§404(a)). In §404(a)(1)(B) ERISA requires fiduciaries to determine a reasonable asset allocation and ensure that the investment furthers the purpose of the plan. The Department of Labor (DOL) has made it clear that in enforcing ERISA they will not judge fiduciaries on the results they achieve but rather by their process they follow. But process is not static. What might have been a reasonable process in 1974 would almost certainly not be today. And best practices of just a few years ago, may not be today. Fred Reish, a nationally known ERISA attorney, recently commented, "the expectations of the performance of plan fiduciaries and committee members, is increasing." This evolving standard may catch some plan fiduciaries unaware and expose them to unnecessary liability because they have not reviewed and revised their process."

243.   Using these ubiquitous criteria for selections/retentions, Plaintiffs found evidence that Defendants' "selection and retention processes" were thoughtless and irresponsible.

244.   Defendants exhibited a lack of loyalty, care and skill when they

selected/retained the first and most significant investment—the Mainstay Winslow Large Cap Growth fund.  Before beginning, the analysis experts used the share class with the longest reporting period (oldest share class) representing the first fund's SEC-prospectus filing at www.sec.gov/edgar.

245.  Based on SEC-prospectus, the portfolio manager's compensation is based on the management of all share classes and the dollars invested. When trading is performed, the manager at the time buys stocks in bulk using all share classes' investors' dollars and "allocates shares pro-rata" to each share class.

246.  Each share class is derived later from the initial open-end fund reported to the SEC. The portfolio managers and their holdings are identical for every share class based on the SEC reporting. The Defendants acted to select the Mainstay Winslow Large Cap Growth fund in plan year 2011 (when the managers were hired on 12/31/2005). They had only managed the limited stocks from 2010 back to 2006. The oldest share class will always be the Mainstay Winslow Large Cap Growth "A" (born on 6/30/1995). When the Defendants initially selected/retained the fund, the managers were Kelly/Winslow/Burton.

247.  These portfolio managers managed only 69 stocks across all share classes at the time of selection. The cheapest identical share class of the fund was and is today the "R6" version called Mainstay Winslow Large Cap Growth "R6" (started on June 17, 2013; using Kelly/Winslow/Burton as portfolio managers).

248.  Due to adverse compounding effects, revenue sharing credits are never as beneficial or equal to the lost opportunity of instead owning the cheapest share class of the matching fund. For example, using the 2018 year, the "A" version earned 55.56% in total return (over five years or 11.11%/year) with a revenue sharing of 0.25%/year.

249.  The "R6" version of the same SEC-registered mutual fund (Mainstay Winslow Large Cap Growth "Management Company: 0C00002DSP" for all share classes) earned 58.36% over five years in total (11.67%). The difference in returns

per year was 0.562% which is over twice the revenue sharing credit of 0.25%/year (should the Defendants have selected a revenue sharing version (Plaintiffs requested specific fund information like this, but requests went unfulfilled)). Thus, selecting/retaining share classes embedded with additional return-reducing "revenue sharing" costs indicates imprudent selections/retention processes by the Defendants.

250.   Putting these specific facts in dollar terms, the average account balance in the Ferguson Enterprises LLC 401(K) Retirement Savings Plan in 2016, according to the Defendants' financial statements, was over $60,000, with the average salary savings contribution over $6,000 per year. Over five years, an investor investing $60k (putting an additional $6k/year) growing at 11.11%/year equals $139,064.73. Growth at 11.67%/year equals $142,059.80--$2,995.07 more. It makes no sense for the Defendants to have ever selected/retained an identical but more expensive share class for participants'/beneficiaries' accounts.

251.   The other two investments (MFS International Intrinsic Value fund and Goldman Sachs Small Cap Value) examples that follow had similar attributes and circumstantial evidence. Hence, an equal depth of analysis about them is unnecessary in the interest of brevity.

252.   Based on the sponsor/Defendants' annual reporting to the U.S. Departments of Treasury and Labor, the MAINSTAY WINSLOW LARGE CAP GROWTH open-ended mutual fund had the most assets (mostly from the participants'/beneficiaries' salary dollars) as of the plan's year of 2016. Defendants basically failed to inform Plan participants about the $9,668,890.88 in trust assets wasted over the succeeding years (in portfolio manager's compensation/fees) as a result of Ferguson's selection of this specific fund (and CapTrust/CapFinancial recommendation under their contract.

253.   The fund's novice managers' performance lost over $48M compared to the benchmark these managers pitted their performance against and it was in plain sight of Defendants to take action. Neither Ferguson nor CapTrust/CapFinancial

1  acted.

2      254.   Plan participants were unaware that the Defendants' selection was

3  thoughtless but levied on their beneficial interest in the trust to pay this portfolio

4  manager's compensation totaling $9,668,890.88.

5      255.   Plan participants lost the opportunity to be invested in the fund's SEC-

6  prospectus and 29 CFR § 2550.404a-5 benchmark and kept these fees in their

7  accounts instead. The trust fund's gross (gross asset value (GAV)) or "price" of this

8  asset was reduced daily for portfolio manager's compensation. At 4pm these dollars

9  or expenses continued to be paid daily over the most recent six years,

10     256.   In other cases, defendants regularly argue that they could not obtain

11  funds with the least amount of price erosion—the cheapest version. This argument is

12  stated because of fund minimum deposit requirements. That argument fails because

13  all minimum deposit requirements have been waived for omnibus trusts (per

14  prospectus for every mutual fund in this plan for over a decade).

15     257.   The sponsor certified in the audits that this fund was legally registered

16  in trust's nominee name and held in a beneficial manner on behalf of the

17  participants'/beneficiaries' accounts (via "book entry accounting")--like every daily-

18  valued, participant-directed defined contribution plan in the USA.

19     258.   A total of $156 million of trust net asset values was audited and

20  reported to the U.S. government by the plan sponsor in the 2016 plan year.

21     259.   The novice portfolio manager's variance/risk was extraordinarily high at

22  8.4% per year (even more than expected annual returns; trust variance is risk

23  Defendants must monitor according to Restatement (Third) of Trusts due to (1) their

24  high annual compensation fee and (2) also by the portfolio managers holding only 50

25  stocks.

26     260.   Such risk implies the risk of loss exceeded the potential expected return

27  and the story is even worse using a more extended term.

28     261.   Conservatively using only the Defendants' initial 2016 balance of $156

million in trust in the fund (not including any of the participants'/beneficiaries' biweekly contributions totaling $195,469,313.80 from 2016 to 2020), the Defendants' chosen fund, Mainstay Winslow Large Cap Growth, grew $45,248,526 less than its reported benchmark (from 2016 to 6/30/2022).

262.   The Mainstay Winslow Large Cap Growth fund's benchmark's mean return was 13.19% since 2016. However, the Defendants' choice (the Mainstay Winslow Large Cap Growth fund) mean return was only 10.8% per year (using January 2016 to June 2022 prospectus data).

### Assessing Damage to Only One Participant

263.   To view the damage for one participant, the Plaintiffs use the average monthly contribution (based on the Defendants' reporting to the U.S. Departments of Treasury and Labor) of $573 and a $10,000 balance to prove the harm to only one worker in the Mainstay Winslow Large Cap Growth fund. If a participant only deposited $10,000 in 2016 into this fund and invested $573  per month, their account would grow to $36,033.36 in the Defendants' choice of investment.

264.   The Defendants should have realized that their managers struggled over many years to "beat their index" so perhaps it was prudent to "buy the index." Because if they had done so, participants'/beneficiaries' accounts would have risen to $39,097.28 instead of $36,033.36—a lost opportunity cost difference (for only one worker investing $10K) of $3,063.92.

265.   Plaintiffs now use one worker's actual average account balance (from the Ferguson audited financial statements) of $66,054 and assume one worker invests all of his salary savings in the Defendants' fund's broad-based securities market index. The index grew $18,761 higher over the six years from 2016 to 2021. Defendants will argue an investor cannot buy the "index," but Plaintiffs note many equivalent index mutual funds exist (costing zero (Fidelity) to 10 basis points/annum (0.1%)) that match the Defendants' fund's Russell benchmark. Paying this nominal SEC-accounting fee of seven basis points would reduce the equivalent benchmark's

1   return growth by only 761 dollars, using this example of the Plan's most significant
2   holding in 2016.

3       266.   It is important to note that the managers' performance this year has
4   again lagged severely. The additional damage to the trust occurred during the six
5   months of 2022 when the Defendants' fund lost -32.34% versus its benchmark at -
6   4.27% ( a difference of -28.07)%.

7       267.   The managers of this fund created risk (trust variance) from inception in
8   1996 to 2011 at a rate of 13.83%/year ((1) primarily due to holding about fifty stocks
9   and (2) taking the ~1%/year in fund expenses from the participants'/beneficiaries'
10  accounts). The cost of the managers never helped returns v. the benchmark-- in fact,
11  they <u>hindered growth</u> (i.e., the managers added no benefit to the trust as "holder of
12  record" (and thus the participants'/beneficiaries' accounts)).

13      268.   It was careless and disloyal, not to mention "wasteful," for the
14  Defendants to fail to prudently select and then to fail to monitor and remove this
15  imprudent fund. The Mainstay Winslow Large Cap Growth fund has been causing
16  the trust (and participants/beneficiaries) to incur annual median losses (from 2011 to
17  June 30, 2022) <u>of -2.55% each year (versus the broad-based securities market index)</u>.

18      269.   Almost 1,900 participants with account balances in the Ferguson
19  Enterprises LLC 401(K) Retirement Savings Plan separate from service and cash out
20  their accounts each year (over 5% participant turnover). Thus, the Defendants'
21  choice of adding this fund means the managers' massive volatility risk could affect
22  workers and they never have a chance to recover.

24  ### <u>TRUST LOST OPPORTUNITY COSTS WERE $23,817,615 DUE TO</u>
25  ### <u>REPEATED FAILURES TO PRUDENTLY AND LOYALLY</u>
26  ### <u>SELECT/MONITOR THE MFS INTERNATIONAL INTRINSIC VALUE</u>
27  ### <u>FUND</u>

28      271.   Plaintiffs analyzed, using manager and mutual fund risk/reward

specifics (facts and circumstances prevailing at that time at the time of the Defendants' conduct) the trust's MFS International Intrinsic Value fund. Once again, Plaintiffs used the oldest share class with the most available performance, fee and risk data to review.

272.   Over the past six years, Plaintiffs (and the class they represent) paid $8,465,680.30 in wasted portfolio manager's compensation (incurring reduced investment returns versus the appropriate broad-based securities market index) because of the Defendants' selected/retained MFS International Intrinsic Value fund.

273.   But for the Defendants' imprudent selections/retentions processes, each one of the Ferguson workers saved an average of 573 dollars per month for 72 months (the average per Ferguson's IRS/DOL reporting (saved wages)). If one of them elected to put about one-sixth of their ~$60K balance ($10,000) into this fund's benchmark (instead of the Defendants' MFS International Intrinsic Value fund), their $10K would have grown by an additional $3,555 (to $22,187.60 (instead of $18,632.81 in the Defendants' fund choice (MFS International Intrinsic Value fund))). The annual loss versus benchmark was -7.34% each year.

274.   However, over the past six years, the Defendants' repeatedly forced their average workers who wanted to own the plan's only "international value" large cap fund (which in 2016 owned "international *blend* stocks; a few years later the portfolio manager kept the word "VALUE" in the name but sold those stocks so only holdings left were those on the opposite spectrum called "international growth.") Based on information and belief, employees were never informed, and their accounts suffered in aggregate.

275.   Based on the Defendants' government reporting, this trust investment had approximately $131 million invested ($130,730,896 in 2016). The Defendants chose this investment for the plan initially in 2014. Plaintiffs' experts now evaluate their selection process using information prevailing at the time of this conduct.

276.   Holding that the fiduciaries had a continuing duty to monitor

participants' investment options and to remove imprudent ones, the U.S. Supreme Court ruled in a unanimous opinion authored by Justice Breyer on May 18, 2015, that ERISA's fiduciary duty, derived from the law of trusts, imposes a continuing duty to monitor plan investments and remove imprudent ones. Accordingly, so long as a plaintiff alleges a breach of this continuing fiduciary duty during the six-year period before suit, the claim would be timely, regardless of when any fund is initially added to the menu for participants/beneficiaries to invest/defer their salary dollars. "[S]eparate and apart from the trustee's duty to exercise prudence in selecting investments at the outset," a trustee also "has a continuing duty" "[u]nder trust law" "to monitor trust investments and remove imprudent ones."

277.   The United States Supreme Court in *Tibble v. Edison Int'l*, (575, U.S. 523, 135 S. Ct. 1823, 1827-28 (2015)) reversed the Ninth Circuit which had held a fiduciary breach claim barred by the statute of limitations because it was brought more than six years after the fiduciary selected the plan investments at issue. Id. at 1827. But, as the Supreme Court recognized, ERISA also imposes a duty on fiduciaries to monitor plan investments and take action when such investments become imprudent. *Id*. at 1828. This "continuing duty" meant that the limitations period must be assessed from some date later than the date of selecting the investments. *Id*.

278.   The *Tibble* Court concluded that the plaintiffs had identified a potential violation with respect to certain funds because "a fiduciary is required to conduct a regular review of its investment." *Id.* Tibble's discussion of the continuing duty to monitor plan investments applies here.

279.   The Supreme Court held that the fiduciary duty is continuing in nature and that each new breach begins a six-year limitations period under § 1113(1). The Court recognized the breach as "a fiduciary's allegedly imprudent retention of an investment" which results in a series of related breaches as the investment is retained over time.

280.   Once again, the Defendants chose the MFS International Intrinsic Value fund's portfolio manager in 2014 <u>even though the money manager started managing this investment on November 20th of 2008.</u>  His performance prior to selection by the Defendants (using the participants' 29 CFR § 2550.404a-5 "appropriate broad-based securities market index") was abysmal. The portfolio manager's compensation taken from investors' returns helped drag his performance down versus his bogey or benchmark.

281.   However, based on the circumstances at the time, basic mathematical facts informed the Defendants that the portfolio manager's compensation was not deserved. The portfolio manager caused his fund's performance to lag behind his chosen benchmark with a loss of 4.37% per year (for the years of his managing the fund's portfolio (at a cost or expense ratio at the time of the Defendants' selection of 1.14% per yr.)). Plaintiffs' experts provide these empirical facts over the years he was at the helm (2013, 2012, 2011, 2010, and 2009).

282.   Considering not only this one portfolio manager but every one of the MFS International Intrinsic Value fund managers ever hired (to manage the portfolio before the Defendants' selection in 2014), Plaintiffs' experts discovered when taken together (since the fund's inception on October 24, 1995) the managers in total varied from their benchmarks by over 20% per year.

283.   This risk or variance caused losses as about 2,000 of Ferguson's workers saving into the plan each year were cashed out and paid diminished gains and never had a chance to experience a recovery. Facts existed at the time of the Defendants' selections/retentions to inform them of their chosen portfolio manager's lack of skill and related risks.

1.   Alpha is a fundamental concept used by mutual fund managers and investors and is quoted at investopedia as: "Alpha measures the amount that the investment has returned in comparison to the market index or other broad benchmark that it is compared against." Another definition under Wikipedia describes it better in

-74-

"WHAT IS MANAGER'S ALPHA? HOW CRITICAL IS IT IN SELECTION OF FUNDS?" as it states: "It is nothing but the excess return generated by the scheme over and above what is given by the market. This is a measure of the value addition provided by the fund manager's skills, contribution of his research team and the fund house's investment philosophy."

284.   For the Defendants' selection/retention of MFS International Intrinsic Value fund, a basic statistical review of the manager's alpha (return v. benchmark) found that it would require over 117 years of annual monitoring of every one of the MFS International Intrinsic Value fund's managers to confirm any of the fund's managers had "skill" to select stocks and thus deserved to be chosen and fees taken.

285.   In other words, a fundamental review, at the time of the Defendants' selection, (and every annual monitoring period for plan years 2016, 2017, 2018, 2019 and 2020) shows that to have 95% confidence in this fund's managers requires the Defendants' monitoring of over 117 years (i.e., the Defendants' MFS International Intrinsic Value fund (partly because of the heavy annual portfolio managers' fees as well as other fund costs reducing the fund's daily net asset values (NAVs) or prices for this trust's single holding)).

286.   Once again, the MFS International Intrinsic Value fund managers consistently concentrated all of the share classes' dollars (identically) so much that over 30% of all share classes of this fund's dollars were held in only ten stocks (increasing this trust's fund's variance and risk to participants'/beneficiaries' accounts).

## DEFENDANTS SELECT/RETAIN MFS INTERNATIONAL INTRINSIC VALUE FUND WITHOUT ENSURING MANAGERS DID NOT MISLEAD PARTICIPANTS/BENEFICIARIES

271.   Jason Zweig wrote for the Wall Street Journal on Aug. 19, 2022, the article "How to Beat the Stock Market Without Even Lying--Stock funds have been pulling a switcheroo to make their returns look better: When they don't measure up,

1   they change how they measure."

2   272.   This statement is important and conveys two things. First, it echoes the

3   facts of this case for the Defendants' MFS International Intrinsic Value fund.

4   Second, it reminds investors: "Prospectuses always warn that past performance is no

5   guarantee of future results. Turns out it's no guarantee of past results, either."

6   273.   It continues with: "Fund managers can easily beat the market. All they

7   have to do is change the market they're trying to beat. * * * New study found that

8   b/w 2006-2018, 37% of all US stock mutual funds switched benchmarks…"* * * In

9   as many as two-thirds of the cases, funds made past returns look better by changing

10  the benchmarks they compared themselves to. More than half the time, funds chose a

11  new index that wasn't even a good match for their strategy. For the first year after a

12  change, the SEC requires funds to continue showing the old benchmark alongside the

13  new one. (That rule was intended to "minimize the possibility" that funds would

14  switch yardsticks solely to make themselves look better by comparison.) After a

15  year, funds can measure their past returns only against the new index and drop all

16  mention of the one they used to use."

17      **Defendants' MFS International Intrinsic Value Fund Bought "Value"**

18      **Stocks When the Defendants' First Selection Process Occurred**

19  274.   At the time of (1) CapTrust/CapFinancial research and recommendation

20  coupled with (2) Ferguson's committee's acceptance and then (3) written approval to

21  Prudential, the MFS International Intrinsic Value fund managers bought "value"

22  stocks—aka, dividend-paying stocks (Figure 2 "Category" below at the time of

23  Captrust's recommendation and Ferguson's acceptance (written board resolution)

24  and direction to the custodian to add the fund. At the beginning of the limitations

25  period, the managers decided to shift the portfolio to a "blend" of value and growth

26  stocks with lower overall monthly dividend yields to the Plan and Trust (Figure 3).

27

28

MFS International          MFS® International
Objective:  **Foreign Stock**     Objective:  **Foreign Stock**
Category:    Foreign Large Value    Category:    Foreign Large Blend

275.   On or before the plan year 2019, based on the SEC-prospectus at www.sec.gov/edgar at the time, Defendants could have noted the fund's managers decided that they would keep the name the same "Value" but do a "switcheroo" totally from "value" stocks to non-dividend paying stocks (aka "growth" stocks). This portfolio manager's "switcheroo" dramatically reduced the monthly income to the Plan and Trust from 1.26% in 2016 to zero in 2019 and remains at zero percent today. Based on information and belief, the Defendants never (1) diligently noted this and (2) never clearly explained this information to the investors (i.e., participants/beneficiaries). As proof, Plaintiffs provide Figure 4 below from the fund's prospectus information.

# MFS International

Objective:     **Foreign Stock**

Category:      **Foreign Large Growt**

276.   The Defendants could have easily noted the switcheroo to make their returns look better. When they don't measure up, they change how they measure (Figure 3 below). These facts help explain why Plaintiffs' experts use the Prudent Investor Rule (Restatement Third) recommended benchmark ("best-fit" index required by Modern Portfolio Theory (MPT) and Prudent Investor Rule (Restatement Third).

277.  The Prudent Investor Rule (Restatement Third) is designed to accommodate Modern Portfolio Theory (MPT). This accommodation has vast implications for the administration, planning, and drafting of trusts. See generally RESTATEMENT (THIRD) OF TRUSTS § 227 cmts. e-h (1992) (introducing

Modern Portfolio Theory and other investment concepts); BEVIS LONGSTRETH, MODERN INVESTMENT MANAGEMENT AND THE PRUDENT MAN RULE 7 (1986) (providing an overview of Modern Portfolio Theory for a fiduciary subject to the prudent man rule); JONATHAN R. MACEY, AN INTRODUCTION TO MODERN FINANCIAL THEORY (2d ed. 1998) (studying the: elements of modern finance theory); BURTON GORDON MALKIEL, A RANDOM WALK DOWN WALL STREET (6th ed. 1996) (defining Modern Portfolio Theory and the related risks).

278.   The MPT best-fit index measures the performance of the portfolio manager's actual holdings versus their SEC-prospectus filings (that can be misleading). Meaning, the correlation (R-squared) of both the portfolio manager's actual holdings to the measurement device (the "appropriate broad-based securities market index") is high and a fairer way to measure the portfolio manager's skill.

279.   Plaintiffs reviewed the performance of each fund offered by the Defendants with portfolio manager's compensation and found they were all chosen and retained using reckless and negligent processes at the moment of their conduct. However, Plaintiffs only discuss three of them (more prominent than others not discussed) here specifically:

> (1) the Mainstay Winslow Large Cap Growth fund,
>
> (2) the MFS International Intrinsic Value fund and
>
> (3) the Goldman Sachs Small Cap Value fund

280.   Plaintiffs' experts evaluated portfolio manager performance against the (1) SEC prospectus; (2) the 29 CFR § 2550.404a-5 appropriate broad-based securities market index and lastly, (3) the "Best-Fit Index." (under Restatement 3rd of Trusts (American Law Institute in 1992; Prudent Investor Rule Modern Portfolio Theory (MPT) statistics).

281.   The last measure is contingent upon the strength of the relationship between the fund and its benchmark. "Investors should seek a benchmark with the

highest degree of correlation (R-squared) with the fund because the reliability of a fund's Modern Portfolio Theory (MPT) statistics is contingent upon the strength of the relationship between the fund and its benchmark. A higher R-squared generally ensures a more reliable beta and alpha figure." (https://www.morningstar.com/articles/372237/understanding-best-fit-versus-standard-indexes)

282.   From Investopedia again, "R-squared is a measure of the percentage of an asset or mutual fund's performance as a result of a benchmark. Fund managers use a benchmark to evaluate the performance of a mutual fund."

## THE TRUST LOST $8,142,245 FOR FAILURE TO PRUDENTLY SELECT/MONITOR THE GOLDMAN SACHS SMALL CAP VALUE FUND

283.   The third investment Plaintiffs' experts reviewed was also selected and retained using thoughtless, irresponsible, and negligent processes--with the Defendants' fund's manager's fees causing a daily price reduction and burdening the trust's value (and participants'/beneficiaries' accounts). The wasted annual fee of 1.38% per year began hitting the fund's gross asset value (GAV) immediately the first day after it was added (1/365th). The portfolio manager's compensation continued to reduce trust corpus values with zero or no benefit to the trust. In fact, at the time of the Defendants' conduct, it was clear the manager's fees reduced the average 20-year return to 9.77% (versus the portfolio manager's desired benchmark) at almost one percent per year more (10.63%/year).

284.   Defendants directed $97 million of the participants'/beneficiaries' salaries (in 2016) in the Goldman Sachs Small Cap Value fund. The trust and participants/beneficiaries wasted $6,031,634.38 in the portfolio manager's compensation/fees (which added no value to the trust's and participants'/beneficiaries' accounts). However, the $6M in wasted fund manager costs to investors was only incurred over the past six years. Under a continuing duty requirement, the make-whole or trust "benefits restoration" ("benefits lost harm"

1  versus legal damages) requires over twice this amount to put <u>"trust beneficiaries to</u>
2  <u>the position they would have occupied but for the breach of trust</u>."

3    285.   One appropriate remedy in cases of breach of fiduciary duty is the
4  restoration of the trust beneficiaries to the position they would have occupied but for
5  the breach of trust. Restatement (Second) of Trusts § 205(c) (1959); see Eaves v.
6  Penn, 587 F.2d at 463. In view of the intent expressed by Congress in providing for
7  the recovery of "losses," and in the absence of evidence of congressional intent to
8  penalize, as such, violations of section 409, we hold that the measure of loss
9  applicable under ERISA section 409 requires a comparison of what the Plan actually
10  earned on the Grumman investment with what the Plan would have earned had the
11  funds been available for other Plan purposes. If the latter amount is greater than the
12  former, the loss is the difference between the two; if the former is greater, no loss
13  was sustained. See id.; Restatement (Second) of Trusts § 205(c) (1959); see also In
14  re Imperial "400" National, Inc., 456 F.2d 926, 931 (3d Cir. 1972); Perkins v.
15  Waukesha National Bank, 290 F.2d 912, 918 (7th Cir.), cert. denied, 368 U.S. 928,
16  82 S.Ct. 363, 7 L.Ed.2d 191 (1961).

17    286.   Referring to the Supreme Court's *Amara v. Cigna* (2011) and *LaRue v.*
18  *DeWolf* (2008) decisions, the Defendants' violations are supported by the Court's
19  "make-whole" references. When combined with ERISA Section 409 requirements
20  (ERISA section 409(a) imposes personal liability on fiduciaries that breach their
21  fiduciary duties), restoration of the Defendants' harm to the Plan and Trust dovetails
22  with the pure form of the continuing violations doctrine and each element here
23  avoids giving the Defendants a "license" to perpetuate its misconduct.

24    287.  Plaintiffs believe "a continu[ous] series of events gives rise to a
25  cumulative injury." That is the gravamen of our specific claims at issue—
26  participants/beneficiaries seek the trustee/fiduciary to restore all trust damages under
27  the laws of equity so that the Plaintiffs' accounts would reach the same levels as if
28  the breaches never occurred. Such is analogous to treating the claim as continuing in

nature. (See Kyle Graham, "The Continuing Violations Doctrine," Vol. 43 p 293, Gonzaga Law Review (2008)).

288.   The Defendants' Goldman fund was added in the year 2013. The Defendants directed $45,747,660 of the trust's assets into the under-yielding and underperforming Goldman Sachs Small Cap Value Fund. In 2013, according to their fund's SEC-prospectus, the yield was 0.31%/year, while the fund's prospectus broad-based securities market index yielded 1.77%/year.

289.   Also, the Defendants' choice Goldman Sachs Small Cap Value held 227 stocks, but its respective benchmark held 1,394 stocks. The Defendants' actions then ignored the fact that at the time of adding the Goldman Sachs Small Cap Value fund, its 20-year total return before was 545%, but its benchmark was 654% for the prior 20 years.

290.   Finally, the Defendants' choice of Goldman Sachs Small Cap Value cost to the trust was 1.38%/year but the Defendants could have selected another fund that matched the Defendants' fund's benchmark for ten basis points (0.10%; versus one hundred and thirty-eight basis points).

291.   As of the year of selection, the Defendants' fund's average return back to the inception of the fund (in 1992) was a loss to the benchmark of ninety-five basis points per annum—the geomean return was a loss of (1.21%) per year to its benchmark.

292.   If the manager cannot beat the benchmark, the Defendants' actions should have been to "buy the benchmark." Some benchmark mutual funds are offered at zero total annual fees. Such actions would have resulted (during the limitations period) of growth at 7.71% per year for the trust's $62,343,278 invested in 2016 to $101,009,885.45 (versus annual growth rate of 6.32% or $92,867,640.79. This illustration ignores new biweekly salary contributions from employees.

293.   We have found that our third and last comparison results are repeated for every portfolio manager that Defendants selected/retained since 2009. Plaintiffs

1  may amend this complaint and add other similar assertions later, especially if they
2  can receive items via a limited discovery process in the future.

3       294.   But for the Defendants' incompetence, a worker in the Ferguson
4  Enterprises LLC 401(K) Retirement Savings Plan who saved the average from the
5  Defendants' reporting ($573 dollars per year over six years) and who made an initial
6  deposit of $10,000 into this fund's benchmark would have grown their account
7  balance to $20,817.31.

8       295.   However, the Defendants' forced the workers to pay $6,031,634.38 in
9  fees to the Goldman Sachs Small Cap Value managers (versus the benchmark stated
10 in this fund's prospectus at www.sec.gov/edgar), resulting in a loss of (-1.54%/yr)
11 each year and losing the chance to have another $1,480.60 in their accounts.

12

13       **ADVISOR FOR PLAN AND TRUST PAID UNDER TWO EIN**
14   **NUMBERS AND THREE ENTITIES: (1) CAPFINANCIAL PARTNERS,**
15   **LLC, EIN 26-0058143; (2) CAPTRUST FINANCIAL PARTNERS, EIN 26-**
16       **0058143; (3) CAPFINANCIAL SECURITIES LLC, EIN 46-4350797**

17       296.   Defendants engage in the typical "shell" game to confuse participants
18  and beneficiaries.   The Plan Advisor, CapTrust, use multiple tax entities to steer
19  compensation that was never earned.

20       297.   For over a decade, Ferguson Enterprises LLC reported on IRS/DOL
21  FORM 5500 that CapTrust/CapFinancial and affiliates served as SCHEDULE C
22  SERVICE CODE 27. This is defined on page 27 of the 2020 "Instructions for Form
23  5500" to mean "Investment advisory (plan)."

24       298.   CapTrust/CapFinancial (with Ferguson's written approval) charged the
25  Plaintiffs (and Plan and Trust) <u>directly</u> and alienated the trust corpus (and
26  participants'/beneficiaries' accounts) an average of $520,798 each year from 2016 to
27  2020.

28

299.   However, the average for all of their clients over these years was only $47,233/yr (median $44,946). Based on information and belief, they served under a contract with very similar terms (if not identical terms) and provided similar services. A larger size of assets in a plan are unrelated to CapTrust/CapFinancial specific services in their agreement. CapTrust/CapFinancial provides. every one of Ferguson's certified reporting states CapTrust/CapFinancial is providing "CODE 27 (investment advisory (plan)) or plan level services.

300.   Thus, "--Ongoing Investment Due Diligence" is the same for a $10M plan with 20 investments as it is for a $100M plan with 20 investments on its menu. Importantly, based on information and belief, CapTrust/CapFinancial's contract's terms carved out liability. CapTrust/CapFinancial's contract or services agreement's regular hours were mainly for quarterly research and reporting to the responsible plan fiduciaries at Ferguson Enterprises LLC.  All Plaintiffs and class representatives paid CapTrust/CapFinancial's fee "pro-rata" (or based on the size or dollars in their accounts). Thus, longer-serving participants/beneficiaries paid more than new hires at Ferguson Enterprises LLC.

301.   Based on information and belief, a conflicted CapTrust/CapFinancial recommended these three expensive, risky, underperforming, lower-yielding mutual funds to Ferguson. Ferguson's actions to blindly follow CapTrust/CapFinancial continuing flawed recommendations impeded the trust's corpus growth (and participants'/beneficiaries' accounts). Specific funds analyzed here were: Mainstay Winslow Large Cap Growth, MFS International Intrinsic Value fund and Goldman Sachs Small Cap Value.

**Biweekly Workers Salary Contributions into Imprudent Funds**

302.   Based on Ferguson's chosen recordkeeping firm's standard agreement, Plaintiffs find that CapTrust/CapFinancial and Ferguson collaborated to direct the custodian to "invest" all future periodic cash in-flows into the same recklessly chosen and maintained mutual funds (and sub-advised collective/separate accounts).

These participants'/beneficiaries' investments' recurring cash deposits to the trust were also invested into these underperforming funds over months and years:

1. employees' salary savings (biweekly)

2. matching dollars related to employees' savings (biweekly)

3. realized gains (monthly)

4. dividends (monthly)

5. interest (monthly)

6. capital appreciation

303.   CapTrust/CapFinancial, aided by Ferguson, was also paid compensation from the cash in-flows in recent years which explains their increased compensation.

304.   To be compliant however, Ferguson and CapTrust/CapFinancial must have (1) amended their agreement to provide (2) additional value to participants'/beneficiaries' accounts, so the increased pay was: "necessary for the establishment or operation of the plan" (thus exempt from prohibited transaction rules (§ 406(a)(1)).

305.   Based on information and belief, this did not happen. CapTrust/CapFinancial was <u>detrimental</u> to the Plan and Trust instead of being "necessary."

306.   Ferguson authorized CapTrust/CapFinancial to be excessively compensated for over a decade and must have been aware that CapTrust/CapFinancial did not meet the rules requiring "no more than reasonable compensation is paid therefor." 29 U.S.C. § 1108(b)(2)

307.   Stemming from the same related breaches, since being hired, CapTrust/CapFinancial alienated over $4M directly from participants'/beneficiaries' accounts to one or more of the three different CapTrust/CapFinancial affiliates reported by Ferguson Enterprises LLC (below):



308.    To  manage  operating  expenses,  a  plan  sponsor  must  understand  and
continually  evaluate  the  plan's  expenses,  fees  and  service  providers.    The
Department of Labor advises:

> As the sponsor of a retirement plan ... you, or someone you appoint, will
> be  responsible  for  making  important  decisions  about  the  plan's
> management.  Your  decision-making  will  include  selecting  plan
> investments or investment options and plan service providers.  Many of
> your decisions will require you to understand and evaluate the costs to the
> plan....   Among other duties, fiduciaries have a responsibility to ensure
> that the services provided to their plan are necessary and that the cost of
> those services is reasonable....   As a plan fiduciary, you have an obligation
> under  ERISA  to  prudently  select  and  monitor  plan  investments,

investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. (U.S. Dep't of Labor, Emp. Benefits Sec. Admin., Understanding Retirement Plan Fees and Expenses, 1-2 (Dec. 2011)).

309.   Prospectuses and empirical data at the time that the Defendants made their investment selections and retention decisions demonstrated that, over time and across market sectors, the actively managed funds they selected consistently failed to outperform "an appropriate broad-based securities market index" under 29 CFR § 2550.404a-5. This failure was most pronounced in asset classes, demonstrating a high degree of market efficiency.

310.   Based on information and belief, in violation of the Prudent Investor Rule (Restatement Third) and the plan's Investment Policy Statement (IPS), CapTrust/CapFinancial did not make expense ratios (portfolio manager's compensation) a primary test in fund selection. The leading mutual fund investment research and services firm, Morningstar, emphasizes the effect of expenses on fund performance and advises investors to rely on expense ratios when choosing mutual funds:

"If there's anything in the whole world of mutual funds that you can take to the bank, it's that expense ratios help you make a better decision.  In every single time period and data point tested, low-cost funds beat high-cost funds  * * *  Expense ratios are strong predictors of performance  * * *  Investors should make expense ratios a primary test in fund selection. They are still the most dependable predictor of performance."

Russel Kinnel, How Expense Ratios and Star Ratings Predict Success (Aug.  9,
2010), at https://www.morningstar.com/articles/347327/how-expense-ratios-and-
star-ratings-predict-success.

311.   CapTrust/CapFinancial babysat the fund menu for many years. There
was only one fund change in the limitations period (2018). Thus, Plaintiffs infer
there was little time spent on research for new funds and no study to remove a fund,
etc. CapTrust/CapFinancial simply issued reports taking about 20-25 hours per
quarter under the industry-leading survey of firms like CapTrust/CapFinancial (Fee
Benchmarker® (Advisor Fee Almanac, 6th Edition, 2017)).

312.   CapTrust/CapFinancial's fee for all other clients in the USA equals
about $45,000/year. This is closer to the Advisor Fee Almanac's surveys. At the
maximum "principal" level of $300/hour spending, about 25 hours per quarter comes
in at $30,000/year. Adding another 30% ($10,000) for profit brings the annual total
to $40K.

313.   To be specific, in 2016 CapTrust/CapFinancial collected ten-times more
at $462,039 (direct from the trust). In 2017 they took enormous dollars direct from
the trust's corpus equaling $560,935.

314.   In 2018 CapTrust/CapFinancial alienated another $624,264 direct from
the trust.

**CapTrust/CapFinancial New Entity Raises Its Head**

315.   Plaintiffs  note  at  https://brokercheck.finra.org:  CAPFINANCIAL
SECURITIES, LLC. – BrokerCheck: "A brokerage firm, also called a broker-dealer,
is in the business of buying and selling securities – stocks, bonds, mutual funds, and
certain other investment * * *"

316.   In 2019, Ferguson authorized a different Captrust entity (that held a
license as an investment advisory firm) called "CAPFINANCIAL SECURITIES
LLC" to be compensated by the Ferguson Enterprises LLC 401(K) Retirement
Savings Plan.

317.   This entity did not get paid in the past based on Ferguson's annual reporting. Based on information and belief, Ferguson authorized CAPFINANCIAL SECURITIES LLC (a commissioned based mutual fund selling company) to be paid $321,563 for their recommendation to put $97,995,387 of participants'/beneficiaries' salary dollars into a new fund (MassMutual Select Mid Cap Growth Fund).

318.   Based on information and belief, the Plaintiffs infer this was a kickback for recommending or "selling" the MassMutual Select Mid Cap Growth fund to Ferguson called a "finders fee." CapTrust/CapFinancial's self-dealing occurred during the limitations period. This transaction needs further exploration.

### Not a Recordkeeping Expense or "Active v. Passive" Complaint

319.   Based on these sources and others, coupled with the "totality of circumstances," the Defendants primarily selected and retained investments using monitoring reporting that hid their recommendations of investments' poor performance versus "an appropriate broad-based securities market index" (29 CFR § 2550.404a-5). In doing so, CapTrust/CapFinancial could remain in receipt of excessive compensation even more considerable than other similar plans they served. As the image below proves, CapTrust/CapFinancial used multiple entities designed and licensed for specific purposes to aid in compensation schemes likely to go unnoticed by Ferguson and its committee members. Figure 5 is provided again in a larger size to note specific compensation details which demonstrates self-dealing and "conflicts of interest" against CapTrust/CapFinancial contract's terms (in breach) because of (1) multiple tax entities at the bottom of the figure below as well as (2) massive compensation variance coupled with (3) arbitrary swings in pay but a trend upwards:



320.   The Defendants had a duty to select CapTrust and monitor CapTrust prudently. Allowing CapTrust/CapFinancial to take $4,276,860 of trust assets in the form of "reasonable compensation" requires the trust to be restored (according to Ferguson's plan documents).

321.   The fiduciary Defendants' failure to act and failure to follow their IRS-approved plan document over and over, caused them to fail their duty to put the participants'/beneficiaries' accounts "back to the condition they should have been" but for the "excessive compensation" paid from the trust since January 1, 2009.

322.   The Prudential document required Ferguson's use of a Form 5330, Return of Excise Taxes Related to Employee Benefit Plans. Failure to follow the plan's documents subjects the plan to disqualification and Plan participants to be

1  taxed on their earlier wages they saved. (see IRS' Restorative Payment procedure

2  (IRS Employee Plans Compliance Resolution System (EPCRS)).

3    323.   Ferguson's "inadequate supervision is an act of nonfeasance, not one of

4  malfeasance" (see Bd. Of Trs. Of Health & Welfare Dep't of Constr. & Gen.

5  Laborers' Dist. Council of Chi. & Vicinity v. Allison Enters., Inc. (No. 12 C 4097,

6  2013 BL 152089, at *3 (N.D. Ill. June 10, 2013))).

7    324.   Plaintiffs remain subordinate and cannot access information relating to

8  2021 and 2022 trust deductions. The general rule placing on the plaintiff the burden

9  of proving his claim "is moderated in order to take account of . . . the trustee's

10  superior (often, unique) access to information about the trust and its activities."

11  (Restatement Third, § 100 cmt. F).

12    325.   Plaintiffs find Ferguson Enterprises LLC avoided paying CapTrust from

13  Ferguson   Enterprises   LLC's   profits   so   they   could   instead   burden   the

14  participants/beneficiaries. In 2018 Ferguson increased CapTrust/CapFinancial's

15  compensation even though the exact same services were provided to the plan and

16  participants/beneficiaries.

17    326.   In 2018, Ferguson paid CapTrust/CapFinancial an increase to $624,264

18  (from the Plan and Trust). This equaled a 138% increase approved by the CEO

19  (Kevin Murphy and/or John Walley Martin) and/or Chief Financial Officers (Bill

20  Brundage and/or Mike Powell). That works out to a 14% per year pay raise which is

21  more favorable than the trust's rate of growth from investments as well as the staff at

22  Ferguson (Indeed.com reports that: "Average Ferguson Enterprises, Inc. hourly pay

23  ranges from approximately $13.50 per hour for Accounts Payable Clerk to $26.25

24  per hour for Warehouse Technician." Thus, a full-time (2,000 hours/year) Ferguson

25  employee's annual pay at Ferguson is between $27,000 and $52,500—less than one-

26  tenth of CapTrust's pay and ten to twenty times more hours than CapTrust's 100-

27  hour estimate.

28

CLASS ACTION COMPLAINT

327.   The Defendants' nonfeasance was a breach of their duties under ERISA. They were "willfully blind" to massive compensation from January 1, 2009 and before. ERISA Section 406(b) creates a per se ERISA violation even in the absence of bad faith or in the presence of a fair and reasonable transaction; § 1106(b) establishes a blanket prohibition of certain acts, easily applied, in order to facilitate Congress' remedial interest in protecting employee benefit plans. (Gilliam v. Edwards, 492 F.Supp. 1255, 1263  (D.N.J.1980) citing Cutaiar v. Marshall, 590 F.2d 523, 529-30 (3rd Cir.1979); see also Brink v. DaLesio, 496 F.Supp. 1350 (D.Md.1980), aff'd in part and rev'd in part, 667 F.2d 420  (4th Cir.1982) (trustee of a pension plan, having accepted gratuities from individuals providing services to the plan, violated ERISA § 406(b)(3) even though it had not been proven that the [*1554] transaction was a quid pro quo for the gratuities or that harm had resulted).

328. Based also on SEC information that CapTrust provided, https://reports.adviserinfo.sec.gov/crs/crs_175112.pdf conflicts exist for this fiduciary firm (Captrust) and were confirmed via links from Captrust's filings with the SEC. Plaintiffs note, for example [emphasis added]:

> Affiliate Services: CAPTRUST has an affiliated broker-dealer, CapFinancial Securities, LLC * * * However, our interests can conflict with your interests: when we provide recommendations, we must eliminate these conflicts or tell you about them and in some cases reduce them. You should understand and ask about these conflicts because they can affect the recommendations we make. Here are some of the ways we make money. Third Party Payments: CFS registered representatives can earn commissions on mutual fund and variable annuities and life insurance products. Revenue Sharing Arrangements: some independent third-party investment managers pay CFS a portion of their management fee to provide shareholder servicing.

329.   A fiduciary's mismanagement of plan assets leading to an investment lineup filled with poor-performing investments and excessive fees can force a participant to work an extra five to six years to compensate for the excess fees that were paid.

330.   To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pa.,* 923 F.3d 320, 333 (3d Cir. 2019). Accord Restatement (Second) of Trusts § 2 cmt. b (1959).

## CLASS ACTION ALLEGATIONS

331.   Plaintiffs bring this action in a representative capacity on behalf of the Plan and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a Class defined as follows: All participants in or beneficiaries of the FERGUSON ENTERPRISES, LLC 401(K) RETIREMENT SAVINGS PLAN from October 1, 2016 through the date of judgment,   (the "Relevant Time Period or Class Period").[2]

332.   29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

333.   This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

     a. The Class include over 25,000 members and are so large that joinder of all its members is impracticable.

     b. There are questions of law and fact common to the Class because Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and made omissions alleged

---

[2] Plaintiffs reserve their right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breaches of duty.

c.  Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

d.  Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with any other member of the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.  Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially

impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

334.   A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

335.   The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of December 31, 2020, the Plan had over 30,256 participants with account balances.

336.   There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class, which predominate over questions that may affect individual class members, include, *inter alia*:

     a.  whether Defendants are a fiduciaries of the Plan;

     b.  whether Defendants breached fiduciary duties of loyalty and prudence with respect to the Plan;

     c.  whether Defendants had a duty to monitor other fiduciaries of the Plan;

     d.  whether Defendants breached their duty to monitor other fiduciaries of the Plan;

e.  the proper form of equitable and injunctive relief; and

f.   the proper measure of monetary relief.

337.   Plaintiffs' claims are typical of those of the Class because their claims arise from the same event, practice and/or course of conduct as other members of the Class.

338.   Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action litigation in general and ERISA class actions involving fiduciary breaches.

339.   Plaintiffs have no interests that conflict with those of the Class. Defendant does not have any unique defenses against any of the Plaintiffs that would interfere with their representation of the Class.

340.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be too small for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are not aware of any difficulties likely to be encountered in the management of this matter as a class action.

341.   In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final, injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

**<u>FIRST CAUSE OF ACTION</u>**

**Violation of 29 U.S.C. §§ 1104(a)(1)(B) and 1105**

**(Liability for breach of co-fiduciary; Duty of Prudence)**

**(Against All Defendants)**

342.   Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

343.   ERISA mandates that fiduciaries act with prudence in the disposition of Plan assets and selection and monitoring of investments, as well as in the monitoring and minimization of administrative expenses. 29 U.S.C. § 1104(a)(1)(B).

344.   In determining whether an ERISA fiduciary breached its duty of prudence, courts focus on: "whether the fiduciary engaged in a reasoned decision-making process, consistent with that of a prudent man acting in a like capacity....... ERISA requires fiduciaries to employ appropriate methods to investigate the merits of the investment and to structure the investment as well as to engage in a reasoned decision-making process, consistent with that of a prudent man acting in a like capacity." *Tatum v. RJR Pension Inv. Comm*., 761 F.3d 346, 356-58 (4th Cir. 2014). Accord Fifth Third *Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014).

345.   In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." Tibble, 575 U.S. 523.   To satisfy its duties under ERISA, a fiduciary simply may not argue that other funds, in combination, theoretically create a prudent portfolio. *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)."

346.   At all relevant times, Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

347.   At all relevant times during the Class Period, Ferguson Enterprises LLC (and its delegates) and CapTrust/CapFinancial, when selecting and retaining the Plan's investment lineup, deciding which funds to populate the limited Plan's menu of choices for workers, and retaining covered service providers, were ERISA

fiduciaries.

348.   At all relevant times during the Class Period, Defendant Investment Fiduciaries, in recommending investment options to the Plan for valuable consideration, in recommending investment managers and subaccount managers for the Plan to Plan fiduciaries, and in having sufficient influence over Plan Fiduciaries with respect to their selection of investment options for the Plan, was an ERISA fiduciary.

349.   At all relevant times during the Class Period, the Trustee, having residual fiduciary responsibility for determining whether a given direction is proper and whether following the direction would result in a violation of ERISA, and in heeding the directions of Plan Fiduciaries with respect to the payment of unreasonable and unnecessary fees and expenses to Prudential and Defendant Investment Fiduciaries, was an ERISA fiduciary.

350.   As fiduciaries of the Plan, Defendants were subject to the ERISA's duty of prudence.

351.   Defendants breached this fiduciary duty in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan participants. Instead, the Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. Likewise, Defendants failed to monitor or control the grossly excessive compensation paid for administrative services. Moreover, Defendants failed to investigate the competence of and periodically monitor covered service providers which they had selected to provide services to the Plan and Plan participants.

352. Based on reasonable inferences from the facts set forth in this Complaint, at all relevant times during Class Period, Plan Fiduciaries failed to have a proper system of review in place to ensure that: (a) participants in the Plan were

being charged appropriate and reasonable fees for the Plan's third-party service providers; (b) their selection and retention of investment options were prudent; (c) ensured all parties-in-interest were competent and free from self-interest; (d) and that Plan expenses were reasonable and necessary; and (e) they placed the interests of Plan participants and beneficiaries over the interests of hired covered service providers, and themselves.

353.   At all relevant times during the Class Period, Defendants did not have adequate procedures in place to monitor Plan service providers and investments and did not act in the best interests of the Plan participants.

354.   The United States Supreme Court held in Tibble that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones ... separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset."   575 U.S. at 529. "The trustee must systematically consider all the investments of the trust at regular intervals to ensure that they are appropriate." Id.

355.   Thus, to discharge this duty, Plan Fiduciaries must have had a prudent process and method for selecting, monitoring and retaining prudent, cost-effective investments for the Plan, and for removing imprudent investments.   As set forth below, this the Plan Fiduciaries here did not have.

356.   Plan fiduciaries are held to a "high standard of care and diligence" and must: (1) "establish a prudent process for selecting investment options and service providers;" (2) "ensure that fees paid to service providers and other expenses of the plan are reasonable in light of the of level and quality of services provided;" and (3) "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties. See A Look at Fee, supra.

357.   Prudence requires plan fiduciaries to monitor both the performance and cost of the investments selected for their 401(k) plans, leveraging the size of their plan to ensure that well-performing, lower cost investment options are available to

1    plan participants.

2    358.   Likewise, Plan Fiduciaries must be continually mindful of the
3    performance and cost of plan investment options to avoid undue risk to plan
4    participants' savings and to ensure that any fees paid are reasonable compensation
5    for the services provided. This includes fees from any plan service provider,
6    including the plan fiduciaries themselves.

7    359.   Plan Fiduciaries must also be wary of conflicts of interest that arise
8    when plan administrators and other fiduciaries select investment options for the plan
9    which include a remittance of a fee to the Plan sponsor, administrator, or investment
10   advisor, or another party otherwise affiliated with the Plan sponsor.

11   360.   Given the vulnerability of plan participants, who are dependent on the
12   retirement income earned by their Defendants' chosen plan investment choices, Plan
13   Fiduciaries also must be particularly vigilant about evaluating whether lower-
14   expense share classes are available to participants.

15   361.   Plan Fiduciaries had a fiduciary duty to monitor and evaluate the
16   performance of the Plan's investments they selected and retained, and to remove and
17   replace imprudent investments.

18   362.   Plan Fiduciaries did not have a prudent process for monitoring and
19   evaluating the performance of the Plan's investments.

20   363.   At all relevant times during the Class Period, the Plan's mutual funds
21   significantly underperformed their meaningful benchmarks.

22   364.   If Plan Fiduciaries had monitored and evaluated the performance of the
23   Plan's mutual funds, it would have known that those funds were consistently
24   underperforming both their SEC-prospectus benchmarks and benchmarks under 29
25   CFR § 2550.404a-5.  Plan Fiduciaries did not know about, did not correct, and did
26   not prevent, the resulting losses to Plan participants.

27   365.   As a direct and proximate result of the breaches of fiduciary duties
28   alleged herein, the Plan and Plan participants suffered over $50 million in losses.

366. Had Defendants complied with their fiduciary obligations, the Plan and Plan participants would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

367. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.

368. In addition, Plaintiffs are entitled to equitable relief under 29 U.S.C. § 1132(a)(3) and other appropriate relief as set forth in their Prayer for Relief.

369. ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

370. Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CAUSE OF ACTION

### Violation of 29 U.S.C. §§ 1104(a)(1)(A) and 1105

### (Liability for breach of Duty of Loyalty)

### (Against All Defendants)

371. Plaintiffs repeat and reallege the above paragraphs as though fully set

forth herein.

372.   ERISA fiduciaries owe a duty of loyalty. 29 U.S.C. § 1104(a)(1)(A). The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display…complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." Id. at 224.

373.   Thus, in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A (Dec. 19, 1988).

374.   At all relevant times, Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

375.   At all relevant times during the Class Period, the Defendants and the Committees, and its individual members, when selecting and retaining the Plan's investment lineup, deciding which funds to populate the limited menu of choices, and keeping covered service providers rather than soliciting requests for proposal, were ERISA fiduciaries.

376.   At all relevant times during the Class Period, CapTrust/CapFinancial for valuable consideration, and in exercising discretion and control over rebates and other Plan assets instead of returning them to the Plan and/or Plan participants, and in having sufficient influence over Plan Fiduciaries with respect to their selection of investment options for the Plan, was an ERISA fiduciary.

377.   At all relevant times during the Class Period, the Trustee, having residual fiduciary responsibility for determining whether a given direction is proper and whether following the direction would result in a violation of ERISA, and in heeding the directions of Plan Fiduciaries with respect to the payment of unreasonable and unnecessary fees and expenses to covered service providers, was an ERISA fiduciary.

378.   As fiduciaries of the Plan, Defendants were subject to the ERISA's duty of loyalty.

379.   Defendants breached their fiduciary duty of loyalty in multiple respects as discussed throughout. At all relevant times during the Class Period, CapTrust/CapFinancial made investment decisions and/or provided investment advice while tainted with self-interest.

380.   At all relevant times during the Class Period, Plan Fiduciaries put their interests ahead of those of the Plan and Plan participants by choosing investment products and services which generated substantial revenues at great costs to the Plan and Plan participants.

381.   Investment fund options chosen for a plan should not favor the fund provider and a party-in-interest over the plan's participants. Yet here, to the detriment of the Plan and its participants and beneficiaries, the Plan's fiduciaries endorsed Prudential's and CapTrust/CapFinancial's selling agreements with investment funds in the Plan, revenue sharing agreements between Prudential, CapTrust/CapFinancial and Ferguson Enterprises LLC, in their own self interest. As a result, Plan participants were unaware of the excessive and unreasonable fees secretly charged to their accounts because of the Defendants.

382.   As a result of their conflicts of interest, Plan Fiduciaries selected and retained in the Plan many investment funds that were more expensive than necessary and otherwise were not justified on the basis of their managers and historical performance. Plan Fiduciaries, moreover, hid these facts and the conflicts of

interests from the DOL, IRS, and Plan participants and beneficiaries.

383. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and Plan participants suffered over $50 million in losses.

384. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the plan's providers.

385. In addition, Plaintiffs are entitled to equitable relief under 29 U.S.C. § 1132(a)(3) and other appropriate relief as set forth in their Prayer for Relief.

386. ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

387. Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## THIRD CAUSE OF ACTION

### Failure to Monitor Other Plan Fiduciaries

### (Against All Defendants)

388. Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

389. Ferguson Enterprises LLC had the authority to appoint and remove

1   members of the Committees.

2       390.   Defendants also each had the authority to select service providers for
3   the Plan. In light of this authority, Defendants each were a fiduciary of the Plan.

4       391.   As the appointing/selecting fiduciaries, Ferguson Enterprises LLC and
5   its board had a duty to monitor their appointees and providers they selected to ensure
6   that they were adequately performing their fiduciary and non-fiduciary obligations,
7   and to take prompt and effective action to protect the Plan in the event that they were
8   not fulfilling those duties.

9       392.   Ferguson also had a duty to ensure that their appointees and Plan service
10  providers they selected and retained possessed the needed qualifications and
11  experience to carry out their duties (or used qualified advisors and service providers
12  to fulfill their duties); had adequate financial resources and information; and
13  maintained adequate records of the information on which they based their decisions
14  and analysis with respect to the Plan's investments.

15      393.   Ferguson and its members breached their fiduciary monitoring duties
16  by, among other things:

17          a.  Failing to monitor and evaluate the performance of their appointees and
18              Plan service providers, or have a system in place for doing so, standing
19              idly by as the Plan and Plan participants suffered significant losses as a
20              result of their imprudent actions and omissions;

21          b.  Failing to monitor the processes by which Plan investments were
22              evaluated, and failing to investigate the availability of lower-cost
23              separate account and collective trust vehicles; and

24          c.  Failing to remove Committee members and service providers who were
25              incompetent, who charged excessive fees, and/or whose performance
26              was inadequate.

27      394.   As a direct and proximate result of the breaches of fiduciary duties
28  alleged herein, the Plan and Plan participants suffered over $50 million in losses.

395. Had Ferguson and its members complied with their fiduciary obligations, the Plan and Plan participants would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

396. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to monitor.

397. In addition, Plaintiffs are entitled to equitable relief under 29 U.S.C. § 1132(a)(3) and other appropriate relief as set forth in their Prayer for Relief.

398. ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

399. Defendants Ferguson, Committee and CapTrust knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## FOURTH CAUSE OF ACTION

### Breach of Fiduciary Duty by Omission

### (Against All Defendants)

400. Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

401. As fiduciaries of the Plan with the powers to bring actions on behalf of the Plan, Defendants had the ability to bring actions on behalf of the Plan pursuant to

1    ERISA § 502(a)(2) and ERISA § 502(a)(3) at all relevant times during the Class
2    Period.

3    402.   Among the assets of an employee benefit plan under ERISA is a "chose
4    in action" – the right to bring an action to recover a debt, money or a thing –
5    including to institute a lawsuit for a breach of fiduciary duties or other violations.
6    ERISA fiduciaries are prohibited from engaging in transactions under ERISA §
7    406(a) or 406(b) unless there is an exception or exemption, and a claim can be
8    brought on behalf of the Plan against an ERISA fiduciary who engages in such
9    prohibited transactions.

10   403.   As a result, one of the assets of the Plan was a claim against Defendants
11   for engaging in prohibited transactions for their own benefit as set forth in this
12   Complaint.

13   404.   Each of them either knew (because they were parties to the transaction)
14   or through a proper review would have discovered that Defendants engaged in
15   prohibited transactions in violation of ERISA as set forth in this Complaint, because
16   each of them had knowledge of the terms of these self-dealing transactions, or
17   through a prudent and loyal investigation in their role as Plan fiduciaries would have
18   discovered them.

19   405.   Defendants did not take any action, including any legal action, or
20   exercised any other authority under the Plan or the Trust Agreement, to properly
21   manage this choice in action.

22   406.   By failing to remedy these prohibited transactions on behalf of the Plan,
23   including by, if necessary, bringing suit against Defendants through the present,
24   Defendants violated ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A.

25   407.   Because their fiduciary duties included employment of legal advisors,
26   Defendants failed to comply with ERISA § 404(a)(1) in the administration of their
27   specific responsibilities as fiduciaries, and this failure enabled the other Defendants
28   to violate ERISA in their acquisition of unreasonable fees and Plan assets.

408.   As a direct and proximate result of these breaches by Defendants, the Plan suffered losses and/or Defendants obtained profits that rightfully belong to the Plan and its participants.

409.   Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the other Defendants.

410.   Plaintiffs are entitled to equitable relief under 29 U.S.C. § 1132(a)(3) and other appropriate relief as set forth in their Prayer for Relief.

411.   ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

412.   Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## **FIFTH CAUSE OF ACTION**

### **Refusal to Supply Requested Information Under 29 U.S.C. 1132(a)(3)**
### **Against Defendant Ferguson and Committee**

413.   Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

414.   This Count alleges violations against the Ferguson Enterprises LLC

401(k) Retirement Plan Committee ("COMMITTEE").

415. A claim for breach of fiduciary duty under 29 U.S.C. §1132(a)(3) may be simultaneously pled with a 29 U.S.C. § 1132(c)(1)(B) claim for failure to disclose Plan information, as they provide separate and distinct remedies. *See, e.g., Poole v. Life Ins.Co. of N.A.*, 984 F. Supp. 2d 1179 (M.D. Ala. 2013).

416. As the Plan Administrator, the Plan Committee is obligated "upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." 29 U.S.C. §1024(b)(4). If the Plan Committee fails to provide the material requested within 30 days, the court may assess a penalty against it in favor of the participant in the amount of $110 a day from the date of such failure or refusal. 29 U.S.C. §1132(c)(1); 29 U.S.C. §2575.502c-1.

417. On May 7, 2022, Counsel for Plaintiff Bozzini mailed, Via Fedex Overnight Business With Delivery Confirmation, a request for Plan information described above under 29 U.S.C. §1024(b). The request for information was directed to the 401(k) Plan Administrator and IRS Form 5500 signatory Richard Winckler at 12500 Jefferson Ave., Newport News, VA 23602. Delivery confirmation was obtained by FedEX.

418. Again, May 7, 2022, Counsel for Plaintiff Gonzales mailed, Via Fedex Overnight Business With Delivery Confirmation, a request for Plan information described above under 29 U.S.C. §1024(b). The request for information was directed to the 401(k) Plan Administrator and IRS Form 5500 signatory Richard Winckler at 12500 Jefferson Ave., Newport News, VA 23602. Delivery confirmation was obtained by FedEx.

419. To date, the Plan Administrator and Committee has not complied with Named Plaintiff Bozzini or Gonzales' request for information.

420. Based on the Committee's refusal to comply with Named Plaintiff

1  Bozzini and Gonzales' request for information, the Pension Committee violated its

2  statutory obligations under 29 U.S.C. §1024(b)(4).

3    421.  The PLAN Committee is liable for its violations of 29 U.S.C.

4  §1024(b)(4) as alleged in this Count.

5  **ENTITLEMENT TO RELIEF**

6    422.  By virtue of the violations set forth in the foregoing paragraphs,

7  Plaintiffs and the Class are entitled to sue each of the Defendants pursuant to ERISA

8  § 502(a)(2), 29 U.S.C. § 1132(a)(2), for relief on behalf of the Plan as provided in

9  ERISA § 409, 29 U.S.C. § 1109, including for recovery of any losses to the Plan, the

10  recovery of any profits resulting from the breaches of fiduciary duty, and such other

11  equitable or remedial relief as the Court may deem appropriate.

12    423.  By virtue of the violations set forth in the foregoing paragraphs,

13  Plaintiffs and the Class are entitled pursuant to ERISA § 502(a)(3), 29 U.S.C. §

14  1132(a)(3), to sue each of the Defendants for any appropriate equitable relief to

15  redress the wrongs described above.

16    424.  Plaintiffs allege a "cumulative" harm which implicates the pure form of

17  the continuing violations doctrine.

18    425.  The injury claimed by each plaintiff repeats daily when mutual fund

19  pricing is calculated.

20    426.  Thus, resulting from the cumulative impact of daily negative

21  compounding over months and years of the Defendants' repeated flawed selection

22  and monitoring processes. Participants/beneficiaries charge precisely the sort of

23  continuous conduct accreting retirement account injury that justifies characterization

24  as a continuing violation.

25    427.  The concept of "make-whole" relief under laws of equity are clear.

26  Where a beneficiary claims to recover trust property, the fixed limitation period shall

27  not apply. No limits of recovery of lost benefits to recover from the trustee apply if a

28  timely claim is filed.  The reason for this exception under laws of equity is that the

possession of the property by a plan fiduciary or trustee is never by virtue of any right of his own but is acquired initially for and on behalf of the beneficiaries. The trustee's ownership or possession is representative of the beneficiary's interest.

428.   The effect is that time does not run in the trustee's favor and against the property beneficiary. ERISA grants full damages and restitution to redress a fiduciary breach involving plan assets. Three remedies are the workhorses of ERISA litigation, although ERISA does grant less important remedies to enforce statutory penalties and the like. Together, they make up what the Supreme Court described as a "carefully integrated interlocking, interrelated, and interdependent remedial scheme, which is . . . part of a 'comprehensive and reticulated statute.'"

429.   According to Professor Dobbs, "[j]udicial remedies usually fall in one of four major categories: (1) Damages remedies, (2) Restitutionary remedies, (3) Coercive remedies . . . or (4) Declaratory remedies."

430. ERISA clearly grants declaratory and coercive remedies, as an employee can bring an action "to clarify his rights to future benefits under the terms of the plan" and the court can "enjoin any act or practice which violates [ERISA] or the terms of the plan." The provisions also grant the ability to enforce the payment of promised benefits.

431.   Limiting our Plaintiffs to harms "suffered within the limitations period prior to suit would render their claims unintelligible and nugatory" for the injuries inflicted upon the plaintiff within the limitations period could only be understood and evaluated by reference to activity occurring outside of the period. (Kyle Graham, The Continuing Violations Doctrine, Vol. 43, p 289, Gonzaga Law Review (2008))

432.   Injuries stemmed from the cumulative impact of years of breaches for (1) lack of loyalty and (2) lack of care or skill (1104). Lost opportunity costs to have their eight years of average tenure at Ferguson to accrue growth faster (from more interest, dividends, etc. as well as less burdens from fees such as manager fees and their related trading costs) is precisely the sort of continuous conduct accreting

injuries that justifies characterization as a continuing violation. (See Highland Indus. Park, Inc. v. BEI Def. Sys. Co., 357 F.3d 794, 797 (8th Cir. 2004) ("[W]e know of no state whatever in which an injured party must know the full extent of the damages that it may recover before the statute of limitations begins to run on its claim."); WOOD, supra note 57, § 179 ("[i]n actions from injuries resulting from the negligence or unskillfulness of another, the statute [of limitations] attaches and begins to run from the time when the injury was first inflicted, and.not from the time when the full extent of the damages sustained has been ascertained"). But see 54 C.J.S. Limitation of Actions § 204 (2005) ("Where a continuing tort causes a single, indivisible injury, the cause of action accrues at, and limitations begin to run from, the time when the nature and extent of the damage are ascertainable, which may be at the inception of the tort or not until the last date of the tortious conduct.").

433.   "[W]hen the acts or conduct are continuous on an almost daily basis, by the same actor, of the same nature, and the conduct becomes tortious and actionable because of its continuous, cumulative, synergistic nature, then prescription does not commence until the last act occurs or the conduct is abated." *Rodrique v. Olin Employees Credit Union*, 406 F.3d 434, 442 (7th Cir. 2005); see also *Flowers v. Carville*, 310 F.3d 1118, 1126 (9th Cir. 2002); *Landman v. Royster,* 354 F. Supp. 1302, 1315 (E.D. Va. 1973); *Bustamento v. Tucker*, 607 So. 2d 532, 542 (La. 1992)

434.   Our claims build upon a factual foundation laid outside of the limitations period prior to suit. Courts have ruled that it would be unfair to allow the plaintiff to recover only for the incremental worsening of his condition (lack of growth of her salary savings) within the limitations period.

435.   Referring to the Supreme Court's *Amara v. Cigna* (2011) and *LaRue v. DeWolf* (2008) decisions, the Defendants' violations are supported by the Court's "make-whole" references. When combined with ERISA Section 409 requirements (ERISA section 409(a) imposes personal liability on fiduciaries that breach their fiduciary duties), restoration of the Defendants' harm to the Plan and Trust dovetails

with the pure form of the continuing violations doctrine and each element here avoids giving the Defendants a "license" to perpetuate its misconduct.

436.  The Defendants' continuing violations we refer to here are "a continu[ous] series of events gives rise to a cumulative injury." That is the gravamen of our specific claims at issue—participants/beneficiaries seek the trustee/fiduciary to restore under the laws of equity all trust damages so that the Plaintiffs' accounts would reach the same levels as if the breaches never occurred. This is analogous to treating the claim as continuing in nature. (Kyle Graham, The Continuing Violations Doctrine, Vol. 43 p 293, Gonzaga Law Review (2008))

## JURY TRIAL DEMANDED

437.  Under Fed. R. Civ. P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request the Court:

- Certify the Class, appoint Plaintiffs as class representatives, and appoint Tower Legal Group, P.C. and The Sharman Law Firm as Class Counsel;
- Find and declare that Defendants have breached their fiduciary duties as described above;
- Find and adjudge that Defendants are liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;
- Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;
- Order Defendants to provide an accounting necessary to determine the amounts Defendants must make good the Plan under §1109(a);

CLASS ACTION COMPLAINT

- Find and adjudge that Defendants must disgorge all sums of money received from their use of assets of the Plan;
- Impose a constructive trust on any monies by which Defendants were unjustly enriched as a result of breaches of fiduciary duty or prohibited transactions, and cause Defendants to disgorge such monies and return them to the Plan;
- Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which an accounting reveals were improper, excessive, and/or in violation of ERISA;
- Order equitable restitution against Defendants;
- Award to Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;
- Order the payment of interest to the extent it is allowed by law; and
- Grant other equitable or remedial relief as the Court deems appropriate.

**PLAINTIFFS DEMAND A TRIAL BY JURY OF ALL ISSUES SO TRIABLE BY LAW.**

Dated: September 30, 2022                    **TOWER LEGAL GROUP, P.C.**


By: _____

JAMES A. CLARK
RENEE P. ORTEGA
Attorneys for Plaintiffs

CLASS ACTION COMPLAINT