±

**TOWER LEGAL GROUP, P.C.**
James A. Clark (SBN 278372)
Renee P. Ortega (SBN 283441)
11335 Gold Express Drive, Ste. 105
Gold River, CA 95670
Telephone: (916) 361-6009
Facsimile: (916) 361-6019
Email: james.clark@towerlegalgroup.com
Email: renee.ortega@towerlegalgroup.com

**THE SHARMAN LAW FIRM**
Paul Sharman (Pro Hac Vice)
11175 Cicero Drive, Suite 100
Alpharetta, GA  30022
Telephone: (678) 242-5297
Facsimile:  (678) 802-2129
Email: paul@sharman-law.com

[Attorneys for Plaintiffs]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

TERA BOZZINI and ADRIAN GONZALES, individually and as a representative of a Putative Class of Participants and Beneficiaries, on behalf of the FERGUSON ENTERPRISES, LLC, 401(K) RETIREMENT SAVINGS PLAN f/k/a FERGUSON ENTERPRISES, INC, 401(K) RETIREMENT SAVINGS PLAN,

          Plaintiffs,

      v.

FERGUSON ENTERPRISES, LLC, f/k/a FERGUSON ENTERPRISES, INC.; RETIREMENT PLAN COMMITTEE OF FERGUSON ENTERPRISES, LLC 401(K) RETIREMENT SAVINGS PLAN; PRUDENTIAL RETIREMENT INSURANCE AND ANNUITY COMPANY; PRUDENTIAL BANK & TRUST, FSB; CAPFINANCIAL PARTNERS, LLC D/B/A CAPTRUST

Case No.: 3:22-CV-05667-WHO

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES**

DEMAND FOR JURY TRIAL

-1-
FIRST AMENDED CLASS ACTION COMPLAINT    3:22-CV-05667-WHO

FINANCIAL ADVISORS; CAPFINANCIAL SECURITIES, LLC; BOARD OF DIRECTORS OF FERGUSON ENTERPRISES, LLC f/k/a FERGUSON ENTERPRISES, INC.; WILLIAM BRUNDAGE; RICHARD WINCKLER; AND DOES 1-50,

Defendants.

-2-

# TABLE OF CONTENTS

I. INTRODUCTION ……………………………………………………………… 5

II. JURISDICTION AND VENUE……………………………………….…… 8

III. THE PARTIES…………………………………………………................. 8

IV. RELEVANT DEFINITIONS AND ERISA PROVISIONS ………..……… 11

V. FACTUAL ALLLEGATIONS …………………………...…………………. 15

   A. Failure to Investigate, Analyze, or Monitor Plan Expenses …………..…..… 15

      1. Excessive and Unjustified Recordkeeping Expenses …………………….. 19

      2. Excessive and Unjustified Investment Management Costs ……………….. 22

   B. Failure To Investigate, Analyze, And Monitor Plan Investments ….………. 40

      1. The Mainstay Winslow Large Cap Growth Fund …………………….…… 45

      2. The MFS International Intrinsic Value ……………………………………... 54

      3. The Goldman Sachs Small Cap Value Fund ……………………………... 57

      4. American Funds Europacific Growth ……………………………….……… 59

      5. Metropolitan West Total Return Bond …………………………………… 63

      6. American Funds Balanced Fund …………………………………………….. 67

      7. Vanguard and funds in Prudential Pooled Separate Accounts …………… 68

   C. Prohibited Transactions And Failure To Monitor …………………………… 71

   D. Statutory Penalties …………………………………………………..… 75

VI. CLASS ACTION ALLEGATIONS ………………………………………… 76

VII. TIMELINESS …………………………………………………….… 80

VIII. STANDING ……………………………………………………….... 81

   FIRST CAUSE OF ACTION ………………………………………….. 83

   SECOND CAUSE OF ACTION …………………………………………. 87

   THIRD CAUSE OF ACTION …………………………………………… 89

   FOURTH CAUSE OF ACTION …………………………………………. 90

   FIFTH CAUSE OF ACTION …………………………………………….. 92

FIRST AMENDED CLASS ACTION COMPLAINT          3:22-CV-05667-WHO

SIXTH CAUSE OF ACTION ……………………………………………….… 94

SEVENTH CASUE OF ACTION ………………………………………….... 95

EIGHTH CAUSE OF ACTION ……………………………………….…. 97

JURY TRIAL DEMANDED ……………………………………………... 98, 100

PRAYER FOR RELIEF ……………………………………………………  98

FIRST AMENDED CLASS ACTION COMPLAINT      3:22-CV-05667-WHO

Plaintiffs Tera Bozzini and Adrian Gonzales (collectively "Plaintiffs"), individually and as representatives of participants and beneficiaries of the FERGUSON ENTERPRISES, LLC, 401(K) RETIREMENT SAVINGS PLAN (the "PLAN"), bring this action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, on behalf of themselves and the Plan against FERGUSON ENTERPRISES, LLC f/k/a FERGUSON ENTERPRISES, INC. ( "Ferguson") and its Board of Directors (the "BOD"), the RETIREMENT PLAN COMMITTEE OF FERGUSON ENTERPRISES, LLC 401(K) RETIREMENT SAVINGS PLAN (the "Committee"), PRUDENTIAL RETIREMENT INSURANCE AND ANNUITY COMPANY ("PRIAC"), PRUDENTIAL BANK & TRUST, FSB ("Prudential Bank & Trust"); CAPFINANCIAL PARTNERS, LLC D/B/A CAPTRUST FINANCIAL ADVISORS ("CapTrust"); CAPFINANCIAL SECURITIES, LLC ("CapFinancial"); WILLIAM BRUNDAGE ("Brundage"), RICHARD WINCKLER ("Winckler"), and DOES 1-50.

## I. **INTRODUCTION**

1. This action is brought by current and former employees / participants / beneficiaries of Defendants' Plan to recover losses due to mismanagement of the 401k retirement plan and certain selected funds. The 401k plan has become the dominant source of retirement savings for most Americans. Unlike defined-benefit pensions, which provide set payouts for life, 401(k) accounts are defined-contribution plans which rise and fall with financial markets, and therefore, the proliferation of 401(k) plans has exposed workers to big drops in the stock market and high fees from Wall Street money managers. This action is filed to recover millions of dollars of funds owed back to the plan on behalf of employees / participants / beneficiaries. These retirement funds are significant to the welfare of the class.

2.     Federal law affords employers the privilege of enticing and retaining employees by setting up retirement through defined contribution plans pursuant to 26 U.S.C. § 401 ("401(k) plans"). These plans provide employees investment options with tax benefits that inure to the benefits of the employees and, necessarily, to the employers by increasing the "net" compensation their employees receive via tax deferment. To enjoy this benefit, employers must follow the rules and standards proscribed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et. seq. ("ERISA").   Upon information and belief, none of the Defendants followed these rules.

3.     Upon information and belief, Plan fiduciaries did not act reasonably and consistently with ERISA's provisions, costing Plan participants and beneficiaries millions of dollars by, among other things: (1) failing to leverage the Plan's size to reduce expenses; (2) failing to exercise independent judgment in choosing and retaining the investments included in the Plan discussed below; (3) allowing conflicted Plan service providers (PRIAC, Prudential Bank & Trust, CapTrust and CapFinancial) to require inclusion of poorly performing funds and to charge the Plan and Plan participants excessive and unjustified indirect compensation based on these funds; (4) selecting and retaining unnecessarily expensive and underperforming investment options in the Plans; (4) failing to monitor and control the Plan's administrative fees; (5) failing to monitor other fiduciaries; and (6) causing the Plan to engage in prohibited transactions.

4.     Plan fiduciaries inexplicably flooded the Plan with extremely expensive, often underperforming investment options for participants to choose from, all while they had the ability to obtain much cheaper and more lucrative investment options. Upon information and belief, Plan fiduciaries never put the recordkeeping contract for the Plan up for a bid to bring in more competitive offers from other service providers. Additionally, Plan fiduciaries allowed conflicted Plan service providers

-6-

FIRST AMENDED CLASS ACTION COMPLAINT          3:22-CV-05667-WHO

(PRIAC (recordkeeper and issuer of investment products), Prudential bank & Trust (Trustee and issuer of investment products), CapTrust (advisor), and CapFinancial (broker)) to take large amounts of money from the Plan and its participants through excessive fees and compensation mechanisms, much higher than those warranted by the amount of work these service providers were completing. These excessive fees and the costs of acquiring overly expensive funds were paid directly by the Plan and its participants. For the entire Class Period, Plan fiduciaries neglected their duties and allowed these Plan service providers to make immense amounts of money off of Defendants' own employees.

5.     Plaintiffs and the putative class, all of whom invested in one or more of the funds at issue in this action, lost significant retirement savings as a result of Defendants' wrongful conduct discussed below, including but not limited to the illicit kickbacks received by conflicted Plan service providers and the affirmative misrepresentations by Plan fiduciaries about the security of their investments and the competence of the conflicted Plan service providers.

6.     Through this action, Plaintiffs seek equitable relief under ERISA, including but not limited to a surcharge; the disgorgement of improper profits realized by Plan fiduciaries as a result of their breaches of duty; the restoration of losses to them, the Class and the Plan; and an award of reasonable attorney fees. Plaintiffs also seek an award of penalties under ERISA § 502(c) based on the Plan administrator's failure to provide requested Plan documents timely.

7.     Plaintiffs' allegations are based on information from Defendants' own certified annual plan Forms 5500 filed under penalties of perjury to the Internal Revenue Service (IRS) and Department of Labor (DOL) for the plan years 2009 to 2021. The fact that Defendants are in sole possession of critical documents has limited Plaintiffs' abilities to ascertain other pertinent facts relevant to their claims.

8.     Plaintiffs' claims are timely under ERISA   § 413 because, upon

-7-

information and belief, Defendants, during the Class Period defined below, affirmatively concealed (and continue to conceal) their misconduct described below.

## II. JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

10. This Court has personal jurisdiction over Defendants because, among other reasons, Defendants transact business in and have significant contacts with this District and ERISA provides for nationwide service of process pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

11. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) and 28 U.S.C. §§ 1391(b) and (c), because a substantial part of the breaches and violations giving rise to Plaintiffs' claims occurred in this District, and because one or more of Plan fiduciaries may be found in this District.

12. Divisional Assignment. A substantial part of the events or omissions giving rise to the Claims occurred in Contra Costa County and San Francisco County.

## III. THE PARTIES

13. A defined contribution plan governed by ERISA and 26 U.S.C. § 401(k), the Plan enables eligible employees of Ferguson to make tax-deferred contributions from their salaries for retirement. As of December 31, 2020, the Plan had 30,256 participants and over $2.6 billion in assets.

14. Plaintiff Tera Bozzini ("Bozzini"), a resident of Contra Costa County, California, a former employee of Ferguson, and a participant in the Plan, invested in one or more of some or all of the funds imprudently selected and/or retained by Plan fiduciaries in the Plan.

15. Plaintiff Adrian Gonzales ("Gonzales"), a resident of San Diego,

California, former employee of Ferguson, and participant in the Plan, invested in one or more of the funds imprudently selected and/or retained by Plan fiduciaries in the Plan.

16. During the Class Period, Ferguson, the sponsor and administrator of the Plan, upon information and belief, was a named fiduciary under ERISA and also a *de facto* fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), to the extent that it had and/or exercised discretion in the administration or management of the Plan and exerted control over Plan assets.

17. During the Class Period, the BOD, upon information and belief, was a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), to the extent that it appointed the members of the Committee and had the corresponding, continuing duty to monitor them, served as *de facto* Plan Administrator, and to the extent that it otherwise had and/or exercised discretion in the administration or management of the Plan and exerted control over Plan assets.

18. Upon information and belief, Brundage, Winckler, and DOES 1-25, during the Class Period, were members of the BOD and, in such capacities, were *de facto* fiduciaries under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), to the extent that they appointed the members of the Committee and had the corresponding, continuing duty to monitor them, served as *de facto* Plan Administrator, and to the extent that they otherwise had and/or exercised discretion in the administration or management of the Plan and exerted control over Plan assets. The BOD, Winckler, Brundage, and DOES 26-50 are collectively referred to as the "BOD."

19. During the Class Period, the Committee, upon information and belief, is a named fiduciary of the Plan and also a *de facto* fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), to the extent that it had and/or exercised discretion in the administration or management of the Plan and exerted control over Plan assets.

20. Upon information and belief, Brundage, Winckler, and DOES 26-50, during the Class Period, were members of the Committee and, in such capacities, were *de facto* fiduciaries under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), to the extent that they had and/or exercised discretion in the administration or management of the Plan and exerted control over Plan assets. The Committee, Winckler, Brundage, and DOES 1-25 are collectively referred to as the "Committee."

21. During the Class Period, PRIAC, an insurance company with offices throughout the United States, including in this District, served as recordkeeper for the Plan and, upon information and belief, issued one or more group annuity contracts and/or group funding agreements as investment options to the Plan. PRIAC was and remains a fiduciary to the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

22. During the Class Period, Prudential Bank & Trust, upon information and belief, served as the Trustee to the Plan; acted as the "contract-holder" of the Group Contracts (defined below) for the Plan; and had the authority, control and discretion to add, delete or substitute the investment options available to the Plan, to make investment decisions on behalf of the Plan, and to allocate any revenue sharing payments it received by Prudential Trust. Prudential Bank & Trust, which maintains its principal place of business at the same address as PRIAC, was and remained a fiduciary to the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

23. Upon information and belief, PRIAC and Prudential Trust, at all relevant times, functioned as alter egos of each other, as a joint entity, as an integrated enterprise and/or as agents of each other in the form of "Prudential Retirement." At all pertinent times, PRIAC and Prudential Trust shared the same or overlapping offices, executives, and employees and acted without regard for the

-10-

corporate formalities between them.    PRIAC and Prudential Bank & Trust are collectively referred to as the "Prudential Entities."

24.    Upon information and belief, CapTrust, which, at all relevant times, provided investment advisory services to the Plan and maintained offices throughout the United States, including in this District, was (and remains) a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

25.    Upon information and belief, CapFinancial, which, at all relevant times, maintained offices throughout the United States, including in this District and provided brokerage services to the Plan, was (and remains) a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

26.    Upon information and belief, CapTrust and CapFinancial, at all relevant times, functioned as alter egos of each other, as a joint entity, as an integrated enterprise and/or as agents of each other.    CapTrust and CapFinancial are collectively referred to as the "CapFinancial Entities."

## IV.    RELEVANT DEFINITIONS AND ERISA PROVISIONS

27.    ERISA imposes upon fiduciaries "a number of detailed duties and responsibilities, which include the proper management, administration, and investment of [plan] assets, the maintenance of proper records, the disclosure of specified information, and the avoidance of conflicts of interest." *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 251-52 (1993) (internal quotation marks omitted) (alteration in original). ERISA is a "comprehensive and reticulated statute" which statutorily defines these duties. *Id.* at 251 (quoting *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 361 (1980)).

28.    An ERISA fiduciary has a duty of loyalty, which requires that he "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1)(A). The duty of loyalty,

thus, requires fiduciaries to act solely in the interest of the participants and beneficiaries with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000).

29. An ERISA fiduciary also has a duty of prudence, which requires that the fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." Id. § 1104(a)(1)(B).

30. ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), also imposes a prudent person standard by which to measure fiduciaries' investment decisions and disposition of assets. The prudent person standard in ERISA requires a continuing duty to monitor Plan investments and Plan service providers and remove imprudent ones. Such duty exists separate and apart from the fiduciary's duty to exercise prudence in selecting investments and service providers.

31. These fiduciary duties are the highest known to the law.

32. The legal construction of an ERISA fiduciary's duties is derived from the common law of trusts. Therefore, in determining the contours of an ERISA fiduciary's duty, this Court should look to the law of trusts.

33. The general duties of loyalty and prudence imposed by ERISA § 404, 29 U.S.C. § 1104, are supplemented by ERISA § 406, 29 U.S.C § 1106, which provides a detailed list of prohibited transactions that constitute per se violations of ERISA.

34. ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), in pertinent part, states that: "(A) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect – i. sale or exchange, or leasing, of any property between the plan and a party in interest; … ii. furnishing of goods, services, or facilities between the plan

-12-

FIRST AMENDED CLASS ACTION COMPLAINT        3:22-CV-05667-WHO

and a party in interest; iii. transfer to, or use by or for the benefit of a party in interest, of any assets of the plan ….” A party in interest includes fiduciaries or employees of a plan itself, service providers, employers whose employees belong to a plan, employee organizations, relatives of the above-described individuals, and those with various ownership stakes in certain corporations, partnerships, and joint ventures. ERISA § 3(14), 29 U.S.C. § 1002(14).

35.   ERISA § 406(b), 29 U.S.C. § 1106(b), relates to transactions between the plan and a fiduciary of the plan, providing that: “A fiduciary with respect to a plan shall not (1) deal with the assets of the plan in his own interest or for his own account; (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries; or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.”

36.   ERISA recognizes co-fiduciaries and related liability. ERISA § 405(a), 29 U.S.C. § 1105(a), titled “Liability for Breach by Co-Fiduciary,” provides, in pertinent part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2) if, by his failure to comply with section 404(a)(1)[, 29 U.S.C. § 1104(a)(1),] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to

commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

37. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant on behalf of the Plan for relief under ERISA § 409, 29 U.S.C. § 1109, which, in turn, provides, in relevant part:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

38. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to seek equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, a constructive trust, restitution, and other equitable relief.

39. ERISA also requires a plan administrator to disclose to a participant, including a summary plan description, the documents governing the plan, and the plan's annual report. *Accord* 29 U.S.C. §§ 1022(a) and 1024(b). ERISA § 502(c), 29 U.S.C. § 1132(c), provides:

(1)Any administrator … (B) who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary … by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to [$110] a day from the

-14-
FIRST AMENDED CLASS ACTION COMPLAINT                3:22-CV-05667-WHO

date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper. For purposes of this paragraph, each violation described in subparagraph (A) with respect to any single participant, and each violation described in subparagraph (B) with respect to any single participant or beneficiary, shall be treated as a separate violation.

(Emphasis added.)

40.   Finally, ERISA § 502(g), 29 U.S.C. § 1132(g) authorizes the Court to award reasonable attorney fees, cost, and interest to prevailing participants.

## V.   FACTUAL ALLEGATIONS

### A.  Failure to Investigate, Analyze, or Monitor Plan Expenses

41.   The majority of the Plan's expenses were attributable to investment management expenses and administrative expenses. Investment management expenses are asset-based fees that are charged by a mutual fund to compensate the investment manager and fund company for managing the assets of the fund and are a common and equivalent component among all share classes within a fund's expense ratio. Administrative expenses are the expenses a plan incurs for administration services such as recordkeeping, accounting, legal, and trustee services.

42.   Defendants had the option to pay for the expenses and costs that the various service providers (including recordkeepers) charged in two ways: "direct" payments from plan assets, and "indirect" revenue sharing payments from the plan investments offered to participants. Defendants were not limited in their selection of which methods of payment to use.

43.   In an example of a direct payment arrangement, the fiduciary contracts with the recordkeeper to obtain administrative services in exchange for a flat annual fee based on the number of participants for which the recordkeeper will be providing services, i.e. $30 per participant. Large defined contribution plans possess tremendous economies of scale for purposes of recordkeeping and administrative

fees. A plan with 20,000 participants, for example, can obtain a much lower fee on a per-participant basis than a plan with 2,000 participants.

44.    A recordkeeper's cost for providing services depends on the number of participants in the plan, not the amount of assets in the plan or in an individual account. The cost of recordkeeping a $75,000 account balance is the same as a $7,500 account. Accordingly, a flat price based on the number of participants in the plan ensures that the amount of compensation is tied to the actual services provided and does not grow based on matters that have nothing to do with the services provided, such as an increase in plan assets due to market growth or greater plan contributions by the employee.

45.    As an example, a fiduciary of a 20,000-participant, $3 billion plan may issue a request for proposal to several recordkeepers and request that the respondents provide pricing based on a flat rate for a 20,000-participant plan. If the winning recordkeeper offers to provide the specified services at a flat rate of $30 per participant per year, the fiduciary would then contract with the recordkeeper for the plan to pay a $600,000 direct annual fee (20,000 participants at $30/participant). If the plan's assets increase to $4 billion during the term of the contract but the participant level stays constant, the recordkeeper's compensation does not change because the services provided have not changed.

46.    Such a flat per-participant agreement does not necessarily mean, however, that every participant in the plan must pay the same $30 fee from his or her account. A fiduciary could reasonably determine that it is equitable to charge each participant the same $30 (for example, through a quarterly charge of $7.50 to each account in the plan). Alternatively, the fiduciary could conclude that assessing the same fee to all investors would discourage participants with relatively small accounts from participating in the plan, and that, once the aggregate flat fee for the plan has been determined, a proportional asset-based charge should be used. In that case, the

flat per-participant rate of $30 per participant multiplied by the number of participants would simply be converted to an asset-based charge, such that every participant pays the same percentage of his or her account balance. If plan assets increase, the percentage is adjusted downward so that the plan as a whole is still paying the same plan-level price for the negotiated services.

47. Unbeknownst to Plaintiffs and the putative class, the Plan paid for recordkeeping through "indirect" revenue sharing payments from the plan's mutual funds. In a revenue sharing arrangement, the mutual fund pays the plan's recordkeeper putatively for providing recordkeeping and administrative services for the fund. However, because revenue sharing payments are asset-based, the fees can grow to unreasonable and prohibited levels due to employee and employer contributions along with capital appreciation, interest and dividends, while the number of participants, and thus the services provided, has not increased at a similar rate.

48. Revenue sharing, while not a per se violation of ERISA, can lead to excessive fees if, as here, it is not properly monitored and capped. Therefore, if a fiduciary decides to use revenue sharing to pay for recordkeeping, it is required that the fiduciary: (a) determine and monitor the amount of the revenue sharing and any other sources of compensation that the provider has received, (b) compare that amount to the price that would be available on a flat per-participant basis, and (c) control the amount of fees paid through recordkeeping by obtaining rebates of any revenue sharing amounts that exceed the reasonable level of fees. Defendants did not do this.

49. Another element of revenue sharing—determining the price that would be available on a flat per-participant basis—requires fiduciaries of larger plans, as here, to solicit bids from competing providers at reasonable intervals. In large plans

FIRST AMENDED CLASS ACTION COMPLAINT            3:22-CV-05667-WHO

with over 10,000 participants, benchmarking based on fee surveys alone is inadequate.

50.   Revenue sharing is a practice that can lead to excessive fees if not properly monitored and capped. Prudent fiduciaries of defined contribution plans, thus, obtain competitive bids for recordkeeping at regular intervals of approximately three years.

51.   Upon information and belief, Plan fiduciaries failed to solicit such bids at such meaningful intervals.

52.   At all material times, the Plan was massive in terms of net assets and participants with account balances.  As such, the Plan, at all material times,  had enormous bargaining power by reason of its massive size to command very low investment management and recordkeeping fees for participants. Plan fiduciaries failed to avail themselves of this bargaining power.

53.   The fiduciaries were responsible for hiring administrative service providers for the plan, such as a recordkeeper, and for negotiating and approving the amount of fees paid to those administrative service providers. The fiduciaries also had exclusive control over the menu of investment options to which participants may direct the assets in their accounts. Those selections each had their own fees, which are deducted from the returns that participants receive on their investments.

54.   These fiduciary decisions dramatically affected the amount of money that participants are able to save for retirement. By way of example, a 1% difference in fees over the course of a 35-year career makes a difference of 28% in savings at retirement. U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, at 1–2 (Aug. 2013).

55.   Plan fiduciaries, despite their enormous bargaining power, failed to engage in a rigorous process to control these costs and ensure that participants pay no more than a reasonable level of fees.

56.   The Prudential Entities and CapFinancial Entities had an incentive to

-18-

FIRST AMENDED CLASS ACTION COMPLAINT          3:22-CV-05667-WHO

maximize their fees by putting their own higher-cost funds in plans and collecting the highest amount possible for recordkeeping. For each additional dollar in fees paid to a service provider, participants' retirement savings were directly reduced by the same amount, and participants lost the potential for those lost assets to grow over the remainder of their careers. Accordingly, participants' retirement security was directly and negatively affected by Plan fiduciaries' lack of diligence used by plan fiduciaries to control, negotiate, and reduce the plan's fees.

57.    Fiduciaries must be cognizant of providers' self-interest in maximizing fees, and not simply accede to the providers' preferred investment lineup—*i.e.,* proprietary funds that will generate substantial fee revenue for the provider—or agree to the provider's administrative fee quotes without negotiating or considering alternatives. To act in the exclusive interest of participants and not in the service providers' interest, fiduciaries must negotiate as if their own money was at stake. Instead of simply accepting the investment funds or fees demanded by these conflicted providers, fiduciaries must consider whether participants would be better served by using alternative investment products or services.

58.    Stated simply, ERISA requires Plan fiduciaries to negotiate and approve the amount of fees paid to the service providers. Acting in the exclusive interest of participants and not in the service providers' interest required Plan fiduciaries to negotiate as if their own money was at stake. This the Plan fiduciaries also did not do.

**1. Excessive and Unjustified Recordkeeping Expenses**

59.    Recordkeeping is a service necessary for every defined contribution plan. The recordkeeper keeps track of the amount of each participant's investments in the various options in the plan, and typically provides each participant with a quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about the plan and to review

their accounts. The recordkeeper may also provide access to investment education materials or investment advice. These services are largely commodities, and the market for recordkeeping services is highly competitive.

60.    At all relevant times, there were numerous recordkeepers in the marketplace who could provide a high level of service and who would have vigorously competed to win a recordkeeping contract for a jumbo-defined contribution plan like the Plan here. These recordkeepers readily respond to a request for proposal and will tailor their bids based on the desired services (*e.g.,* recordkeeping, website, call center, etc.). In light of the commoditized nature of their services, recordkeepers primarily differentiate themselves based on price and will aggressively bid to offer the best price in an effort to win the business, particularly for jumbo plans like the Plan.

61.    Some recordkeepers in the market provide only recordkeeping and administrative services, while others (*e.g.,* the Prudential Entities) provide both recordkeeping services and investment products. The Prudential Entities had the incentive to place their own proprietary products in the Plan in order to maximize revenues from servicing the Plan.

62.    Despite being faced with such conflicted fund recommendations, Plan fiduciaries failed to independently assess whether the provider's investment product was the best choice for the Plan, or whether the purpose of providing benefits to participants would be better accomplished by considering other investment managers who may offer superior funds at a better price.

63.    At all relevant times, PRIAC, upon information and belief, provided recordkeeping, compliance, and other services to the Plan, including but not limited to the allocation of participant contributions and administration of communications with participants.

64.    Upon information and belief, PRIAC, unbeknownst to Plan participants

FIRST AMENDED CLASS ACTION COMPLAINT          3:22-CV-05667-WHO

but known to Plan fiduciaries, received excessive indirect compensation (ex: 12b-1 fees, administration fees, service fees, sub-transfer agent fees, and other "revenue sharing payments") from various mutual funds, affiliates of mutual funds, its own affiliates, mutual fund advisors, sub-advisors, investment funds, including collective trusts, registered investment companies and other investment advisors, instruments or vehicles (collectively, "mutual funds").

65.   PRIAC, upon information and belief, failed to appropriately credit the amount of revenue sharing payments on a dollar-for-dollar basis for the benefit of the Plan and Plan participants.

66.   In selecting and retaining PRIAC as recordkeeper for the Plan, Plan fiduciaries ignored the Prudential Entities' self-interest in maximizing fees and, upon information and belief, simply agreed to PRIAC's fee quotes evidently without negotiating or considering alternatives.

67.   A prudent fiduciary must ensure that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable, negotiated recordkeeping fee. Because revenue sharing payments are asset-based, they often bear no relation to a reasonable recordkeeping fee and can provide excessive compensation or may be used as kickbacks to induce recordkeepers to have high-priced funds included as plan investments. To the extent that revenue sharing could be considered prudent in a jumbo plan, Plan fiduciaries did not ensure that the PRIAC rebated to the Plan and Plan participants all excess revenue sharing payments it received.

68.   Unchecked asset-based compensation ensured that PRIAC received continual, systematic and unjustified pay increases from the Plan unrelated to the number of participants and labor performed.

69.   As recordkeeping costs are directly correlated to the number of participants, there is no justification for the Plan to have uncapped asset-based

compensation. This is prohibited and should have been reported on the Schedule H, line 4d, Schedule G and IRS Form 5330 for each year in which the overpayment to the Prudential Entities occurred.

70.    PRIAC received and continues to receive excessive and unjustified indirect asset-based compensation for recordkeeping services.

## 2. Excessive and Unjustified Investment Management Costs

71.    Plan fiduciaries had exclusive control over the particular investment alternatives available in the Plan to which participants direct and allocate their accounts and the returns on which are credited to participants' accounts.

72.    Investment options can be passively or actively managed. In a passively managed or "index" fund, the investment manager attempts to match the performance of a given benchmark index by holding a representative sample of securities in that index, such as the S&P 500. In an actively managed fund, the investment manager uses her judgment in buying and selling individual securities (*e.g.,* stocks, bonds, etc.) in an attempt to generate investment returns that surpass a benchmark index, net of fees. Because no stock selection or research is necessary for the manager to track the index and trading is limited, passively managed investments charge significantly lower fees than actively managed funds.

73.    Mutual fund fees are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the mutual fund deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points (bps). The fees deducted from a mutual fund's assets reduce the value of the shares owned by participants investing in them.

74.    Many mutual funds offer their investors different share classes. Retail share classes are marketed to individuals with small amounts to invest. Institutional share classes are offered to investors with large amounts to invest, such as large retirement plans. The different share classes of a given mutual fund have the

-22-

identical manager, are managed identically (same stocks/bonds), and invest in the same portfolio of securities. The only difference is that the retail shares charge significantly higher fees, resulting in retail class investors receiving lower returns. The share classes are otherwise identical in all respects.

75. Some mutual funds engage in a practice known as "revenue sharing." In a revenue-sharing arrangement, a mutual fund pays a portion of its expense ratio to the entity providing administrative and recordkeeping services to a plan. The difference in fees between a mutual fund's retail and institutional share classes is often attributable to revenue sharing. To illustrate, a fund's retail share class may have an expense ratio of 100 bps, including 25 bps of revenue sharing, while the institutional share charges 75 bps, with no or lesser revenue sharing. The presence of revenue sharing thus provides an incentive for administrative service providers to 5 One basis point is equal to 1/100th of one percent (or 0.01%).

76. The importance of fees in prudent investment selection cannot be overstated. The prudent investor rule developed in the common law of trusts, which informs ERISA's fiduciary duties, emphasizes "the duty to avoid unwarranted costs[.]" Restatement (Third) of Trusts ch. 17, intro. note (2007). As the Restatement explains, "cost-conscious management is fundamental to prudence in the investment function." *Id.* § 90 cmt. b. While a fiduciary may consider higher-cost, actively-managed mutual funds as an alternative to index funds, active management strategies involve investigation expenses and other transaction costs that must be considered, realistically, in relation to the likelihood of increased return from such strategies. *Id.* at 90 cmt. h(2).

77. Academic and financial industry literature demonstrates that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee*

*Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2008); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries,* 158 U. PA. L. REV. 1961, 1993 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio"). Price and quality, thus, seem to be inversely related in the market for actively managed mutual funds. Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

78. In light of this effect of fees on expected returns, fiduciaries must carefully consider whether the added cost of actively managed funds is realistically justified by an expectation of higher returns. Restatement (Third) of Trusts ch. 17, intro. note; *id.* § 90 cmt. h(2). A prudent investor will not select higher-cost actively managed funds without analyzing whether a particular investment manager is likely to beat the overwhelming odds against outperforming its benchmark index over time, net of the fund's higher investment expenses.

79. Pursuant to the prudent investor rule, fiduciaries are required to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." Restatement (Third) of Trusts § 90(c)(3) (2007); see also Restatement § 90 cmt. b ("[C]ost conscious management is fundamental to prudence in the investment function."). The duty to be cost-conscious requires attention to such matters as the culmination of fiduciary commissions with agent fees or the purchase and management charges associated with mutual funds and other pooled investment vehicles.

80. The Prudential Entities, upon information and belief, improperly influenced their own compensation by investing the retirement assets of the Plan in the mutual funds generally through insurance company pooled separate accounts, common or collective trusts, individual trusts, and a proprietary group insurance contract (the "GIC"). The GIC is managed and operated by a Prudential-affiliated

entity, which pays revenue sharing payments to the Prudential Entities.

81. The revenue sharing payments effectively increased the expense ratios of the mutual funds, in which expenses are generally deducted directly from the retirement assets of each participant investing in those funds. The revenue sharing payments are based, in whole or in part, on a percentage of the retirement plans' investments in a mutual fund that are delivered to it by the Prudential Entities and/or based on the magnitude of the investments by such retirement plans in the mutual fund. But the amounts of the revenue sharing payments bore no relationship to the cost or value of any such services provided by the Prudential Entities. Indeed, the Prudential Entities performed the same services regardless of the amount of revenue sharing payments, if any, made to them.

82. The Prudential Entities effectively operated a system in which they were motivated to increase the amount of such payments, while improperly requiring participants who invested in mutual funds and similar investments that provide higher amounts of revenue sharing payments to incur and pay unreasonably high fees for the services provided.

83. The Prudential Entities, upon information and belief, exercised discretionary authority and control over Plan assets by, among other things, electing to receive dividends from the mutual funds and/or by making the affirmative investment decision to reinvest all cash dividends from mutual funds in additional mutual fund shares of the same mutual funds and, thus, increasing the amount of revenue sharing payments payable to them.

84. Upon information and belief, the Prudential Entities maintained complete discretion to substitute, eliminate and add funds as well as to make other investment decisions on behalf of the Plan administrator, controlled the menu of available mutual funds offered to the Plan, and retained the discretion to change its fund menus and to not offer certain investment options to Plan.

FIRST AMENDED CLASS ACTION COMPLAINT          3:22-CV-05667-WHO

85. Similarly, Prudential Bank and Trust, upon information and belief, exercised discretion by pooling the investments of the Plan before collectively investing them in mutual funds and similar investment vehicles.

86. Upon information and belief, Prudential Trust agreed to serve as trustee of the Trust only if the Plan maintained the GIC or a similar funding medium with PRIAC and utilized the retirement services of PRIAC.

87. Upon information and belief, the Prudential Entities had and exercised discretion to restrict the transfer of assets between one investment option and another investment option offered to the Plan, as well as to suspend the valuation rights and withdrawal rights of the Plan with respect to the retirement assets invested in the Trust.

88. Upon information and belief, the Prudential Entities established the investment objectives of each investment fund ("Fund") within the Trusts and had the sole authority and discretion to determine whether any particular investment met the investment objectives of a Fund.

89. Upon information and belief, the Prudential Entities also had sole authority, discretion and control to add or delete Funds within the Trust.

90. Upon information and belief, the Prudential Entities further retained the authority, discretion and control to establish share classes within each Fund and to determine its own compensation by changing the share class and/or share class description within each Fund.

91. Upon information and belief, the Prudential Entities also had the authority and control, in their sole discretion, to determine the value of the Funds.

92. Upon information and belief, the Prudential Entities had the authority and control, in their sole discretion, to engage and/or terminate the services of investment managers for the Funds.

-26-
FIRST AMENDED CLASS ACTION COMPLAINT          3:22-CV-05667-WHO

93.    Upon information and belief, the Prudential Entities had the authority and control, in their sole discretion, to determine how the assets of the Trust shall be invested, reinvested or retained as it deems to be in the best interests of the participants in the Trust.

94.    Neither the Prudential Entities nor other Plan fiduciaries meaningfully disclosed and, in fact, affirmatively concealed that revenue sharing payments would be made to the Prudential Entities by the mutual funds offered as investments to the Plan and that the Prudential Entities would utilize the investments in the Trusts to generate profits based upon the existence and leveraging of these assets for their own benefit.

95.    Plan fiduciaries' decision to retain the Prudential Entities as service providers caused harm to Plaintiffs and other participants. For each additional dollar in fees paid to the Prudential Entities, Plaintiffs and other participants suffered a decrease in the value of their retirement assets and the benefit of additional compounding. These deductions significantly reduced Plaintiffs' and other participants' net retirement benefits. Participants, thus, lost the full potential for their account balances to grow over the remainder of their careers.

96.    The Prudential Entities also influence their own compensation by effectively electing to receive all dividends payable to the Plan from mutual funds in the form of additional mutual fund shares, thereby increasing the amount of the assets of the Plans in the Separate Accounts and under the Prudential Entities' management and, thus, increasing the amount of revenue share payments to them.

97.    Upon information and belief, PRIAC, as the owner of the Separate Accounts, along with Prudential Bank & Trust, as the trustee of the Trusts and the Contract holder of the GIC, allows the Prudential Entities to retain the discretion, authority and control to vote the interests of the mutual fund shares held in the Separate Accounts, as well as to engage in securities lending activities with third

parties, pursuant to which it earns excessive compensation on its own account in connection with transactions involving the assets of the Plans.

98.    During the Class Period, upon information and belief, the Prudential Entities, therefore, have influenced and controlled their own compensation derived from the Separate Accounts by, among other things, negotiating the terms of the participation agreements with the mutual funds, which generally make revenue sharing payments on the basis of the assets invested in their mutual funds.

99.    The Prudential Entities, upon information and belief, also controlled the menu of available mutual funds offered in its Separate Accounts and retained the discretion to change its fund menus and to not offer certain investment options to the Plan based upon contract pricing and other considerations.

100.    The Prudential Entities, upon information and belief, also utilized the assets contained in the Separate Accounts, all of which appear on their balance sheet, to earn additional compensation independent of the revenue sharing payments by utilizing uncommitted assets in these Separate Accounts to engage in certain securities lending transactions for which it earns excessive compensation on its own account. Thus, the Prudential Entities utilized their ownership and authority over the Separate Accounts, as well as the discretion and control that they exercised over the Separate Accounts, to obtain additional compensation from third parties that they effectively self-determined.

101.    Pursuant to the Group Contracts administered and managed by Prudential and issued in its own name, the Prudential Entities manage the retirement assets of the Plan and serve as legal title owner and holder of the assets in the Trusts. Upon information and belief, some (if not all) of the investments of the Plan are held in the Trusts in the name of the Prudential Entities, which investments also are administered and managed by the Prudential Entities.

102.    The Prudential Entities and Plan Administrator affirmatively concealed the revenue sharing payments made to the Prudential Entities by the mutual funds offered as investments to the Plan.

103.    Upon information and belief, the Prudential Entities further influenced their own compensation through "GoalMaker™," an asset allocation program which the Plan, upon information and belief, adopted and, at times during the Class Period, used as a default mechanism for investments by its participants.

104.    Neither the Prudential Entities nor other Plan fiduciaries disclosed that GoalMaker directly steers participant investments into certain proprietary Prudential mutual funds and other similar mutual funds that are both expensive and unsuitable for most Plans and their participants, but which earn Prudential significant compensation at the expense of the Plans and their participants.

105.    Based upon the Plan's October 31, 2014 Overview of Plan Investment Options and Fees, in addition to the Stable Value Fund, the following investment options were used by Prudential through GoalMaker: American Funds Europacific Growth R6 (49), John Hancock Disciplined Value R5 (79 bps), Mainstay Large Cap Growth I (77 bps), PIMCO Total Return Instl (46 bps), Mid-Cap Growth/Artisan Partners (77 bps), JP Morgan Mid-Cap Value Instl (99 bps), Goldman Sachs Small Cap Value (102 bps), Small Cap Growth/TimeSquare (81 bps) and MFS International Value R5 (76 bps). Notably absent from the GoalMaker allocation was the availability of any low cost index funds or other suitable alternatives to the expensive, actively managed mutual funds included by the Prudential Entities in the asset-allocation "service."

106.    GoalMaker involves excessive fees and risks, as well as undisclosed conflicts of interest. GoalMaker specifically excludes passive and low-cost investment options for the Plans and, as a result, is not an appropriate asset allocation product for the Plans and their participants.

107. The Prudential Entities disingenuously attempted to disguise the true nature of GoalMaker by representing that it is "powered by Morningstar Associates, LLC, a respected industry leader." However, they did not disclose that Morningstar Associates, LLC only is permitted to recommend investments for inclusion in the GoalMaker allocation process from a set of investments hand-picked by the Prudential Entities, which have the true (albeit undisclosed) object of earning the Prudential Entities significant compensation.

108. Upon information and belief, the Prudential Entities used GoalMaker to influence and increase their own compensation, and earn excessive fees, all while failing to adequately disclose to the Plan or to participants the true nature of this product/device and thereby breaching its fiduciary duties to the Plans.

109. Likewise, the CapFinancial Entities failed to justify their excessive compensation and otherwise failed to show that they added any material value by maintaining predominantly actively-managed retail share class investments.

110. "Active investment management" and similar terms refer to investment strategies that try to achieve above average market returns over time, that is, actively managed funds try to "beat the market." That is, active managers try to identify and exploit market inefficiencies. *See* Restatement (Third) of Trusts § 90 cmt. h(2) (active management involves "searching for advantageous segments of a market, or for individual bargains in the form of underpriced securities."). The search for potential market inefficiencies requires research and analysis, which increases investment management costs. *See id.*

111. With actively managed mutual funds, the funds' respective investment managers charged fees based on a percentage of the fund's total assets. The investment management fees are deducted from investment returns, thus reducing the net returns on participants' investments, often without their knowledge.

112. While prudent investment principles allow for active management

-30-

FIRST AMENDED CLASS ACTION COMPLAINT          3:22-CV-05667-WHO

strategies in appropriate circumstances, the additional risks and costs involved "must be justified by realistically evaluated return expectations. Additionally, "[a] trustee's approach to investing must be reasonably supported in concept and must be implemented with proper care, skill and caution." Restatement (Third) of Trusts cmt. f.

113. Thus, in deciding whether to pursue an active management strategy, a fiduciary should determine that "gains from the course of action in question can reasonably be expected to compensate for its additional costs and risks." Id. at cmt. h(2). That is, prudence requires a fiduciary to have a realistic expectation that an active management strategy will generate net returns equal to or greater than reasonable alternatives, such as investing in low-cost index funds (a "passive" strategy).

114. A passive management strategy "aim[s] to maximize returns over the long run by not buying and selling securities very often. In contrast, an actively managed fund often seeks to outperform a market (usually measured by some kind of index) by doing more frequent purchases and sales." U.S. Sec. and Exch. Comm'n, Investor Bulletin: Index Funds (Aug. 6, 2018). See also A Look at 401(k) Plan Fees, supra, at 7 ("Passively managed funds seek to obtain the investment results of an established market index, such as the Standard and Poor's 500, by duplicating the holdings included in the index.").

115. Whether an active or passive strategy ultimately is chosen, prudence requires the plan fiduciary to avoid any investment that is not reasonably expected to generate returns sufficient to cover its costs.

116. Here, Plan fiduciaries not only breached their duties by failing to have a prudent, reasoned process for deciding upon and carrying out their investment strategy, but also, they failed to monitor the funds and assets they selected for the Plan menu and failed to replace their imprudent selections with prudent ones.

FIRST AMENDED CLASS ACTION COMPLAINT          3:22-CV-05667-WHO

117. Plan fiduciaries selected and retained only actively managed funds that paid excessively high revenue sharing and kickbacks to CapTrust and Investment Fiduciaries but that did not perform as well as other funds which were available to Ferguson and the Committee at the time of their investment decisions.

118. As noted above, in deciding whether to pursue such an expensive and risky active management strategy, Plan fiduciaries were obligated, first, to determine that "gains from the course of action in question [could] reasonably be expected to compensate for its additional costs and risks." Restatement (Third) of Trusts § 90 cmt. h(2).

119. Plan fiduciaries' active management strategy was not justified because they knew or should have known that there was no realistic expectation of recouping returns sufficient to cover the substantial additional costs and risks of the strategy.

120. Empirical data at the time that Plan fiduciaries made their investment selections and retention decisions demonstrated that, over time and across market sectors, the actively managed funds they selected consistently failed to outperform the market. This failure was most pronounced in asset classes demonstrating a high degree of market efficiency.

121. Faced with this data, Plan fiduciaries should have proceeded with great caution, knowing that an active management strategy was a high-stakes, low-percentage bet. Nevertheless, Plan fiduciaries heedlessly made that bet while playing with participants' money.

122. The annual dollar cost to the Plan's participants of Plan fiduciaries' decision to pursue an active investment strategy, compared to the cost of comparable but less expensive investment products, was significant (in the multi-millions of dollars).

123. With actively managed mutual funds, the funds' respective investment managers charged fees based on a percentage of the fund's total assets. Thus, more

-32-

dollars are paid from investors to pay portfolio managers compensation as investors save more salary dollars (regardless of any positive returns over the funds' meaningful benchmarks). The portfolio manager's compensation (investment management fees) is deducted daily from investment returns, thus reducing the net returns on participants' investments, often without their knowledge.

124. While prudent investment principles allow for active management strategies in appropriate circumstances, the additional risks and costs involved "must be justified by realistically evaluated return expectations. Additionally, "[a] trustee's approach to investing must be reasonably supported in concept and must be implemented with proper care, skill and caution." Restatement (Third) of Trusts cmt. f.

125. Plan fiduciaries should have realized that their managers struggled over many years to "beat their index" so perhaps it was prudent to "buy the index." Why? Because if they had done so, participants' and beneficiaries' accounts would have risen to $39,097.28 instead of $36,033.36—a lost opportunity cost difference (for only one worker investing $10,000.00) of $3,063.92

126. Ferguson failed to clearly disclose their mutual fund's share classes on their past plan returns' financial statements to the U.S. Departments of Treasury and Labor.

127. Plan fiduciaries also failed to use expense ratios of the mutual funds they selected to understand the costs of their active management strategy. A mutual fund's annual expense ratio is calculated by dividing the fund's operating expenses by the average dollar value of its assets. Expense ratios are strong predictors of performance. In fact, the SEC requires every mutual fund to disclose its expense ratio in a standardized format in the fund's prospectus.

128. In addition to investment management fees, the expense ratio also reflects certain other fees that may be paid by the mutual fund to other service

-33-

FIRST AMENDED CLASS ACTION COMPLAINT        3:22-CV-05667-WHO

providers (a practice known as "revenue sharing"), such as "distribution" fees (or "12b 1 fees"), "sub-transfer agency" fees and other costs, such as for accounting and legal services. The mutual fund passes along these costs to investors by deducting them from investment returns.

129. The leading mutual fund investment research and services firm, Morningstar, emphasizes the effect of expenses on fund performance and advises investors to rely on expense ratios when choosing mutual funds:

> If there's anything in the whole world of mutual funds that you can take to the bank, it's that expense ratios help you make a better decision. In every single time period and data point tested, low-cost funds beat high-cost funds.... Expense ratios are strong predictors of performance…. Investors should make expense ratios a primary test in fund selection. They are still the most dependable predictor of performance.

Russel Kinnel, *How Expense Ratios and Star Ratings Predict Success* (Aug. 9, 2010), https://www.morningstar.com/articles/347327/how-expense-ratios-and-star-ratings-predict-success.

130. Plan fiduciaries, however, did not make expense ratios a primary test in fund selection. Instead, they rubberstamped the CapFinancial Entities' recommendation to use high-fee, actively managed funds and intentionally excluded lower fee, similarly or better performing funds, including significantly cheaper share classes of the more expensive funds they retained.

131. The average annual expense ratios for multiple investment options in the Plan were significantly higher than the average expense ratios for lower-cost, similarly or better performing Vanguard index funds invested in the same asset classes ("Vanguard comparable funds"). Because every mutual fund's expense ratio is published at the front of its prospectus, this information was readily available to Plan fiduciaries at the time they made their investment decisions.

132. Throughout the Class Period, the investment management fees charged

FIRST AMENDED CLASS ACTION COMPLAINT          3:22-CV-05667-WHO

by the Plan's fund managers were millions of dollars higher than the investment management fees for comparable Vanguard funds would have been.

133. Prior to their selection, Plan fiduciaries did not compare the performance of the funds to the performance of Vanguard comparable funds, among other passively managed target date index funds.

134. Failure to include Vanguard comparable funds in the Plan resulted in millions of dollars of losses in plan participants' retirement savings.

135. Plan fiduciaries' failure to proceed with great caution further caused them to ignore that actively managed funds typically charge higher fees than passively managed funds. *See* A Look at 401(k) Plan Fees, *supra*, at 7. These costs are significant. As the Department of Labor reports, investment management fees are "by far the largest component" of all ERISA plan fees and expenses. *See id*. at 2

136. The additional investment management fees charged by the Plan's fund managers were not justified because, at the time they made their investment decisions, the Plan fiduciaries knew or should have known that the funds, based on their historic performance and other market factors, would not generate returns that compensated for those additional fees.

137. Had Plan fiduciaries simply compared the expense ratios of the Plan's funds with the expense ratios of the Vanguard comparable funds' benchmarks, they would have known that participants could have invested in essentially the same underlying assets simply by choosing the lower-cost, similarly or better performing Vanguard comparable funds (or similar funds) and thereby saved the Plan participants millions of dollars.

138. In short, at the time they made their investment decisions, Plan fiduciaries knew or should have known that the returns from the actively managed funds selected for the Plan would fall far short of recouping the millions of dollars those funds cost.

139.   Plan Fiduciaries easily could have determined the costs of the Plan's investments by comparing their expense ratios to those of Vanguard comparables or other index funds invested in the same asset classes.  This they did not do.

140.   A trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Tibble v. Edison International*, 843 F.3d 1187, 1198 (9th Cir. 2016).

141.   To demonstrate that they were acting prudently and adding value, the CapFinancial Entities should have helped Plan fiduciaries avoid imprudent fund and share classes by using tools such as FINRA's own free mutual fund cost analyzer to help select prudent investment options and appropriate share classes for the size of the Plan.

142.   Given their role, the CapFinancial Entities had considerable influence over the investment options in the Plan and, upon information and belief, set their own compensation through unjustified revenue sharing sources, including "finder's fees" and asset-based direct fees, for their own benefit.

143.   The fees of mutual funds and other investment options are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the fund deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points (bps). (One basis point is equal to 1/100th of one percent (or 0.01%). The fees deducted from a fund's assets reduce the value of the shares owned by fund investors.

144.   These expenses are deducted from the returns that participants receive on their investments and, as such, can significantly reduce Plaintiffs' and other participants' net retirement benefits. The higher the expense ratio, the less the participant would benefit. To illustrate, a fund's retail share class may have an expense ratio of 100 bps, including 25 bps of 12b-1 fees and 15 bps of sub-transfer

agency fees, while the institutional share charges 60 bps, with significantly less or no revenue sharing. The difference of 0.40% or often more is reflected in the annual returns.

145. Commencing (at the latest) in 2009, the CapFinancial Entities induced Plan fiduciaries to load the Plan primarily with mutual funds consisting of, among other things, institutional ("true no-load") funds, an "institutional" fund with exceptionally high revenue sharing fees and total expenses, and retail funds. Plaintiffs and all employees who became eligible to participate in the Plan were required to choose from this limited fund list created and maintained by the Plan fiduciaries and had no control or ability to use investments outside of this limited menu.

146. Many of the funds with retail share classes had sufficient assets to meet the minimum initial investment requirements to obtain their otherwise identical but less expensive institutional share classes. These minimums are frequently waived for large retirement plans in any event.

147. Retail share classes that utilize revenue sharing not only reduce returns, but they also suffer from inefficiencies known as "friction." The cumulative excess costs of revenue sharing, lagging returns and inefficiencies over a five year period of time is significant.

148. Plan fiduciaries were required but failed to ensure that the fees and expenses incurred by the Plan were fair and reasonable, including ensuring that the expenses associated with the mutual funds offered for investment in the Plan were fair, reasonable and cost competitive.

149. Upon information and belief, Plan fiduciaries rubber-stamped the CapFinancial Entities' active investment strategy without investigating or analyzing whether the added transaction costs were justified by realistically evaluated return expectations."

-37-

150.   The CapFinancial Entities lagged behind their prospectus benchmarks. A significant portion of that lag was due to wasted managers' fees. Where, as here, a manager's costs provide no value to Plan participants, these fees are not necessary and, therefore, prohibited transactions that should have been disclosed and rebated to Plan participants investing in this fund.

151.   Although in very recent years, Plan fiduciaries added some limited, low-cost Vanguard index funds to the investment options available to participants, as a historical matter and to this very day, the expenses associated with the investments in the Plan have been and are grossly excessive, because the investment options made available to the Plan's participants, at all pertinent times, have been focused upon expensive and unsuitable actively managed mutual funds.

152.   The current investment options and fees associated with these mutual funds are generally excessive and imprudent, amounting to four times or more the cost of passively managed mutual funds, with absolutely no justification for this concentration in the Plan on actively managed and extremely expensive mutual funds, which rarely add value or can be justified as investment options, especially in the absence of a broad array of passively managed index funds is also made available. For example, as reflected in the Plan's October 31, 2014 Overview of Plan Investment Options and Fees, Oakmark Equity & Income I (77 bps), John Hancock Disciplined Value R5 (79 bps), Mainstay Large Cap Growth I (77 bps), Mid-Cap Growth/Artisan Partners (77 bps), JP Morgan Mid-Cap Value Instl (99 bps), Goldman Sachs Small Cap Value (102 bps), Small Cap Growth/TimeSquare (81 bps) and MFS International Value R5 (76 bps), all had expense ratios of 76-102 bps, which were four or more times greater than retail passively managed funds -- which generally were not made available to the Plan and its participants during the pertinent period.

153. Until very recently, as noted above, there were no Vanguard index funds offered in the Plan and the S&P 500 index mutual fund previously offered in the Plan charged an astronomical (for an index fund) expense ratio of 30 bps.

154. Although the fees and expenses in the Plan have improved (albeit marginally) in recent years, examination of the investment options available to the Plan participants and the expenses associated with those investments over the past six years, including the fact that the Plan has only recently migrated from concentrating its investments through Separate Accounts, reveals that the trust and participants/beneficiaries have paid grossly excessive fees during the Class Period.

155. The CapFinancial Entities babysat the fund menu for many years. There have been very few fund changes in the past six years. Every eight years, fifty percent of portfolio managers are fired or quit (per SEC-prospectus at www.sec.gov/edgar). Thus, since over 80% of this trust's funds remained year over, Plaintiffs infer a lack of monitoring by CapTrust (based on Ferguson's certified government reporting). Also, this fact shows that there was (1) little labor or time spent researching new funds by CapFinancial Entities and (2) no research to remove a fund.

156. CapFinancial's pay to issue flawed monitor reports with non-meaningful benchmarks, was excessive because it required only 20-25 hours per quarter to monitor Ferguson's limited fund menu of fewer than 24 options (one hour per option).

157. Assuming CapFinancial Entities provided necessary advice, that's a big assumption given the facts here, excessive compensation still occurred over and over every quarter approved by Ferguson (according to the industry-leading surveys of firms like CapFinancial Entities; Fee Benchmarker® (Advisor Fee Almanac)).

158. The CapFinancial Entities' fee for all other clients in the USA equals about $45,000/year. This is closer to the Advisor Fee Almanac's surveys. At the

maximum "principal" level of $300/hour spending, about 25 hours per quarter comes in at $30,000/year. Adding another 30% ($10,000) for a "reasonable profit" brings the annual total to $40,000.

159.  To be specific, in 2016, the CapFinancial Entities collected ten times more at $462,039 (direct from the trust). In 2017 they took $560,935 from the trust's corpus.

160.  In 2018, the CapFinancial Entities alienated another $624,264 direct from the trust.

161.  Based also on SEC information that CapTrust provided, https://reports.adviserinfo.sec.gov/crs/crs_175112.pdf conflicts exist for this fiduciary firm (Captrust) and were confirmed via links from Captrust's filings with the SEC.

162.  The CapFinancial Entities engaged in the typical "shell" game to confuse participants and beneficiaries.  CapTrust, for one, used multiple tax entities to steer compensation that was never earned. In fact, the CapFinancial Entities and affiliates directly alienated the trust corpus (and participants' and beneficiaries' accounts) an average of $520,798 each year just from 2016 to 2020. This is so even though the average for all of the CapFinancial Entities' clients over these years was only $47,233/ per year (median $44,946). Based on information and belief, they served under a contract with very similar terms (if not identical terms) and provided similar services.

163.  Based on information and belief, the CapFinancial Entities' contract with Plan fiduciaries carved out liability. All Plaintiffs and class representatives paid the CapFinancial Entities' fee pro-rata (*i.e.,* based on the size or dollars in their accounts). Thus, longer-serving participants/beneficiaries paid more than new hires at Ferguson.

**B. Failure to Investigate, Analyze, and Monitor Plan Investments**

164. During the Class Period (*i.e.,* January 1, 2009 to present), Plan fiduciaries, with the active assistance and encouragement of CapTrust, selected and thereafter retained the following investments (open-end mutual funds and separate accounts) in the Plan: American Funds Balanced Fund;  American Funds EuroPacific Growth Fund;  Goldman Sachs Small Cap Value Fund;  JP Morgan Mid Cap Value Fund; Mainstay (Winslow) Large Cap Growth Fund; MassMutual Select Mid Cap Growth Fund; Metropolitan West Funds Total Return Fund; Metropolitan West Total Return Fund; MFS International Value Fund; Mid Cap Growth Artisan Partners Account; Robeco Large Cap Value Account ; Prudential Retirement Insurance & Annuity Co. Small Cap Value Fund; American Funds Balanced Fund; American Funds EuroPacific Growth Fund; Goldman Sachs Small Cap Value; JP Morgan Mid Cap Value Fund; Mainstay Large Cap Growth Fund; MassMutual Select Mid Cap Growth Fund; Metropolitan West Funds Total Return Fund; MFS International Value Fund; Robeco Large Cap Value Account; Small Cap Growth Fund Times Square Account.

165. Plan fiduciaries caused the Plan and Plan participants to pay wholly unnecessary and excessive fees by using higher-cost share classes of mutual funds instead of identical, equal or better performing versions of the same funds in lower-cost share classes.

166. Plan fiduciaries acted imprudently and failed to act by predominantly selecting and thereafter retaining funds with high portfolio manager's compensation and not justified by a cost-benefit analysis that incorporates incorporated risks and the entire portfolio.

167. Jumbo retirement plans like the Plan here have the massive bargaining power to negotiate low fees for investment management services. If a plan invests in mutual funds, fiduciaries must review and consider the available share classes. Because the only difference between the various share classes is fees, selecting a

higher-cost share class results in the plan paying wholly unnecessary fees. Accordingly, absent some compelling reason to opt for the higher-cost version, prudent fiduciaries will select the lowest-cost share class available to the plan. In other words, the "prevailing circumstances"—such as the size of the plan—are a part of a prudent decision-making process.

168. Given that defined contribution plan fiduciaries are held to the standard of a knowledgeable financial expert, a fiduciary should know the basic principle that asset size matters, and must review a fund's prospectus to determine if a lower-cost share class of the same fund is available, to avoid saddling the plan with unnecessary fees.

169. Jumbo investors like the Plan here can obtain share classes with far lower costs than retail mutual fund shares. In addition, common collective funds from providers can significantly reduce investment fees charged on mutual fund investments in defined contribution plans.

170. Higher yielding, lower cost, equally or better performing share classes of mutual fund investment options were readily available to the Plans.

171. Plaintiffs restate "Trusts" by Edward C. Halbach, Jr., University of California, Berkeley, Reporter for the Restatement (Third) of Trusts, Thirteenth Edition: "A trustee has a duty to make the trust property reasonably "productive." This term is usually used to refer to productivity of a reasonable amount of income (i.e., "yield"), but the duty in its broader, but less frequently used, sense includes total return (often just "return"), i.e., income plus other return, mainly in the form of appreciation in the market value of principal."

172. Also, this duty includes the "duty to rid the trust of unproductive, underproductive" or "'wasting' assets."

FIRST AMENDED CLASS ACTION COMPLAINT        3:22-CV-05667-WHO

173. Plan fiduciaries knew or should have known that investment providers would have allowed the Plans to provide lower-cost share classes to participants if they had asked.

174. Plan fiduciaries selected and continued to retain the Plan's investment options with far higher costs than were and are available for the Plan based on its size. This includes their selecting and continuing to offer far higher-cost share classes even though lower-cost share classes of the exact same mutual funds were available.

175. Because the share classes have identical portfolio managers, underlying investments, and asset allocations and differ only in cost, Plan fiduciaries' failure to select the lower-cost share classes for the Plan's mutual fund options demonstrates that they failed to prudently consider and use the size and purchasing power of the Plan when selecting and deciding to retain the investment options.

176. Plan fiduciaries' use of the higher-cost share classes instead of the available lower-cost versions caused the Plan's participants to lose millions of dollars of their retirement savings due to wholly unnecessary fees.

177. Mutual funds are required to offer a prospectus, which is designed to provide material information to potential investors to enable them to make an informed, prudent investment decision. The prospectus sets forth a fund's objectives or goals, investment strategies, principal risks, historical performance, fees and expenses, and fund managers and advisers, among other information. If a participant were to review the prospectuses of all the investment options that were placed in the Plan, they would have to read many thousands of pages of materials. This is a virtually impossible burden. Even for the Plan's fiduciaries, it is inconceivable that they have read the prospectuses and supporting materials of the funds they selected and retained for the Plan.

-43-

178.  Reviewing the performance of each fund offered under the Plan and the portfolio manager's compensation during the Class Period against the SEC prospectus, the 29 CFR § 2550.404a-5 appropriate broad-based securities market index, and the "Best-Fit Index." (under Restatement 3rd of Trusts (American Law Institute in 1992; Prudent Investor Rule Modern Portfolio Theory (MPT) statistics)) reflects that Plan fiduciaries used a reckless and negligent process at the moment of their conduct.

179.  The only difference between retail share classes and institutional share classes is their fees and other charges. The underlying assets in the fund are the same, with these costs being the only difference. (Retail share classes are identified by the suffixes A, Adv, and R1 through R4. Institutional share classes are identified by the suffixes I and R6.)

180.  Plan fiduciaries had an obligation to "avoid unjustified costs" and obtain the cheapest funds possible, particularly when two or more funds were identical in all meaningful aspects.

181.  As such, Plan fiduciaries should try and obtain institutional share classes, when possible, as opposed to their retail share class equivalents.

182.  Plan fiduciaries did not try to get better funds for the Plan during the Class Period. Rather, Plan fiduciaries continually imprudently limited their Plan participants' investment choices to high-cost retail share classes, and when institutional shares were offered, they were the worst performing of the available options. Plan fiduciaries used consistently lower performing, more expensive retail share classes, as opposed to institutional share classes, causing increased fees to the participants as they attempted to save more.

183.  Based on the Plan's Forms 5500, Plan fiduciaries never asked their recordkeepers or advisors to reduce their compensation. Of course, as profit seeking entities, these recordkeepers and advisors had no incentive to recommend that Plan

-44-

fiduciaries adopt cheaper funds or a more Plan-participant friendly compensation structure for themselves.

184.  The differing cost structures of these identical funds exist to allow large customers, such as this Plan, to take advantage of scale as investments are made. Service providers are often willing to waive minimum purchase requirements that often come with institutional funds as a way of incentivizing their adoption into plans.

185.  Plan fiduciaries had an incentive to push these higher-cost funds onto Plan participants because it would allow the recordkeeper and advisor to charge the fees to participants instead of the defendant organizations themselves.

186.  Discovery will reveal more specific details of the communications and contractual relationships behind these decisions but the following three examples of wasteful portfolio manager's compensation being taken from the trust's corpus daily for plan investments are demonstrative and concerning.

## 1.  The Mainstay Winslow Large Cap Growth Fund

187.  Plan fiduciaries rubber-stamped the CapFinancial Entities' recommendation to select the Mainstay Winslow Large Cap Growth fund in plan year 2011 even though the managers were hired on 12/31/2005. These novice portfolio managers managed only 69 stocks across all share classes at the time of selection (and 62 stocks in 2017; 52 in 2019; 45 stocks on 12/31/2022). The cheapest identical share class of the fund was and is today the "R6" version called Mainstay Winslow Large Cap Growth "R6."

188.  Due to adverse compounding effects, revenue sharing credits are never as beneficial or equal to the lost opportunity of instead owning the cheapest share class of the matching fund. For example, using the 2018 year, the "A" version earned 55.56% in total return (over five years or 11.11% per year) with a revenue sharing of 0.25%/year.

-45-
FIRST AMENDED CLASS ACTION COMPLAINT          3:22-CV-05667-WHO

189. The "R6" version of the same SEC-registered mutual fund (Mainstay Winslow Large Cap Growth "Management Company: 0C00002DSP" for all share classes) earned 58.36% over five years in total (11.67%). The difference in returns per year was 0.562% which is over twice the revenue sharing credit of 0.25%/year. Thus, selecting and retaining share classes embedded with additional return-reducing "revenue sharing" costs indicate imprudent selections/retention processes by Plan fiduciaries.

190. Putting these specific facts in dollar terms, the average account balance in the Plan in 2016, according to Plan fiduciaries' financial statements, was over $60,000, with an average salary savings contribution of over $6,000 per year. Over five years, an investor investing $60k (putting an additional $6k/year) growing at 11.11%/year equals $139,064.73. Growth at 11.67%/year equals $142,059.80-- $2,995.07 more. It makes no sense for Plan fiduciaries to have ever selected and thereafter retained an identical but more expensive share class for participants' and beneficiaries' accounts.

191. The Mainstay Winslow Large Cap Growth open-ended mutual fund had the most assets (mostly from the participants' and beneficiaries' salary dollars) as of the plan's year of 2016. Plan fiduciaries failed to inform Plan participants about the $9,668,890.88 in trust assets wasted over the succeeding years (in portfolio manager's compensation/fees) as a result of fiduciaries' selection of this specific fund and their rubber-stamping CapFinancial recommendation under their contract.

192. The fund's novice managers' performance lost over $48 million compared to the benchmark. These managers got paid handsomely (20% of the participants' expected returns) and they gambled against their broad benchmark and it was in plain sight of Plan fiduciaries to take action. They did not take such action.

193. Plan participants were unaware that Plan fiduciaries' selection was thoughtless but levied on their beneficial interest in the trust to pay this portfolio

manager's compensation totaling $9,668,890.88.

194.    Delving into the specific facts and circumstances at the time of the Plan fiduciaries' actions to monitor the fund's manager, plan year 2016, we find that Morningstar gave the fund a two star ranking on 3/31/2016--near the bottom ranking of one star (bottom 33%). The Plan fiduciaries and CapTrust/CapFinancial retained the fund and its management for workers to continue to deposit salaries into every other week.

> The Morningstar Rating™, or "star rating", is a quantitative assessment of a fund's past performance - both return and risk - as measured from one to five stars. It uses focused comparison groups (investment categories) to better measure fund manager skill. The Morningstar Rating™ for funds is calculated for managed products (including mutual funds, variable annuity and variable life subaccounts, exchange-traded funds (ETFs), closed-end funds, and separate accounts) with at least a three-year history. The top 10% of products in each product category receive 5 stars, the next 22.5% receive 4 stars, the next 35% receive 3 stars, the next 22.5% receive 2 stars, and the bottom 10% receive 1 star.

195.    In 2016, it was awarded the worst "Risk Rating" by Morningstar® ("E") and the second worst overall "Risk Adjusted Rating" of "D" by Morningstar® (the manager's benchmark was "A" (Russell 1000 Growth)). This was published in the Wall Street Journal, the US News and World Report, and online news sources.

196.    This investment's portfolio manager's compensation of 1% each year increased costs in another way in 2013 (one year after adding the fund to the plan) and continued into the limitations period. The manager's high stock turnover cost participants dearly--75% of stocks chosen by the fund's portfolio managers on January 1 were sold by December 31 in past years and continued into the limitations period.

197.    The Mainstay portfolio managers' chosen benchmark in the SEC-

prospectus at www.sec.gov/edgar was the Russell 1000 Growth. There is a saying in the investment management industry that if you cannot beat your benchmark, buy it. That is the case here and the philosophy all Defendants should have employed.

198. In the first year of the limitations period it returned a ten year total return of 122% (105% for Mainstay). The five year total return was 79% while Mainstay was 57%. The three year was 47% versus 38% for Mainstay.

199. Part of the reason for the lag was that the portfolio managers chose four or five dozen stocks since they started running the fund (knowing their own chosen benchmark held 1,000 stocks). Plan fiduciaries should have ceased this fleecing of the worker's retirement accounts each and every business day.

200. Low stock count increases volatility, standard deviation, or "risk." Trust law refers to it as "variance." Standard deviation is reported as the square root of variance. Variance is the Restatement Third, Prudent Investor Rule's measure of the dispersion of portfolio managers' returns versus their chosen benchmark. Variance was high because portfolio managers concentrated 34% of the fund's total cash assets into ten (10) stocks (that concentration existed since the fund was put on the participants' limited fund menu by the Plan fiduciaries). The Prudent Investor Rule cautions trustees to avoid this risk.

201. Shortly after adding this fund to participants' limited menu of choices (one year later), Plaintiffs noted their Mainstay Winslow Large Cap Growth's Risk Adjusted Rating in Morningstar® was a "D" grade versus its benchmark's at "A." The Large Growth average was also graded an "A."

202. The Mainstay fund manager's prior three years show he earned 53% total return (15.33% per year) versus 59% (17% per year) for his chosen benchmark (Russell 1000 Growth).

203. Because of the Defendants' careless and imprudent actions, Plan participants lost the opportunity to be invested in the fund's SEC-prospectus and 29

-48-

CFR § 2550.404a-5 benchmark and instead were forced to be burdened by these daily fees in their accounts for portfolio manager's compensation and transaction costs. The trust fund's gross (gross asset value (GAV)) or "price" of this asset was reduced daily for portfolio manager's compensation. At 4pm these expenses continued to be paid daily over the most recent six years,

204.    To view the damage for one participant, the Plaintiffs use the average monthly contribution (based on Plan fiduciaries' reporting to the U.S. Departments of Treasury and Labor) of $573 and a $10,000 balance to prove the harm to only one worker in the Mainstay Winslow Large Cap Growth fund. If a participant initially made an investment change online (changes can be made daily) to buy $10,000 of shares (in 2016) of this fund and periodically invested $573/month, their account would grow to $36,033.36 in Plan fiduciaries' choice of investment.

205.    The Defendants should have realized that this fund's managers struggled over many years to "beat their index" so why not make a phone call to "buy the index." Because if they had done so, participants'/beneficiaries' accounts would have risen to $39,097.28 instead of $36,033.36—a lost opportunity cost difference (for only one worker investing $10K) of $3,063.92.

Derivative of the trustee's duty of prudence, Plan fiduciaries violated the duty to avoid incurring unnecessary expenses when directing trust corpus to buy $70,142,272 of shares in Mainstay Winslow Large Cap Growth fund in 2011 (charging participants/beneficiaries 1.04% per year or $729,480 per year in portfolio manager's compensation; directed via corporate resolution to Prudential).

206.    By failure to act, they forced participants to pay twice the 2011 amount in fees for unnecessary portfolio manager's compensation when $155,905,214 of the trust's corpus (and participants' salaries) was in the Mainstay Winslow Large Cap Growth ($1,512,280 wasted portfolio manager's compensation in 2016). This "return-reducing portfolio manager's compensation" did not include the portfolio

managers' transaction or trading costs to change stocks.

207.    Due to this plan's portfolio managers' lack of skill, their "true costs" from *mismanagement* of their portfolio of stocks (and related concentration/variance) were far more significant in harm to the trust than the total annual expense ratio (including the portfolio manager's compensation).

208.    No rational responsible plan fiduciaries reviewing their fund's prospectus at the moment of initial selection (and during quarterly monitoring periods afterward) would invest and keep people's money with this fund's manager.

209.    As of May 31, 2022, the Mainstay Winslow Large Cap Growth fund's managers held only 49 stocks while its benchmark held 1,000 stocks (Investopedia: "The term Russell 1000 Index refers to a stock market index that is used as a benchmark by investors. It is a subset of the larger Russell 3000 Index and represents the 1000 top companies by market capitalization in the United States."). It is no wonder the fund causes so much trust variance and potential losses affecting thousands of investors, especially hundreds who cash out/lock in realized losses when separating from service at Ferguson.

210.    The Mainstay Winslow Large Cap Growth fund selected and after that retained by both Defendants had a median loss to the fund's benchmark of -2.55% (years reviewed from 1/1/2011 to 6/30/2022). This difference is due to (1) the portfolio manager's trading/transaction cost and (2) holding on to four dozen stocks and having a massive variance from a lack of diversification. This lack of skill is astonishing and harmful.

211.    Based on 2009 to 2020 Annual Returns/Reports of Employee Benefit Plan from Ferguson Enterprises LLC, evidence indicates that CapTrust/CapFinancial served as line 2(b) "Service Code(s)" as a "27" (investment advisor to the plan). Each fiduciary at Ferguson Enterprises LLC and CapTrust/CapFinancial who either (1) was named or (2) functioned or (3) exercised or (4) was granted discretionary

FIRST AMENDED CLASS ACTION COMPLAINT          3:22-CV-05667-WHO

authority (regardless of whether such authority is ever exercised) demonstrated a "lack of skill" in selecting/retaining the Mainstay Winslow Large Cap Growth.

212.   Plan fiduciaries selected and thereafter retained the Mainstay Winslow Large Cap Growth without prudently performing an essential "cost v. benefit" analysis to assess if the fund's portfolio managers' compensation (taken from trust corpus daily) "enhanced" the return probability. There exists no evidence that Plaintiffs could find, in over twelve years of certified annual reports to the U.S. Departments of Treasury and Labor, based on circumstances prevailing at the time, that Plan fiduciaries selection/retention processes could have followed or been loosely based on the Prudent Investor Rule (Restatement Third) by way of carefully investigating any "gains from the course of action in question." Each manager was compensated each business day handsomely to beat his benchmark, but they consistently failed and the participants paid the price (unlike defined benefit plans).

213.   Defined benefit plans were replaced after the advent of SEC Rule 12b-1 fees in 1980 because plan sponsors could shift "investment risk" over to their workers and never worry again about "underfunding" their pension plan by way of poor investment performance.

214.   Moreover, they could eliminate actuarial costs and use SEC Rule 12b-1 fees, sub-transfer agency fees, commissions, finder's (incentive) fees to pay providers. These actions essentially put all costs and risks on their workers.

215.   Plan fiduciaries never ensured this fund's portfolio manager was capable or "expected to compensate" the trust or participants' and beneficiaries' accounts for their "additional costs and risks." Plan fiduciaries' selections since 2009, as evidenced by their certified annual reporting to the U.S. Departments of Treasury and Labor, showed no "credible basis for concluding that the trustee or the manager of a particular activity--possesses or has access to the competence necessary to carry out the program."

216. Plan fiduciaries exhibited a lack of loyalty, care and skill when they selected and retained the Mainstay Winslow Large Cap Growth fund.

217. Based on information and belief, the CapFinancial Entities reviewed this fund via quarterly written monitoring reports and recommended to Plan fiduciaries to retain this imprudent fund from 2011 at least until January 1, 2021.

218. The facts and circumstances below prove Plan fiduciaries had flawed monitoring processes from the SEC-prospectus performance information in 2016. The share classes below performance mirror one another because they are twin sisters (the "I" version simply being an institutional version of the oldest share class ("A" version at the top)).

219. Plan fiduciaries acted to select the Mainstay Winslow Large Cap Growth fund in plan year 2011 (when the managers were hired on 12/31/2005). They had only managed the limited stocks from 2010 back to 2006. The oldest share class will always be the Mainstay Winslow Large Cap Growth "A" (born on 6/30/1995).

220. These portfolio managers managed only 69 stocks across all share classes at the time of selection. The cheapest identical share class of the fund was and is today the "R6" version called Mainstay Winslow Large Cap Growth "R6" (started on June 17, 2013; using Kelly/Winslow/Burton as portfolio managers).

221. The novice portfolio manager's variance/risk was extraordinarily high at 8.4% per year (even more than expected annual returns; trust variance is risk Defendants must monitor according to Restatement (Third) of Trusts) due to (a) their high annual compensation fee and (b) also by the portfolio managers holding only 50 stocks.

222. Such risk implies the risk of loss exceeded the potential expected return and the story is even worse using a more extended term. Conservatively using only the initial 2016 balance of $156 million in trust in the fund (not including any of the participants' or beneficiaries' biweekly contributions totaling $195,469,313.80 from

-52-
FIRST AMENDED CLASS ACTION COMPLAINT                3:22-CV-05667-WHO

2016 to 2020), the Mainstay Winslow Large Cap Growth grew $45,248,526 less than its reported benchmark (from 2016 to 6/30/2022).

223. The Mainstay Winslow Large Cap Growth fund's benchmark's mean return was 13.19% since 2016. However, the Mainstay Winslow Large Cap Growth fund's mean return was only 10.8% per year (using January 2016 to June 2022 prospectus data).

224. Prospectuses and empirical data at the time that the Defendants made their investment selections and retention decisions demonstrated that, over time and across market sectors, the actively managed funds they selected consistently failed to outperform "an appropriate broad-based securities market index" under 29 CFR § 2550.404a-5. This failure was most pronounced in asset classes demonstrating a high degree of market efficiency.

225. Based on information and belief, in violation of the Prudent Investor Rule (Restatement Third) and the plan's Investment Policy Statement (IPS), the CapFinancial Entities did not make expense ratios (portfolio manager's compensation) a primary test in fund selection.

226. Plaintiffs do not assert that any fiduciary acted imprudently merely by offering actively managed funds in its mix of investment options. Neither do Plaintiffs believe that investors should be very skeptical of an actively managed fund's ability to consistently outperform its index.

227. Adherence to these duties requires the regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident" or if there is a "superior alternative investment" to any of the plan's holdings.

> "Plan fiduciaries did not conduct an adequate investigation or analysis. was improvident." Rinehart v. Lehman Bros. Holding Inc., 817 F.3d 56, 67-68 (2d Cir. 2016) (quoting In re Citigroup ERISA Litigation, 662 F.3d 128, 138 (2d Cir).

FIRST AMENDED CLASS ACTION COMPLAINT            3:22-CV-05667-WHO

228. It was careless and disloyal, not to mention "wasteful," for the Defendants to fail to select prudently and then to fail to monitor and remove this imprudent fund. The Mainstay Winslow Large Cap Growth fund has been causing the trust (and participants/beneficiaries) to incur annual median losses (from 2011 to June 30, 2022) of -2.55% each year (versus the broad-based securities market index). That is a great deal since (1) Wharton, (2) the London School of Economics and (3) Warren Buffett warn that an investor should only expect annual stock and bond returns to be five to six percent annually (based on hundreds of years of records).

229. Almost 1,900 participants with account balances in the Ferguson Enterprises LLC 401(K) Retirement Savings Plan separate from service and cash out their accounts each year (over 5% participant turnover). Thus, the Defendants' choice of adding this fund means the managers' massive volatility risk could affect workers and they may never have a chance to recover losses.

## 2. The MFS International Intrinsic Value Fund

230. Plan fiduciaries chose the MFS International Intrinsic Value fund's portfolio manager in 2014 even though the money manager first started managing this investment on November 20, 2008. His performance prior to selection by Plan fiduciaries (using the participants' 29 CFR § 2550.404a-5 "appropriate broad-based securities market index") was abysmal. The portfolio manager's compensation taken from investors' returns helped drag his performance down versus his bogey or benchmark.

231. However, based on the circumstances at the time, basic mathematical facts informed the Plan fiduciaries that the portfolio manager's compensation was not deserved. During the Class Period, the portfolio manager caused his fund's performance to lag behind his chosen benchmark with a loss of 4.37% per year (for

FIRST AMENDED CLASS ACTION COMPLAINT                3:22-CV-05667-WHO

the years of his managing the fund's portfolio (at a cost or expense ratio at the time of Plan fiduciaries' selection of 1.14% per yr.)).

232.  Considering not only this one portfolio manager but every one of the MFS International Intrinsic Value fund managers ever hired (to manage the portfolio before Plan fiduciaries' selection in 2014), the managers in total varied from their benchmarks by over 20% per year.

233.  This risk or variance caused losses of about $2,000 of participants saving into the Plan each year were cashed out and paid diminished gains and never had a chance to experience a recovery. Facts existed at the time of the Plan fiduciaries' selections/retentions to inform them of their chosen portfolio manager's lack of skill and related risks.

234.  For the Plan fiduciaries' selection/retention of MFS International Intrinsic Value fund, a basic statistical review of the manager's alpha (return v. benchmark) found that it would require over 117 years of annual monitoring of every one of the MFS International Intrinsic Value fund's managers to confirm any of the fund's managers had "skill" to select stocks and thus deserved to be chosen and fees taken.

235.  In other words, a fundamental review at the time of the investment decision, and every annual monitoring period for plan years 2016, 2017, 2018, 2019 and 2020, shows that to have 95% confidence in this fund's managers requires Plan fiduciaries' monitoring of over 117 years (*i.e.,* the MFS International Intrinsic Value fund (partly because of the heavy annual portfolio managers' fees as well as other fund costs reducing the fund's daily net asset values (NAVs) or prices for this trust's single holding)).

236.  Once again, the MFS International Intrinsic Value fund managers consistently concentrated all of the share classes' dollars (identically) so much that over 30% of all share classes of this fund's dollars were held in only ten stocks

(increasing this trust's fund's variance and risk to participants' and beneficiaries' accounts).

237. Plan fiduciaries selected and retained the MFS International Intrinsic Value fund without ensuring that its managers did not mislead Plan participants.

238. The MFS International Intrinsic Value fund managers bought "value" stocks (*i.e.,* dividend-paying stocks) at the time of the decision to select and thereafter retain the investment. At the beginning of the limitations period, the managers decided to shift the portfolio to a "blend" of value and growth stocks with lower overall monthly dividend yields to the Plan and Trust.

239. On or before the plan year 2019, based on the SEC-prospectus at www.sec.gov/edgar at the time, Plan fiduciaries could have noted the fund's managers decided that they would keep the name the same "Value" but do a "switcheroo" totally from "value" stocks to non-dividend paying stocks (aka "growth" stocks). This portfolio manager's "switcheroo" dramatically reduced the monthly income to the Plan and Trust from 1.26% in 2016 to zero in 2019 and remains at zero percent today. Based on information and belief, Plan fiduciaries never diligently noted this nor clearly explained this information to the investors (*i.e.,* participants and beneficiaries).

240. Over the past six years, Plaintiffs (and the class they represent) paid $8,465,680.30 in wasted portfolio manager's compensation (incurring reduced investment returns versus the appropriate broad-based securities market index) because of Plan fiduciaries' decision and processes to select and retain the MFS International Intrinsic Value fund.

241. The annual loss versus the benchmark was -7.34% each year.

242. Based on information and belief, employees were never informed, and their accounts suffered in aggregate.

243.   But for Plan fiduciaries' imprudent selections/retentions processes, each one of the Ferguson workers saved an average of $573 per month for 72 months (the average per Ferguson's IRS/DOL reporting (saved wages)). If one of them elected to put about one-sixth of their ~$60K balance ($10,000) into this fund's benchmark (instead of the Defendants' MFS International Intrinsic Value fund), their $10K would have grown by an additional $3,555 (to $22,187.60 (instead of $18,632.81 in the Defendants' fund choice (MFS International Intrinsic Value fund))). The annual loss versus the benchmark was -7.34% each year.

244.   However, over the past six years, Plan fiduciaries repeatedly forced their average participants who wanted to own the Plan's only "international value" large cap fund (which in 2016 owned "international blend stocks; a few years later the portfolio manager kept the word "VALUE" in the name but sold those stocks so only holdings left were those on the opposite spectrum called "international growth.") Based on information and belief, employees were never informed, and their accounts suffered in aggregate.

### 3. The Goldman Sachs Small Cap Value Fund

245.   In 2013, Plan fiduciaries selected and after that retained the Goldman Sachs Small Cap Value fund using thoughtless, irresponsible, and negligent processes--with the fund's manager's fees causing a daily price reduction and burdening the trust's value (and participants' and beneficiaries' accounts).

246.   Plan fiduciaries directed $45,747,660 of the trust's assets into the under-yielding and underperforming Goldman Sachs Small Cap Value Fund. In 2013, according to their fund's SEC-prospectus, the yield was 0.31%/year, while the fund's prospectus broad-based securities market index yielded 1.77%/year.

247.   Also, the Goldman Sachs Small Cap Value held 227 stocks, but its respective benchmark held 1,394 stocks. Plan fiduciaries ignored the fact that at the

FIRST AMENDED CLASS ACTION COMPLAINT          3:22-CV-05667-WHO

time of adding the Goldman Sachs Small Cap Value fund, its 20-year total return before was 545%, but its benchmark was 654% for the prior 20 years.

248.   The choice of Goldman Sachs Small Cap Value cost to the trust was 1.38%/year but Plan fiduciaries could have selected another fund that matched Plan fiduciaries' fund's benchmark for ten basis points (0.10%; versus 138 basis points).

249.   As of the time the decision to select and retain this fund in the Plan, the fund's average return back to the inception of the fund (in 1992) was a loss to the benchmark of 95 basis points per annum-the geomean return was a loss of (1.21%) per year to its benchmark.

250.   If the manager cannot beat the benchmark, Plan fiduciaries' actions should have been to "buy the benchmark." Some benchmark mutual funds are offered at zero total annual fees. Such actions would have resulted (during the limitations period) of growth at 7.71% per year for the trust's $62,343,278 invested in 2016 to $101,009,885.45 (versus annual growth rate of 6.32% or $92,867,640.79. This illustration ignores new biweekly salary contributions from employees).

251.   The wasted annual fee of 1.38% per year began hitting the fund's gross asset value (GAV) immediately the first day after it was added (1/365th). The portfolio manager's compensation continued to reduce trust corpus values with zero or no benefit to the trust. In fact, had Plan fiduciaries investigated before making their decision to select/retain this fund, they would have seen that the manager's fees reduced the average 20-year return to 9.77% (versus the portfolio manager's desired benchmark) at almost 1% per year more (10.63%/year).

252.   Plan fiduciaries directed $97 million of the participants' and beneficiaries' salaries (in 2016) in the Goldman Sachs Small Cap Value fund. The trust and participants/beneficiaries wasted $6,031,634.38 in the portfolio manager's compensation/fees (which added no value to the trust's and participants' and

beneficiaries' accounts). However, the $6 million in wasted fund manager costs to investors was only incurred over the past six years.

253. Under a continuing duty requirement, the make-whole or trust "benefits restoration" ("benefits lost harm" versus legal damages) requires over twice this amount to put "trust beneficiaries to the position they would have occupied but for the breach of trust."

254. But for Plan fiduciaries' breaches of their ERISA duties, a participant who saved the reported average ($573 per year over six years) and who made an initial deposit of $10,000 into this fund's benchmark would have grown their account balance to $20,817.31.

255. However, Plan fiduciaries forced misinformed participants to pay $6,031,634.38 in fees to the Goldman Sachs Small Cap Value managers (versus the benchmark stated in this fund's prospectus at www.sec.gov/edgar), resulting in a loss of (-1.54% per year) each year and losing the chance to have another $1,480.60 in their accounts.

### 4. American Funds Europacific Growth

256. In 2011, the Plan fiduciaries added this fund for investors to save into and it remains today. In 2011, the Plan fiduciaries directed the custodian to move $31M of the trust's assets into this fund. Over $237M of participants' salary contributions are in the fund based on the responsible plan fiduciaries' 2021 Annual Return/Report of Employee Benefit Plan at the DOL/IRS.

257. The following facts use the oldest share class so the most data possible (alpha) can be analyzed in order to determine American Funds Europacific Growth portfolio managers' skill. The manager's performance over the prior 24 years (versus the appropriate broad-based securities market index) indicated in 2011 that it was prudent to add this fund. The portfolio managers' alpha variance divided by the average alpha equaled 23 years of monitoring to determine that the portfolio

managers had the skill (with a 95% confidence interval).

258. This form of portfolio managers' measurement is comparable to measuring a fund's manager's "experience and expertise" (Hughes v. Northwestern University, 142 S. Ct. 737 (2022)). This form of alpha measurement has been around since the start of defined benefit plans. In the first half-century we saw significant defined benefit plan growth from 1880-1930 (more than 400 private plans were established).

259. It requires only one number, the alpha of the fund's manager. It follows the duties of ERISA plan fiduciaries who must discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." §1104(a)(1)(B).

260. Plaintiffs also note [emphasis added]:

> Because the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts, §1104(a)(1)(B), the appropriate inquiry will necessarily be context specific." Fifth Third Bancorp v. Dudenhoeffer, 573 U. S. 409, 425 (2014). At times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise.

Hughes v. Northwestern University, No. 19-1401 (U.S. Jan. 24, 2022).

261. The manager's alpha (and variance of the average alpha) can quickly determine if a manager earned his keep and deserved his management fee. This math for fund managers has been mentioned in annual reporting by Standard and Poor's for over a decade. In fact, the U.S. Securities and Exchange Commission's General Counsel (in 2007) discussed this also:

> MUTUAL FUND MANAGERS: LUCK OR SKILL?
> The burgeoning discipline of behavioral finance is predicated on the empirical observation that we're prone to certain categories of mental

-60-

errors. Judge Posner, in his lecture here last year, noted this and referred to one failing in particular: the tendency to see patterns where they don't exist. * * * When evaluating a manager's past performance, however, this tendency to see patterns where none exist leads to the irrational expectation that streaks will persist. As Judge Posner pointed out, people are very poor at intuiting probabilities. * * * We don't really need sturdy academic studies to tell us this; we know it from our own experience. But sturdy academic studies there are. And they inform us that, just as many gamblers erroneously believe in "hot streaks" and "cold dice," many investors believe a mutual fund that shows past performance better than an appropriate benchmark index is much more likely to continue to outperform in the future. Countless academic studies, however, have shown that very often such outperformance fails to persist. * * * Outperformance is an asset magnet: the dollars flow to the funds that show records of outperformance.

262. When cash flows into the fund it needs to be invested in keeping up with the benchmark, which never holds idle (zero-yielding) cash. That idle zero-interest cash helped bring down returns of the Plan fiduciaries' selection for many years—the American Funds Europacific Growth fund.

263. We found all of the Defendants failed to periodically monitor basic known facts surrounding the use of portfolio managers. Three core hurdles exist for the portfolio managers that require continued scrutiny of the Plan fiduciaries' past selections for this plan: (1) cash (uninvested), (2) concentration of holdings and (3) costs—huge monthly burdens for their chosen portfolio managers. Portfolio managers' performance can lag benchmarks quickly.

264. During the first year of the limitations period, looking back at alpha now for a decade and a half (equals average Ferguson worker's tenure times two), we find the mean alpha is now negative (meaning the benchmark has beaten the portfolio managers by twenty-five basis points per year for years 2002 to 2016).

265. The U.S. Supreme Court stated in their unanimous 2015 opinion that this plan's responsible plan fiduciaries must "systematic[ally] conside[r] all the investments of the trust at regular intervals' to ensure that they are appropriate."

-61-

FIRST AMENDED CLASS ACTION COMPLAINT          3:22-CV-05667-WHO

Tibble II, 135 S. Ct. at 1828.

266. Fast forward to years of 2016 to 2022 and we find the portfolio managers earned 4.87% per year versus the MSCI ACWI Ex USA at 5.30%/year. This was the American Fund's website's benchmark as well as the SEC's at www.sec.gov/edgar.

267. Frequent monitoring, after buying mutual fund with daily portfolio manager's compensation, is critical because portfolio managers are fired and quit regularly (median manager tenure is less than eight years per Morningstar® back to 2009). This is the case here—a "manager change" (25% every 2 years) added insult to injury for Plan fiduciaries' American Funds Europacific Growth fund.

268. If the responsible plan fiduciaries have a belief that building a menu of investment choices that require participants to pay for portfolio manager's compensation is the best choice for them, even though ERISA requires they thoroughly investigate the risks and costs of this strategy beforehand, Plaintiffs question why they kept this choice when the peers (Foreign Large Growth) earned 70% over the past 10 years (total; as of the end of 2022) while their American Funds Europacific Growth fund earned 62%. Similarly, the peer's average for five years was 12% versus theirs at 6%.

269. This is the average--meaning many peers earned more. Similarly, the Plan fiduciaries could have rolled the dice and hit a better active management type of fund half of the time (since that appears to be what they preferred). Prudent Investor Rule (Restatement Third) ratchets up the burden on Plan fiduciaries surrounding the selection of more costly investments (chosen and listed consistently on every one of the Plan fiduciaries' Forms 5500). These investments were bought at the direction of Ferguson and its de facto fiduciaries after being recommended by their overpaid, conflicted advisory firm.

270. These facts prove the Defendants' actions were not to the benefit of the

trust but instead to the detriment of the participants. This higher burden of justifying costly investment strategies is better stated in a direct reference: "The greater the trustee's departure from one of the valid passive strategies, the greater is likely to be the burden of justification [for selecting an active investment strategy] and also of continuous monitoring [of it]." Reporter's General Note on Section 227 of the Restatement 3rd of Trusts (Prudent Investor Rule), comments e through h, page 79.

271.   Plaintiffs infer from past filings/evidence of the Plan fiduciaries' actions that self-dealing (revenue sharing) served as a primary motivator for selection. If Plaintiffs requested the documentation to prove this (the American Fund's selling agreements at Prudential and CapFinancial Entities).

272.   Plaintiffs' found (via a quick Google search) that American Funds was the top RIC (registered investment company) compensating 401k plan sponsors, brokers and recordkeepers (with soft-dollar compensation (sub-transfer agency and finder's fees along with other forms of payment like trips, etc.)).

### 5. Metropolitan West Total Return Bond

273.   The primary conservative investment option is this mutual fund. Older, more cautious investors seek out a safe haven during turbulent economic times like recessions (every seven years) and recently during COVID.

274.   This option for workers has not grown much from its $90M level when the Plan fiduciaries put it on the menu and directed participants that if they do not affirmatively elect out, their dollars will fund it (in 2014; now at $150M at the end of 2021). Typically, investments double in size every five years from biweekly employee contributions. Recently, the bond manager has ranked in the bottom 16% against peers over the past year; bottom 27% (beat by 73% of the portfolio manager's peers) over the past three years; in the bottom 34% over five years and bottom 33% over ten years.

275.   Morningstar® gives the manager's historical performance a grade of

"D" for returns and the same for risk-adjusted ratings. Its peers that charge less in portfolio manager's compensation have performed better. Plaintiffs provide a table of the "delta" or differences in costs illustrated below. These same cost differences have been present since the time of selection in 2014.

276.  Costs are the primary predictor of bond funds' performance (and stock fund performance per Morningstar® and Standard & Poor's (S&P Global, Inc. annual U.S. Persistence Scorecard) along with William F. Sharpe).

277.  The inverse nature of costs and performance was illuminated by 1990 Nobel Laureate when he said "The key issue is that past performance is a thin reed for how to predict future performance. Expense ratios and turnover are generally better predictors."

278.  Also, echoing the SEC and the U.S. Department of Labor's requirements (about selection should entail only comparing portfolio managers' performance to an appropriate broad-based securities market index) Mr. William F. Sharpe's paper called "The Arithmetic of Active Management" warned: "An important corollary is the importance of appropriate performance measurement. "Peer group" comparisons are dangerous. Because the capitalization-weighted average performance of active managers will be inferior to that of an index/passive alternative, the former constitutes a poor measure for decision-making purposes. And because most peer-group averages are not capitalization-weighted, they are subject to additional biases. Moreover, investing equal amounts with many managers is not a practical alternative. Nor, a fortiori, is investing with the "median" manager (whose identity is not even known in advance)."

| 5-Year Total | Expense Ratio | Name |
|---|---|---|
| 10.62 | 0.4 | Weitz Core Plus Income Institutional |
| 10.03 | 0.4 | Carillon Reams Core Plus Bond R-6 |
| 8.21 | 0.45 | Loomis Sayles Investment Grade Bond N |
| 7.04 | 0.41 | USAA Intermediate Term Bond R6 |
| 5.88 | 0.3 | Brandes Core Plus Fixed Income R6 |
| 5.78 | 0.41 | Dodge & Cox Income I |
| -0.55 | 0.65 | Metropolitan West Total Return Bd |

279. Looking back at time of selection, the manager's main competitor and the longest serving portfolio manager had a bond yield of 3.1% per year while the Plan fiduciaries' choice earned 2.7%/year.

280. At the time of the conduct to add this fund, the SEC 30-Day Yield of the multisector bond average was 3.5% per year while the Defendants' choice was 2.0% per year. The primary safety measure is the "Capture-Ratio, Downside." The January 2019 whitepaper "UPSIDE/DOWNSIDE CAPTURE RATIO SPREAD" by Isaac Braley, President, BTS Asset Management, Inc., describes this as:

> Conservative investment approaches may be important to risk averse investors seeking caution and prudence. * * * How can you describe conservative investment products in ways that are meaningful to clients concerned about losing money? Understanding measures like Upside/Downside Capture Ratio and Upside/Downside Capture Ratio Spread may provide meaningful information about whether a fund is a conservative choice. * * * Upside/Downside Capture Ratio measures the degree to which a given fund under- or outperformed a broad market benchmark based on monthly returns during periods of market strength and periods of market weakness. * * * Advisors can gather Upside/Downside Capture Ratios for mutual funds on Morningstar for 1, 3, 5, 10 and 15 year periods. Understanding the significance of Upside/Downside Capture Ratios for funds in a portfolio may be useful to consider for conservative clients.

281. At the time of the conduct to add this fund, the downside risk to conservative participants was greater or more risky for the Defendants' bond choice, Metropolitan West Total Return Bd—every period out as far as 20 years.

282. As importantly, the average bond quality of the index it is matched to at their own website is "A" (Bloomberg US Agg Bond) while the Defendants' choice (Metropolitan West Total Return Bd) was (at time of selection and beginning of 2022) called "junk bonds" ("BB" rated).

283. As of 9/30/2017, the Plan fiduciaries must not have been prudently monitoring this fund still in the plan because its fees began to drag it performance down versus its index and peers. Morningstar® graded the Metropolitan West Total Return Bd fund return rating and risk adjusted return ratings a "D." It fell to the bottom 28th percentile meaning 72% of its peers were beating it.

284. A fact-based risk analysis performed by the responsible plan fiduciaries and their advisory firm in 2017 would have revealed that the risk-adjusted ratings of all major bond indexes and the peer averages fared better than their own selected/retained fund, Metropolitan West Total Return fund.

285. That is, the Bloomberg US Agg Bond was "C" while the Bloomberg Intermediate Credit was "A" along with better quality grades for:

      (1)  the Corporate Bond - General average (investment grade BBB),

      (2) the Corporate Bond average (BBB),

      (3) the Intermediate Term Bond average (A),

      (4) the Multi-sector Bond average (BBB).

286. Plan fiduciaries levied a 68% higher bond fund cost on the participants (.272/.398). The oldest share class of the Metropolitan West Total Return Bd had a 2017 expense ratio of 0.67% per year, while the average for its Corporate Bond peers in 2017 was 0.398%/yr. Since the 5 year average of the Metropolitan West Total Return Bd fund was 2.5% per year, an increase of 0.272% per year in costs had an 11% impact on participants' annual savings (versus if fiduciaries picked an "average cost" option.)

287. Plaintiffs' harm from the reckless selections/retentions of the

Metropolitan West Total Return Bd by the advisory firm (in recommending over and over for many years) and Ferguson's Plan fiduciaries should exceed $3.3M. Damages of this amount are conservatively based on the return of 2.76% over five years per prospectus as of 12/31/2022 versus a loss of -0.55% for the Metropolitan West Total Return fund ~$100M in participants' assets during the period ($90M in 2017 and $150M today) times the difference of 3.3%.

### 6. American Funds Balanced Fund

288. The Plan fiduciaries and CapFinancial Entities collaborated to exchange the Oakmark Equity and Income fund for American Funds Balanced in 2015.

289. Based on the certified and audited reporting to the U.S. Departments of Treasury and Labor for 2014, Ferguson executed a corporate resolution to direct the liquidation of $88M worth of the trust's shares of the Oakmark Equity and Income fund (participants' fourth largest fund option). After the sell order, the fiduciaries directed that the resulting cash proceeds buy the American Funds Balanced Fund.

290. "Past performance is no guarantee of future results." At the time of the Plan fiduciaries' conduct, publicly available Forms 5500 indicated the fiduciaries' selection processes again flaunted the SEC's Rule 156 (in violation of 17 CFR § 230.156). This warning to investors was stated in the fiduciaries' corporate resolution required by Prudential to make a fund change and warned to never chase short-term "hot" manager performance. Mean reversion can kill investors' accounts.

291. Mathematics proves an 11.11% gain is required to recover from a 10% loss (1%/9%) and a 100% gain is needed to offset a 50% loss. This allegation is supported by:

> 1) The five year total of 74% v. 54% for Oakmark;
>
> 2) The longer ten year total of 120% v. 100% for their new choice;
>
> 3) The even longer 15 year total of 293% v. 208%;
>
> 4) The trust variation (standard deviation) risk was higher for the Plan

fiduciaries' choice and the downside deviation over 15 years was higher at 6.7% versus 5.9%;

5) The 20 year alpha of the old fund's manager was higher at 0.5 versus the new fund's manager's alpha of 0.29;

6) The monthly mean return for this conservative option called "balanced" was 0.9%/month for the removed option (Oakmark Equity and Income) and 0.77%/month for the new choice;

7) The removed fund manager's trading or transactions costs were less at 18%/year turnover in the prospectus versus 68% turnover for the Plan fiduciaries' new option called American Funds Balanced Fund.

**7. Vanguard and funds in Prudential Pooled Separate Accounts**

292.    Based on information and belief, in 2011 Ferguson decided to add one fund to the eleven more expensive funds (forcing participants' contributions totaling $79,278,168 to shed 1% per year in costs for portfolio manager's compensation and related transaction costs (79,278,168 dollars wasted that year)).

293.    Plan fiduciaries have one Investment Policy Statement (IPS) per plan and should review this plan document periodically. Plaintiffs believe fiduciaries added this "token" index fund because of the looming ERISA Section 408(b)(2) disclosures (to be implemented by George Bush in 2008 but held by the Obama administration (later released with an effective date of 7/1/2012)).

294.    Plaintiffs' reviewed dozens of investment policy statements and none had criteria that would bifurcate selection to "passive funds" versus active funds. Plaintiffs believe the Plan fiduciaries added the fund not "solely and exclusively" for the Plaintiffs' benefit, but to protect Plan fiduciaries. They cannot receive revenue sharing kickbacks from Vanguard.

295.    Moreover, according to Irina Stefanescu, Board of Governors of the Federal Reserve System; Veronika K. Pool, Vanderbilt University; Clemens Sialm,

University of Texas at Austin and NBER; Mutual Fund Revenue Sharing in 401(k) Plans; January 31, 2022, revenue sharing arrangements not only reflect a contractual agreement between the plan and the recordkeeper, but also between the recordkeeper and the third-party investment companies [mutual funds] on the menu [emphasis added].

> Recordkeepers in DC pension plans are often paid indirectly in the form of revenue sharing from third-party funds on the menu. We show that these arrangements affect the investment menu of 401(k) plans. Revenue-sharing funds are more likely to be added to the menu and are less likely to be deleted. Overall, revenue-sharing plans are more expensive as higher expense ratios are not offset by lower direct fees or by superior performance. Rebates increase with the market power of the recordkeeper suggesting that third-party funds may revenue share to gain access to retirement assets.

296.    This one, sole, passive fund remained on Ferguson's subsequent 2012 Form 5500 through 2014 when they added three more. Now on the 2021 Form 5500 we see that due to higher compounded growth (from almost zero costs (after securities lending revenue is rebated to investors)), Vanguard now occupies the first and fourth largest fund position. Controlled and limited discovery of meeting minutes could help Plaintiffs know if selection/retention criteria changed. Dramatically different approaches in the statement must have occurred. No other passive funds have been added.

297.    Before the annual disclosure requirements in July 2012, Congressional testimony proved that Plan fiduciaries desired to keep costs from being discovered by participants. Plaintiffs restate multiple Schedules D, Part 1 to show several of the plan investments below remain in this opaque state—Prudential's "Pooled Separate Accounts (PSA)."

298.    Limited public information is available to determine the costs, risks and returns of an appropriate broad-based securities market index. Thus, the trustees

-69-

remain in a superior position to the Plaintiffs.

| | |
|---|---|
| Robeco Large Cap Value Account | 199,460,509 |
| Small Cap Growth Fund Times Square Account | 117,292,451 |
| Robeco Fund | 102,199,876 |

299. Ferguson's plan's audits stated [emphasis added]: "Mutual funds: Mutual funds are publicly traded investments and are valued daily at the closing price reported on the active market on which the funds are traded. Pooled separate accounts: The Plan invests in pooled separate accounts for which quoted prices are not available in active markets for identical instruments. The Plan utilizes the net asset value (NAV) of units, as determined by Prudential Retirement Insurance and Annuity Company, as a practical expedient to estimate fair value."

300. A Pooled Separate Account (PSA), is commonly used as a Fund of Funds by 401k plan service providers meaning there can be multiple layers of costs and compensation and thus, potential "self-dealing." They are either privately traded or offered as a derivative through a group variable annuity contract to 401k plan participants, with premiums for the annuity paid through deposits typically made monthly as a payroll deduction plan.

301. Plan participants often believe their earnings are deposited with the insurance company to be invested in an allocation of publicly or privately traded options, but the reality is the money deposited is owned, under the terms of the group variable annuity contract, by the insurance company to be used as they deem appropriate. Those funds are often sold as loans to developers to build commercial properties, with the profits from those investments going directly into the insurance company general account.

302. A Pooled Separate Account (PSA) shares no singular ownership features with the 401k investor, as the investments are not only chosen by the plan service provider but are also owned by that service provider. Prudential likely "sells" units of value in a number of pooled separate accounts, each consisting of a "Fund of Funds" purchased and owned by Prudential. There can be thousands of "owners" in each PSA, and each investor owns a small unit of value. Fees levied both directly and indirectly on participants can be another issue. Plaintiffs requested the contracts between Ferguson and Prudential, but their requests went unanswered.

## C. Prohibited Transactions and Failure to Monitor

303. Based on information and belief, Plan fiduciaries, during the Class Period, authorized CapFinancial, a commission-based mutual fund selling company, to be paid a "kickback" of $321,563 for their recommendation to put $97,995,387 of participants' and beneficiaries' salary dollars into a new fund (MassMutual Select Mid Cap Growth Fund).

304. Based on these sources and others, coupled with the "totality of circumstances," Plan fiduciaries primarily selected and retained investments using monitoring reporting that hid their recommendations of investments' poor performance versus "an appropriate broad-based securities market index" (29 CFR § 2550.404a-5). In doing so, The CapFinancial Entities remained in receipt of excessive compensation even more considerable than other similar plans they served.

305. The CapFinancial Entities used multiple entities designed and licensed for specific purposes to aid in compensation schemes likely to go unnoticed by Ferguson and its committee members.

306. Plan Fiduciaries had a duty to select CapTrust and monitor CapTrust prudently. Allowing the CapFinancial Entities to take $4,276,860 of trust assets in the form of "reasonable compensation" requires the trust to be restored.

-71-

307.    The Plan fiduciaries' failure to act and failure to follow their IRS-approved plan document over and over, caused them to fail their duty to put the participants' and beneficiaries' accounts "back to the condition they should have been" but for the "excessive compensation" paid from the trust since January 1, 2009.

308.    Plaintiffs remain subordinate and cannot access information relating to 2021 and 2022 trust deductions. The general rule placing on the plaintiff the burden of proving his claim "is moderated in order to take account of . . . the trustee's superior (often, unique) access to information about the trust and its activities." (Restatement Third, § 100 cmt. F).

309.    Plan fiduciaries avoided paying CapTrust from Ferguson's profits so they could instead burden the participants/beneficiaries. In 2018, Plan fiduciaries even increased the CapFinancial Entities' compensation even though the exact same services were provided to the plan and participants/beneficiaries.

310.    In 2018, Ferguson paid the CapFinancial Entities an increase to $624,264 (from the Plan and Trust). This equaled a 138% increase approved by the CEO (Kevin Murphy and/or John Walley Martin) and/or Chief Financial Officers (Bill Brundage and/or Mike Powell). That works out to a 14% per year pay raise which is more favorable than the trust's rate of growth from investments.

311.    A fiduciary's mismanagement of plan assets leading to an investment lineup filled with poor-performing investments and excessive fees can force a participant to work an extra five to six years to compensate for the excess fees that are paid.

312.    Evidence shows very little removal of plan investment options available for participants from the 2009 plan year to the 2021 plan year. Plaintiffs found one change in recent years. All shares of the trust's holding in the fund "Mid Cap Growth Artisan Partners Account" (listed in the 2015 Form 5500) were sold. Defendants

directed the resulting cash then deposited into the trust to purchase shares of the "MassMutual Select Mid Cap Growth Fund" (in the 2016 plan year (based on the 2017 Form 5500)).

313. Based on information and belief, during this period (sourced from the certified and audited financial statements approved by Chief Financial Officer of Ferguson Enterprises LLC (Bill Brundage and/or Mike Powell)) also approved a trust asset sale and cash payment to be directed to "CAPTRUST FINANCIAL" of $560,935 (based on their Schedule C reporting on the Form 5500 filed in the calendar year 2017). This amount equals a 21% pay increase ($98,896/$462,039) the CFO approved for the same services listed in the same signed services agreement with the CapFinancial Entities.

314. Based on information and belief, the conflicted CapFinancial Entities recommended these three expensive, risky, underperforming, lower-yielding mutual funds to Plan fiduciaries, who blindly followed the continuing flawed recommendations and, in doing so, impeded the trust's corpus growth (and participants' and beneficiaries' accounts).

315. Plan fiduciaries neither investigated nor informed participants/beneficiaries of the availability of better, cheaper, higher yielding, substantially identical investment options.

316. Plan fiduciaries failed to prudently monitor by retaining lower yielding mutual funds when they could call the Prudential Entities and choose substantially identical versions that yielded far more. For example, they chose and maintained the JP Morgan Mid Cap even though it yielded 0.85% per year versus the substantially identical investment (the iShares Russell Mid-Cap Value fund) with a yield of 2.22% per year. Plan fiduciaries failed to monitor and failed to act to replace this JPMorgan Mid Cap Value fund. They "seeded" the lower yielding fund with $37,039,847 of the participants' and beneficiaries' salary savings in 2012 (reported to the government

with more assets in the fund from salary savings ($80,665,149) as of 12/31/2020 (from Form 5500 by Ferguson)).

317. Plan fiduciaries' reckless initial selection practices in 2012 were on display when selecting this "0.84% per year yielding JPMorgan fund" when they could have bought their fund's SEC-prospectus broad-based securities market index yielding "1.71% per year." Plan fiduciaries' failure to investigate the much higher yield in 2012 (at the time of selection) cost the employees in the Plan monthly income in violation of trust law and ERISA.

318. The value or price of an asset is a function of two factors: (a) the rate of total return (ordinary income/dividends and price appreciation) that the asset is anticipated to generate; and (b) the risk that the actual return will fall short of the anticipated return.

319. An analysis of the risk that returns will fall short focuses upon assets as integral parts of a whole portfolio rather than each asset in isolation. This focus enhances the importance of the rate of total return and leads to the conclusion that the determination of whether a trustee has discharged its duties must focus upon how trustee has made investment decisions.

320. At the time of Plan fiduciaries rubber-stamped the CapFinancial Entities' written investment recommendations, they ignored that their choice held about 100 stocks while its "appropriate broad-based securities market index" held over five times more (535 stocks).

321. Plan fiduciaries imprudently directed that the trust's corpus' future dividends/interest deposits ($86 million) be reinvested into the imprudent funds paying less in yield and with high expenses (for portfolio manager's compensation (1% per year)).

322. In doing so, Plan fiduciaries failed to put first the economic interests of the plan in providing retirement benefits, as they were required to do. "ERISA

fiduciaries must always put first the economic interests of the plan in providing retirement benefits. A fiduciary's evaluation of the economics of an investment should focus on financial factors that have a material effect on the return and risk of an investment based on appropriate investment horizons consistent with the plan's articulated funding and investment objectives." DOL Field Assistance Bulletin 2018-01 (Apr. 23, 2018).

323. Plan fiduciaries failed to investigate the historical performance of the mutual funds they chose and retained in the Plan. In doing so, they failed to note that over time due to past performance problems and litigation, fund families introduced cheaper share classes and continued to reduce expenses slightly.

324. For example, the "A" share class is often the oldest class, and the cheapest "Institutional" or "R6" class of the mutual funds is almost always the youngest or most recent class. As of July 31, 2022 "R6" (the cheapest) share classes had a median inception date of March 29, 2016. That is only about six years to measure the portfolio managers. That is why here Plaintiffs cite the oldest share class to measure portfolio managers.

325. Plaintiffs' maximum portfolio managers' performance review versus their "appropriate broad-based securities market index" (alpha) forms the basis here of every flawed selection/retention allegation.

326. More precise selection/retention criteria should be contained in the Plan's "bible" or plan document for investment management (Investment Policy Statement (IPS)). Plaintiffs requested a copy, but Ferguson ignored the request.

327. "Past performance is no guarantee of future results" is the Securities and Exchange Commission Rule 156 disclosure requirement for every mutual fund. However, on information and belief, viewing the Plan Fiduciaries' certified, audited financial statements, the fiduciaries used short term managers' performance to choose funds in violation of 17 CFR § 230.156.

## D.  Statutory Penalties

328.   Before litigation, Plaintiffs requested that the Plan administrator provide the relevant Plan documents as well as the Plan's selling agreements with the Prudential Entities and the CapFinancial Entities, the Committee's meeting minutes, and other forms of communications and duties under the CapFinancial Entities' services agreement for the Plan.  Their request was denied.

329.   The Plan administrator further failed to provide any Adoption Agreement or Plan governing documents in response to written requests made on behalf of the putative class.

## VI. CLASS ACTION ALLEGATIONS

330.   Plaintiffs bring this action in a representative capacity on behalf of the Plan and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a Class defined as follows: All participants in or beneficiaries of the Plan from January 1, 2009 through the date of judgment (the "Relevant Time Period or Class Period").

331.   This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a. The Class includes over 25,000 members and are so large that joinder of all its members is impracticable.

b. There are questions of law and fact common to the Class because Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and made omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan

-76-

FIRST AMENDED CLASS ACTION COMPLAINT          3:22-CV-05667-WHO

resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breaches of duty.

c. Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

d. Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with any other member of the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e. Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

332. A class action is a superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is

FIRST AMENDED CLASS ACTION COMPLAINT          3:22-CV-05667-WHO

impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

333.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

334.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class, which predominate over questions that may affect individual class members, include, *inter alia*:

      a.  whether Defendants are a fiduciary of the Plan;

      b.  whether Defendants breached fiduciary duties of loyalty and prudence with respect to the Plan;

      c.  whether Defendants had a duty to monitor other fiduciaries of the Plan;

      d.  whether Defendants breached their duty to monitor other fiduciaries of the Plan;

      e.  the proper form of equitable and injunctive relief; and

      f.  the proper measure of monetary relief.

335.    Plaintiffs' claims are typical of those of the Class because their claims arise from the same event, practice and/or course of conduct as other members of the Class.

336. Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action litigation in general and ERISA class actions involving fiduciary breaches.

337. Plaintiffs have no interests that conflict with those of the Class.

338. None of the Defendants has any unique defenses against any of the Plaintiffs that would interfere with their representation of the Class.

339. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be too small for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are not aware of any difficulties likely to be encountered in the management of this matter as a class action.

340. In the alternative, certification under Rule 23(b)(2) is warranted because Plan fiduciaries have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final, injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

341. The following factors set forth in Rule 23(b)(3) also support certification:

a. The members of the Class have an interest in a unitary adjudication of the issues presented in this action for the reasons that this case should be certified under Rule 23(b)(1).

b. No other litigation concerning this controversy has been filed by any other members of the Class.

c. This District is the most desirable location for concentrating this

FIRST AMENDED CLASS ACTION COMPLAINT          3:22-CV-05667-WHO

litigation because a significant number if not the majority of the Class members are located in this District, and a number of the witnesses, including a number of relevant non-party witnesses, are expected to be located in this District.

d. There are no anticipated difficulties in managing this case as a class action.

## VII. TIMELINESS

342. Under ERISA § 413, claims for breach of fiduciary duty may be brought for "(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation ...."

343. Indeed, even after making initial investment decisions, and even after selecting or appointing conflicted Plan service providers, Plan fiduciaries had (and still have) a duty to continue to monitor the Plan investments and appointees and remove imprudent ones. This duty required them to systematically consider all Plan service providers, members of the BOD and Committee, and Plan investments at regular intervals to ensure their initial selection remained prudent.

344. The continuing duty doctrine applies to "monitoring and reviewing" duties even with respect to Investment Funds placed into the Plan more than six years before the filing of the lawsuit if, as here, they remained in the Plan during ERISA's six-year limitation period. Therefore, the Class includes any Plan participant who held imprudent funds during the six-year period, regardless of when those funds were added to the Plan. The Class also includes those participants who suffered damages prior to six years from filing of this action as Plan fiduciaries had a duty to repair and make whole the participants' losses during the six-year period.

345. The continuing duty doctrine applies to "monitoring and reviewing" the Committee and its members, the Prudential Entities, CapFinancial, and CapTrust, all

of whom provided advice or other services within six years of the filing of this action.

346. At all relevant times during the Class Period, Plan fiduciaries made affirmative misrepresentations to participants about the security of their investments, as well as the competence and independence of the Prudential Entities, CapFinancial, and CapTrust.

347. At all relevant times during the Class Period, Plan fiduciaries intentionally concealed their fiduciary breaches and prohibited transactions with the Prudential Entities, CapFinancial, and CapTrust to prevent Plan participants from discovering them and avoiding the need to cure the deficiencies.

348. In this case, Plan fiduciaries had and have an ongoing duty to rectify its deficiencies and make whole losses that creates a continuing duty and ongoing breaches, or alternately tolls the statute, so the Class Period will ultimately begin when the Plan began committing the breaches described herein, as the damages continued and should have been repaired during the six-year period.

349. Because Plan fiduciaries affirmatively concealed the violations of ERISA alleged in this Amended Complaint and their participation in them, and because Plaintiffs first acquired actual knowledge of these violations less than three years before the filing of this action, Plaintiffs' claims are timely.

## VIII. **STANDING**

350. At all relevant times during the Class Period, each of Plaintiffs are and were a participant in the Plan as defined by ERISA § 3(7), 29 U.S.C. § 1002(7). Therefore, each of Plaintiffs has statutory standing to bring claims under ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2), (3). Upon information and belief, although not required, Plaintiffs were participants all funds in the Plan during the statutory plan. Plaintiffs demanded this information prior to filing suit, and Defendants refused to provide plan specific participation.

351. Claims under ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2), are brought in a representative capacity on behalf of the Plan. As explained in detail within this complaint, the Plan suffered millions of dollars in losses traceable to Defendants' fiduciary breaches and remains exposed to harm and continued future losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs.

352. Each of Plaintiffs also has constitutional standing under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) because each Plaintiff personally suffered concrete and particularized injuries in many ways, including but not limited to the following:

a. The named Plaintiffs and all Plan participants suffered financial harm as a result of the imprudent or excessive fee options in the Plan because Named Plan Fiduciaries' inclusion of those options deprived participants of the opportunity to grow their retirement savings by investing in prudent options with reasonable fees, which would have been available in the Plan if Named Plan Fiduciaries had satisfied their fiduciary obligations. All participants continue to be harmed by the ongoing inclusion of these imprudent and excessive cost options and payment of excessive recordkeeping fees.

b. The named Plaintiffs and all participants in the Plans were financially harmed by Prudential's and Named Plan Fiduciaries' improper bundling of some of the Plan's investment products, improperly allowing Prudential and Defendant Investment Fiduciaries to require inclusion of imprudent and excessively high-fee investment products in the Plan.

c. The named Plaintiffs and all participants in the Plans were financially harmed by Prudential's and Named Plan Fiduciaries'

intentional concealment of illicit kickbacks and excessively high-fee and imprudent investment options from them.

d. The named Plaintiffs and all participants in the Plans were financially harmed by Named Plan Fiduciaries' affirmative misrepresentations that their investments were secure, that Defendant Investment Fiduciaries were competent to provide services to them and the Plan, and that participants were not being unreasonably and unnecessarily charged for fees.

353. Each of the Plaintiffs, during the proposed Class Period, invested in one or more of the investments that paid hidden, unreasonable, and unnecessary revenue sharing to the Prudential Entities and the CapFinancial Entities, even though their past poor performance and their excessive fee structure rendered them imprudent investments.

354. Each of Plaintiffs and participants lost significant retirement savings through their investments in these imprudent funds, through other investments and the fees charged on their investments in those funds, and by paying a portion of the Plan's excessive administrative and recordkeeping fees, none of which would have been incurred had Defendants discharged their fiduciary duties to the Plan.

355. Thus, Plaintiffs have Article III standing to bring these claims.

356. All conditions precedent to bringing this action have been satisfied and/or waived.

**FIRST CAUSE OF ACTION**

**Violation of 29 U.S.C. §§ 1104(a)(1)(B) and 1105**

**Violation of Fiduciary Duty of Prudence**

**(Against Ferguson and the Committee)**

357. Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

-83-

358. ERISA mandates that fiduciaries act with prudence in the disposition of Plan assets and selection and monitoring of investments, as well as in the monitoring and minimization of administrative expenses. 29 U.S.C. § 1104(a)(1)(B).

359. In determining whether an ERISA fiduciary breached its duty of prudence, courts focus on: "whether the fiduciary engaged in a reasoned decision-making process, consistent with that of a prudent man acting in a like capacity....... ERISA requires fiduciaries to employ appropriate methods to investigate the merits of the investment and to structure the investment as well as to engage in a reasoned decision-making process, consistent with that of a prudent man acting in a like capacity." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356-58 (4th Cir. 2014). Accord Fifth Third *Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014).

360. In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." Tibble, 575 U.S. 523. To satisfy its duties under ERISA, a fiduciary simply may not argue that other funds, in combination, theoretically create a prudent portfolio. *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)."

361. At all relevant times, Ferguson and the Committee were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

362. At all relevant times during the Class Period, Defendants, when selecting and retaining the Plan's investment lineup, deciding which funds to populate the limited Plan's menu of choices for workers, and retaining covered service providers, were ERISA fiduciaries.

363. As fiduciaries of the Plan, Defendants were subject to the ERISA's duty

of prudence.

364. Defendants breached this fiduciary duty in multiple respects as discussed throughout this Amended Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan participants. Instead, Plan fiduciaries selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. Likewise, Defendants failed to monitor or control the grossly excessive compensation paid for administrative services. Moreover, Defendants failed to investigate the competence of and periodically monitor conflicted Plan service providers which they had selected to provide services to the Plan and Plan participants.

365. Based on reasonable inferences from the facts set forth in this Amended Complaint, at all relevant times during Class Period, Ferguson and the Committee failed to have a proper system of review in place to ensure that: (a) participants in the Plan were being charged appropriate and reasonable fees for the Plan's third-party service providers; (b) their selection and retention of investment options were prudent; (c) ensured all parties-in-interest were competent and free from self-interest; (d) and that Plan expenses were reasonable and necessary; and (e) they placed the interests of Plan participants and beneficiaries over the interests of hired conflicted Plan service providers, and themselves.

366. At all relevant times during the Class Period, Ferguson and the Committee did not have adequate procedures in place to monitor Plan service providers and investments and did not act in the best interests of the Plan participants.

367. "Under trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones ... separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Tibble v. Edison Int'l,*

FIRST AMENDED CLASS ACTION COMPLAINT          3:22-CV-05667-WHO

575 U.S. 523, 529 (2015). "The trustee must systematically consider all the investments of the trust at regular intervals to ensure that they are appropriate." *Id.*

368. Defendants were required to but did not have had a prudent process and method for selecting, monitoring and retaining prudent, cost-effective investments for the Plan, and for removing imprudent investments.

369. Prudence required Defendants to monitor both the performance and cost of the investments selected for the Plan, leveraging the size of the Plan to ensure that well-performing, lower cost investment options were available to plan participants.

370. Prudence required Defendants to avoid undue risk to plan participants' savings and to ensure that any fees paid are reasonable compensation for the services provided. This includes fees from any plan service provider, including the plan fiduciaries themselves.

371. Prudence required Defendants to be wary of conflicts of interest that arose when selecting and thereafter retaining investment options for the Plan that included kickbacks and other indirect compensation paid to parties in interest.

372. Given the vulnerability of plan participants, who are dependent on the retirement income earned by their Defendants' chosen plan investment choices, Defendants also had the duty to be particularly vigilant about evaluating whether lower-expense share classes are available to participants.

373. Defendants further had a fiduciary duty to monitor and evaluate the performance of the Plan's investments they selected and retained, and to remove and replace imprudent investments.

374. Defendants did not have a prudent process for monitoring and evaluating the performance of the Plan's investments.

375. At all relevant times during the Class Period, the Plan's mutual funds significantly underperformed their meaningful benchmarks.

376. If Defendants had monitored and evaluated the performance of the

FIRST AMENDED CLASS ACTION COMPLAINT                3:22-CV-05667-WHO

Plan's mutual funds, they would have known that those funds were consistently underperforming both their SEC-prospectus benchmarks and benchmarks under 29 CFR § 2550.404a-5.

377. Defendants did not have a prudent process for monitoring and evaluating the performance of the Prudential Entities or the CapFinancial Entities. Instead, Defendants rubber-stamped the recommendations of the Prudential Entities and the CapFinancial Entities without investigating or analyzing the prudence of their recommendations.

378. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and Plan participants suffered over $50 million in losses.

379. Had Defendants complied with their fiduciary obligations, the Plan and Plan participants would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

380. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.

381. In addition, Plaintiffs are entitled to equitable relief under 29 U.S.C. § 1132(a)(3), relief under 29 U.S.C. § 1132(g), and other appropriate relief as set forth in their Prayer for Relief.

382. Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CAUSE OF ACTION**

**Violation of 29 U.S.C. §§ 1104(a)(1)(A) and 1105**

**Violation of Fiduciary Duty of Loyalty**

**(Against Ferguson and the Committee)**

383. Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

384. At all relevant times, Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar as they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

385. As fiduciaries of the Plan, Defendants were subject to the ERISA's duty of loyalty.

386. Defendants breached their fiduciary duty of loyalty in multiple respects as discussed above.

387. At all relevant times during the Class Period, Defendants made investment decisions while tainted with self-interest.

388. At all relevant times during the Class Period, Defendants put their interests ahead of those of the Plan and Plan participants by choosing investment products and services which generated substantial revenues at great costs to the Plan and Plan participants.

389. Investment fund options chosen for a plan should not favor the fund provider and a party-in-interest over the plan's participants. Yet here, to the detriment of the Plan and its participants and beneficiaries, Defendants, upon information and belief, endorsed the recommendations and revenue sharing arrangements enjoyed by the Prudential Entities and the CapFinancial Entities, and misled Plan participants about the excessive and unreasonable fees secretly charged to their accounts.

390. As a result of their conflicts of interest, Defendants selected and

retained in the Plan many investment funds that were more expensive than necessary and otherwise were not justified on the basis of their managers and historical performance. Defendants, moreover, hid these facts and the conflicts of interests from the DOL, IRS, and Plan participants and beneficiaries.

391. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and Plan participants suffered over $50 million in losses.

392. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the plan's providers.

393. In addition, Plaintiffs are entitled to equitable relief under 29 U.S.C. § 1132(a)(3), relief under 29 U.S.C. § 1132(g), and other appropriate relief as set forth in their Prayer for Relief.

394. Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## THIRD CAUSE OF ACTION
### Violation of 29 U.S.C. §§ 1106(a)(1)(A) and 1105
### Violation of Prohibited Transactions
### (Against Ferguson and the BOD)

395. Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

396. As a fiduciary under ERISA, Defendants owed a duty to monitor the members of the Committee that it appointed and to remove any member who

violated his or her respective fiduciary duties to the Plan and Plan participants.

397. If Defendants had monitored and evaluated the performance of the Committee and its members, they would have known that the Committee lacked a prudent process for investigating and analyzing the investments recommended by Plan service providers and that the Committee merely rubberstamped those recommendations.

398. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and Plan participants suffered over $50 million in losses.

399. Had Defendants complied with their fiduciary obligations, the Plan and Plan participants would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

400. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.

401. In addition, Plaintiffs are entitled to equitable relief under 29 U.S.C. § 1132(a)(3), relief under 29 U.S.C. § 1132(g), and other appropriate relief as set forth in their Prayer for Relief.

402. Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## FOURTH CAUSE OF ACTION

### Failure to Monitor Other Plan Fiduciaries

### (Against the Committee)

403. Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

404. Defendants, having the authority to select service providers for the Plan. were ERISA fiduciaries.

405. As the appointing fiduciaries, Defendants had a duty to monitor their appointees and Plan service providers they selected to ensure that they were adequately performing their fiduciary and non-fiduciary obligations and to take prompt and effective action to protect the Plan in the event that they were not fulfilling those duties.

406. Defendants also had a duty to ensure that their appointees and Plan service providers they selected and retained possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; and maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments.

407. Defendants breached their fiduciary monitoring duties by, among other things:

    a. Failing to monitor and evaluate the performance of their appointees and Plan service providers, or have a system in place for doing so, standing idly by as the Plan and Plan participants suffered significant losses as a result of their imprudent actions and omissions;

    b. Failing to monitor the processes by which Plan investments were evaluated, and failing to investigate the availability of lower-cost separate account and collective trust vehicles;

    c. Failing to solicit bids from other service providers at reasonable intervals; and

    d. Failing to remove service providers who were incompetent, who

charged excessive fees, and/or whose performance was inadequate.

408.  As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and Plan participants suffered over $50 million in losses.

409.  Had Defendants complied with their fiduciary obligations, the Plan and Plan participants would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

410.  Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to monitor.

411.  In addition, Plaintiffs are entitled to equitable relief under 29 U.S.C. § 1132(a)(3), relief under 29 U.S.C. § 1132(g), and other appropriate relief as set forth in their Prayer for Relief.

412.  Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

### FIFTH CAUSE OF ACTION

**Violation of 29 U.S.C. §§ 1106(a)(1)(D)**

**Violation of Prohibited Transactions**

**(Against all Defendants except the BOD)**

413.  Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

414.  At all relevant times, Ferguson and the Committee, upon information and belief, were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar that they exercised discretionary authority or control over the

administration and/or management of the Plan or disposition of the Plan's assets.

415.    At all relevant times during the Class Period, the Prudential Entities, in exercising discretion and control over rebates and other Plan assets instead of returning them to the Plan and/or Plan participants, in having sufficient influence over Plan Fiduciaries with respect to their selection of investment options for the Plan, and in in having the ability to unilaterally increase their own compensation through revenue sharing and other agreements with the CapFinancial Entities and Plan fiduciaries, were ERISA fiduciaries.

416.    At all relevant times during the Class Period, the CapFinancial Entities, in recommending investment options to the Plan, in recommending investment managers and subaccount managers for the Plan to Plan fiduciaries, in having sufficient influence over Plan Fiduciaries with respect to their selection of investment options for the Plan, and in having the ability to unilaterally increase their own compensation through indirect revenue sharing agreements with the Prudential Entities and Plan fiduciaries, were ERISA fiduciaries.

417.    ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), provides that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan and a party in interest."

418.    Each of Defendants was a party in interest pursuant to ERISA § 3(14), 29 U.S.C. § 1002(14).

419.    Defendants each caused the Plan to allow the Prudential Entities and the CapFinancial Entities to charge and collect from unknowing participants excessive and unjustified kickbacks and revenue sharing payments, which were not rebated to the Plan or Plan participants. This constituted a transfer and use of the assets of the Plan to and for the benefit of Defendants in violation of ERISA § 406(a)(1)(D), 29

U.S.C. § 1106(a)(1)(D).

420. As parties in interest, each of Defendants is liable for knowing participation in these violations of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).

421. At all relevant times, Defendants knew all of the facts sufficient to know that the excessive compensation paid to the Prudential Entities and the CapFinancial Entities, and the latter's failure to rebate those excessive and unjustified payments to the Plan and participants, constituted a direct or indirect transaction between the Plan and themselves as parties-in-interest.

422. Defendants are liable for knowing participation in the prohibited transaction and appropriate equitable relief can and should be awarded against them regardless of whether they were the fiduciaries who caused the Plan to engage in the transactions.

## SIXTH CAUSE OF ACTION

### Violation of 29 U.S.C. §§ 1106(b)(1) & (3)

### Violation of Prohibited Transactions

### (Against the Prudential Entities and the CapFinancial Entities)

423. Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

424. At all relevant times during the Class Period, the Prudential Entities, in exercising discretion and control over rebates and other Plan assets instead of returning them to the Plan and/or Plan participants, in having sufficient influence over Plan Fiduciaries with respect to their selection of investment options for the Plan, and in having the ability to unilaterally increase their own compensation through revenue sharing and other agreements with the CapFinancial Entities and Plan fiduciaries, were ERISA fiduciaries.

425. At all relevant times during the Class Period, the CapFinancial Entities,

-94-

in recommending investment options to the Plan, in recommending investment managers and subaccount managers for the Plan to Plan fiduciaries, in having sufficient influence over Plan Fiduciaries with respect to their selection of investment options for the Plan, and in having the ability to unilaterally increase their own compensation through indirect revenue sharing agreements with the Prudential Entities and Plan fiduciaries, were ERISA fiduciaries.

426.   ERISA § 406(b), 29 U.S.C. § 1106(b) provides in relevant part that (1) "a fiduciary with respect to a plan shall not deal with the assets of the plan in his own interest or for his own account" and (3) "a fiduciary with respect to a plan shall not receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

427.   The illicit kickbacks and excessive revenue sharing payments made to Defendants, and Defendants' failure to rebate those excessive payments to the Plan and participants, were transactions involving the assets of the Plan.

428.   By authorization these transactions and entering into Agreements which formed a part of them, Defendants each dealt with the assets of the Plan in their own interest and/or for their own account in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

429.   Defendants each received consideration for their personal account from Ferguson, a party dealing with the Plan, in violation of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3).

## SEVENTH CAUSE OF ACTION

### Breach of Fiduciary Duty by Omission

### (Against Ferguson, the BOD, and the Committee)

430.   Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

431.   As fiduciaries of the Plan with the powers to bring actions on behalf of

the Plan, Defendants had the ability to bring actions on behalf of the Plan pursuant to ERISA § 502(a)(2) and ERISA § 502(a)(3) at all relevant times during the Class Period.

432.   Among the assets of an employee benefit plan under ERISA is a "chose in action" – the right to bring an action to recover a debt, money or a thing – including to institute a lawsuit for a breach of fiduciary duties or other violations. ERISA fiduciaries are prohibited from engaging in transactions under ERISA § 406(a) or 406(b) unless there is an exception or exemption, and a claim can be brought on behalf of the Plan against an ERISA fiduciary who engages in such prohibited transactions.

433.   As a result, one of the assets of the Plan was a claim against Defendants for engaging in prohibited transactions for their own benefit as set forth in this Complaint.

434.   Each of the Defendants either knew (because they were parties to the transaction) or through a proper review would have discovered that Defendants engaged in prohibited transactions in violation of ERISA as set forth in this Complaint, because each of them had knowledge of the terms of these self-dealing transactions, or through a prudent and loyal investigation in their role as Plan fiduciaries would have discovered them.

435.   Defendants did not take any action, including any legal action, or exercised any other authority under the Plan to properly manage this choice in action.

436.   By failing to remedy these prohibited transactions on behalf of the Plan, including by, if necessary, bringing suit against Defendants through the present, Defendants violated ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A).

437.   Because their fiduciary duties included the employment of legal advisors, Defendants failed to comply with ERISA § 404(a)(1) in the administration

of their specific responsibilities as fiduciaries, and this failure enabled the other Defendants to violate ERISA in their acquisition of unreasonable fees and Plan assets.

438. As a direct and proximate result of these breaches by Defendants, the Plan suffered losses and the Prudential Entities and the CapFinancial Entities obtained profits that rightfully belong to the Plan and its participants.

439. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the other Defendants.

440. Plaintiffs are entitled to equitable relief under 29 U.S.C. § 1132(a)(3), relief under 29 U.S.C. §  1132(g), and other appropriate relief as set forth in their Prayer for Relief.

441. Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## EIGHTH CAUSE OF ACTION

### Statutory Penalties

### (Against Ferguson, the BOD, and the Committee)

442. Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

443. Upon information and belief, each of Defendants either was the named Plan Administrator or the *de facto* Plan Administrator at all relevant times during the Class Period.

FIRST AMENDED CLASS ACTION COMPLAINT            3:22-CV-05667-WHO

444. As Plan Administrator, Defendants were obligated "upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4).

445. Failure to provide the material requested within 30 days authorizes the Court to assess a penalty against Defendants in favor of Plaintiffs in the amount of $110 a day from the date of such failure or refusal. 29 U.S.C. §1132(c)(1); 29 U.S.C. §2575.502c-1.

446. On May 7, 2022, Counsel for Plaintiff Bozzini mailed, Via Fedex Overnight Business With Delivery Confirmation, a request for Plan information described above under 29 U.S.C. §1024(b). The request for information was directed to the 401(k) Plan Administrator and IRS Form 5500 signatory Richard Winckler at 12500 Jefferson Ave., Newport News, VA 23602. Delivery confirmation was obtained by FedEX.

447. On May 7, 2022, Counsel for Plaintiff Gonzales mailed, Via Fedex Overnight Business With Delivery Confirmation, a request for Plan information described above under 29 U.S.C. §1024(b). The request for information was directed to the 401(k) Plan Administrator and IRS Form 5500 signatory Richard Winckler at 12500 Jefferson Ave., Newport News, VA 23602. Delivery confirmation was obtained by FedEx.

448. To date, the Plan Administrator and Committee has not complied with Named Plaintiff Bozzini's or Gonzales' request for information.

449. Based on their refusal to comply with Named Plaintiff Bozzini and Gonzales' request for information, Defendants violated their obligations under 29 U.S.C. § 1024(b)(4) and are liable for daily penalties under 29 U.S.C. § 1132(c).

## **JURY TRIAL DEMANDED**

FIRST AMENDED CLASS ACTION COMPLAINT          3:22-CV-05667-WHO

450. Under Fed. R. Civ. P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

**PRAYER FOR RELIEF**

Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request the Court:

• Certify the Class, appoint Plaintiffs as class representatives, and appoint Tower Legal Group, P.C. and The Sharman Law Firm as Class Counsel;

• Find and declare that Defendants have breached their fiduciary duties as described above;

• Find and adjudge that Defendants are liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

• Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

• Order Defendants to provide an accounting necessary to determine the amounts Defendants must make good the Plan under §1109(a);

• Find and adjudge that Defendants must disgorge all sums of money received from their use of assets of the Plan;

• Impose a constructive trust on any monies by which Defendants were unjustly enriched as a result of breaches of fiduciary duty or prohibited transactions, and cause Defendants to disgorge such monies and return them to the Plan;

• Impose a surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which an accounting reveals were improper, excessive, and/or in violation of ERISA;

• Order Actual damages in the monetary amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to

FIRST AMENDED CLASS ACTION COMPLAINT        3:22-CV-05667-WHO

the accounts' losses;

- Order equitable restitution against Defendants;

- Award to Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant other equitable or remedial relief as the Court deems appropriate.

**PLAINTIFFS DEMAND A TRIAL BY JURY OF ALL ISSUES SO TRIABLE BY LAW.**

Dated: January 30, 2023,                    **TOWER LEGAL GROUP, P.C.**
                                            **THE SHARMAN LAW FIRM LLC**


By: _James A Clark_____
      JAMES A. CLARK
      RENEE P. ORTEGA
      PAUL J. SHARMAN
      Attorneys for Plaintiffs

FIRST AMENDED CLASS ACTION COMPLAINT          3:22-CV-05667-WHO