**TOWER LEGAL GROUP, P.C.**
James A. Clark (SBN 278372)
Renee P. Ortega (SBN 283441)
11335 Gold Express Drive, Ste. 105
Gold River, CA 95670
Telephone: (916) 361-6009
Facsimile: (916) 361-6019
Email: james.clark@towerlegalgroup.com
Email: renee.ortega@towerlegalgroup.com

[Attorneys for Plaintiffs]

**THE SHARMAN LAW FIRM**
Paul Sharman (Pro Hac Vice)
11175 Cicero Drive, Suite 100
Alpharetta, GA  30022
Telephone: (678) 242-5297
Facsimile:  (678) 802-2129
Email: paul@sharman-law.com

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERA BOZZINI and ADRIAN GONZALES, individually, and as representatives of a Putative Class of Participants and Beneficiaries, on behalf of the FERGUSON ENTERPRISES, LLC, 401(K) RETIREMENT SAVINGS PLAN f/k/a FERGUSON ENTERPRISES, INC., 401(K) RETIREMENT SAVINGS PLAN,<br><br>       Plaintiffs,<br><br>     v.<br><br>FERGUSON ENTERPRISES, LLC, f/k/a FERGUSON ENTERPRISES, INC.; RETIREMENT PLAN COMMITTEE OF FERGUSON ENTERPRISES, LLC 401(K) RETIREMENT SAVINGS PLAN; AND DOES 1-50,<br><br>       Defendants. | Case No.: 3:22-CV-05667-WHO<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES**<br><br>DEMAND FOR JURY TRIAL |

# I.  INTRODUCTION

1.     Plaintiffs, Tera Bozzini and Adrian Gonzales (collectively "Plaintiffs"), individually, and as representatives of a Putative Class of Participants and Beneficiaries of and on behalf of the Ferguson Enterprises, LLC, 401(K) Retirement Savings Plan (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1001 *et seq*., against the Plan sponsor and administrator of the Plan, Defendant Ferguson Enterprises, LLC f/k/a Ferguson Enterprises, Inc. ("Ferguson" or the "Company"), the Retirement Plan Committee of Ferguson Enterprises, LLC 401(K) Retirement Savings Plan ("Committee"), and DOES 1-50 as Board Members of Ferguson Enterprises, LLC and/or as members of the Retirement Plan Committee (collectively, "Defendants").

2.     Federal law affords employers the privilege of enticing and retaining employees by setting up retirement through defined contribution plans pursuant to 26 U.S.C. §401 ("401(k) plan"). These plans provide employees investment options with tax benefits that inure to the benefits of the employees, and necessarily, to the employers by increasing the "net" compensation their employees receive via tax deferment. To enjoy this benefit, employers must follow the rules and standards proscribed by "ERISA".

3.     At all relevant times, Defendants are/were fiduciaries to the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

4.     ERISA and the common law of trusts impose strict fiduciary duties of loyalty and prudence upon Defendants as Plan fiduciaries.

5.     29 U.S.C. § 1104(a)(1)(A) requires a plan fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" for the "exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

6.     29 U.S.C. § 1104(a)(1)(B) and common law require a plan fiduciary to discharge his/her obligations "with the care, skill, prudence, and diligence under the

-2-

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims."

7.     A 401(k) defined contribution plan has become the dominant source of retirement savings for most Americans.

8.     In a defined contribution plan, participants' retirement benefits are limited to the value of their own individual accounts, which is determined solely by employee and employer contributions plus the amount gained through investment in the options made available in the plan, less expenses. *See* 29 U.S.C. § 1002(34).

9.     Typically, plan participants direct the investment of their accounts, choosing from the lineup of plan investment options chosen by the plan sponsor. Because retirement savings in defined contribution plans grow and compound over the course of the participants' careers, poor investment performance and excessive fees can dramatically reduce the amount of benefits available when the participants are ready to retire. Over time, even slight differences in fees compound, and can result in vast differences in the amount of savings available at retirement.

10.     The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor ("DOL") has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1-2 (Aug. 2013).

11.     Wasting the Plan's money violates subsections (A), (B) and (D) of ERISA § 404(a)(1). In devising and implementing strategies for the investment and management of the Plan's assets, fiduciaries are obligated to "minimize costs." Uniform Prudent Investor Act (the "UPIA") §7.

12.     As set forth below, throughout the Class Period, the Defendants harmed the Plan and participants by paying unreasonable and unnecessary recordkeeping and administration expenses, and wrongfully taking Plan assets from the Plan's forfeiture

account to be used for the benefit of Ferguson, instead of for the benefit of the Plan.

13. Defendants must be held accountable for the substantial losses resulting from their failure to comply with their obligations under ERISA.

## II. JURISDICTION AND VENUE

14. Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a), which provides that participants or beneficiaries in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and exclusive jurisdiction under ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

16. This Court has personal jurisdiction over Defendants and venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) because Ferguson transacts business in this district, resides in this district, and/or has significant contacts with this district, as do one or more Plaintiffs and Plan participants, and because ERISA provides for nationwide service of process.

## III. THE PARTIES

### A. PLAINTIFFS

17. Plaintiff Tera Bozzini ("Bozzini") resides in the State of California, and at relevant times, has been an employee of Ferguson, and a participant in the Plan under 29 U.S.C. § 1002(7).

18. Plaintiff Adrian Gonzales ("Gonzales") resides in Contra Costa County, in the State of California, and at relevant times, has been an employee of Ferguson, and a participant in the Plan under 29 U.S.C. § 1002(7).

19. As a direct and proximate result of the breaches of fiduciary duties described herein, the Plan and the members of the Putative Class (defined below) suffered substantial losses and damages by paying unreasonable and excessive fees

-4-

to third parties; and otherwise having assets wasted or wrongfully misused, including the unlawful use of Plan assets in the Plan's forfeiture account.

**B. DEFENDANTS**

20. Defendant Ferguson Enterprises, LLC f/k/a Ferguson Enterprises, Inc. ("Ferguson") is a nationwide supplier of, *inter alia*, residential and commercial plumbing, HVAC, appliances, and lighting services and products.

21. Ferguson maintains its headquarters in Virginia, but operates in all fifty states, and represents that it employs approximately 32,000 associates.[1] Ferguson is registered with the State of California and conducts business in this district and throughout California.

22. Ferguson, acting through its Board of Directors, directly controlled and managed the operation and administration of the Plan and/or appointed the Committee to control and manage the operation and the administration of the Plan. Ferguson and the Committee had a concomitant fiduciary duty to prudently select, monitor, and supervise any fiduciary appointees/delegates.

23. Defendant "Does" are the individuals on the Board of Directors and Committee during the Relevant Time Period. The identities of the "Does" are unknown at this time and are named as "John Does" until the "Does" are known and can be named through an amendment to this Complaint.

24. Ferguson, its Board of Directors, and members of the Committee, are all fiduciaries to the Plan under 29 U.S.C. §1002(21)(A)(i) and (iii) because they have discretionary authority to control the operation, management, and administration of the Plan, including the disposition of Plan assets, the selection and compensation of the providers of administrative services to the Plan, and the selection, monitoring, and removal of the investment options made available to participants of the Plan.

---

[1] https://www.corporate.ferguson.com/about-us/Our-Businesses/

SECOND AMENDED CLASS ACTION COMPLAINT          3:22-CV-05667-WHO

## IV. STANDING

25. ERISA permits an individual participant in a retirement savings plan to initiate litigation on behalf of the plan and other participants. 29 U.S.C. § 1132(a)(2) (allowing for "a participant" to bring a civil action "for appropriate relief" under ERISA); *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9, 105 S. Ct. 3085, 87 L. Ed. 2d 96 (1985) (explaining the purpose of the ERISA enforcement statute and describing "Congress' intent that actions for breach of fiduciary duty be brought in a representative capacity on behalf of the plan as a whole"). Generally, a plaintiff has standing to bring an ERISA claim where the plaintiff alleges a causal connection between defendants' actions and actual harm to an ERISA plan in which the plaintiff participates.

26. Claims under ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2), are brought in a representative capacity on behalf of the Plan. As explained in detail within this complaint, the Plan suffered millions of dollars in losses traceable to Defendants' fiduciary breaches.

27. Plaintiffs were participants in the Plan as defined by ERISA § 3(7), 29 U.S.C. § 1002(7) and suffered losses as a result of the Defendants' conduct. Therefore, Plaintiffs have statutory standing to bring claims under ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2), (3).

28. Defendants are liable to the Plan to make good the Plan's losses under 29 U.S.C. § 1109(a).

## V. TIMELINESS

29. Under ERISA § 413, claims for breach of fiduciary duty may be brought for (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation. Plaintiffs each participated in the Plan within the statutory period and have suffered damages.

## VI.    THE PLAN

30.    The Plan is a defined contribution plan covering all eligible employees who are employed by the Company.

31.    As of December 31, 2022, the Plan had 36,786 active participants with account balances and over $2.68 billion in assets.

32.    The substantial size of the Plan's assets under management qualifies it as a jumbo 401(k) plan in the defined contribution plan marketplace; it is among the largest 401(k) plans in the United States, both based on the size of its assets, and the number of active participants with account balances. This is significant because jumbo plans have much greater leverage and bargaining power than smaller plans when dealing with service providers and negotiating fees and expenses.

## VII. FACTUAL ALLEGATIONS
### A. DEFENDANTS PAID UNREASONABLE AND UNNECESSARY RECORDKEEPING AND ADMINISTRATIVE FEES.

33.    Defendants have a duty to prudently select and monitor covered service providers ("CSPs"). The failure to exercise due care in selecting and monitoring CSPs constitutes a breach of a trustees' fiduciary duty.

34.    Every defined contribution plan must pay for recordkeeping services, which tend to be a largely automated service (e.g., recording contributions, withdrawals, and transfer of assets among investments), that can easily be provided at a relatively low fixed cost per participant in a qualified retirement plan. Which is to say, the cost of recordkeeping for an individual plan participant is, and should be, a relatively flat cost that is unrelated to the value of an individual plan participant's assets in the plan.

35.    Recordkeepers for defined contribution plans are sometimes compensated through direct payments from the plan (participants) or employer, or alternatively, or in conjunction therewith, through indirect payments via a practice known as revenue sharing.

36. At all times relevant, Prudential Retirement Insurance and Annuity Company ("Prudential") has received excessive compensation from the Plan for recordkeeping and administration ("RKA") services.

37. The unreasonably high direct compensation paid to Prudential for RKA services is disclosed in the Form 5500s filed annually by Defendants for the Plan. The amount of direct compensation paid to Prudential for RKA from the Plan is detailed in the table in paragraphs 48 and 52 below. As the data shows, Defendants have allowed Prudential to charge the Plan excessive fees and take unreasonable compensation in connection with its RKA services.

38. Using the Plan's Form 5500 data and comparing it to other plans' data, the Plan's average recordkeeping costs per participant paid from Plan assets from 2017 through 2022 greatly exceeds comparable size plans with a similar number of participants receiving the same or similar RKA services.

39. Using the Form 5500 data, the annual recordkeeping costs calculated on a per participant basis for the Plan was: 2017: $43.76; 2018: $48.55; 2019: $51.22; 2020: $57.04; 2021: $52.78; and 2022: $46.08. This data reflects a flawed process in selecting and retaining a recordkeeper, and failing to solicit bids to obtain reasonable pricing and to negotiate lower costs.

40. Upon information and belief, the annual RKA compensation paid to Prudential may have been even more than the direct compensation reported if Prudential also received indirect compensation, including through revenue sharing payments derived from excessive management fees charged to participants on their investments in the Plan. Discovery is necessary to gain information about the amount of indirect compensation received by Prudential.

41. Because revenue sharing arrangements typically pay recordkeepers asset-based fees, fiduciaries must monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper is not receiving unreasonable compensation. A prudent fiduciary either refuses to engage in revenue sharing, or at

-8-

a minimum, ensures that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable per participant recordkeeping fee that can be obtained from the recordkeeping market through competitive bids.

42. Prudent fiduciaries must ensure that all rebates to the Plan are promptly distributed back to participants.

43. Based on the number of Plan participants, the assets in the Plan, and the basic and generic services provided by Prudential to the Plan, as supported by the table below, a reasonable recordkeeping fee for the Plan would have been no more than $25-$30 per participant throughout the Class Period. *See also*, e.g., 15th Annual NEPC 2020 Defined Contribution Plan & Fee Survey, https://f.hubspotusercontent00.net/hubfs/2529352/2020%20DC%20Plan%20and%20 Fee%20Survey/2020%20NEPC%20DC%20Plan%20Progress%20Report.pdf. (reflecting the recordkeeping fees identified in the NEPC's 2020 Defined Contribution Plan & Fee Survey which included 142 defined contribution and deferred compensation plans. Fees were gathered from participating plans' service providers and recast in a uniform format).

44. There are numerous recordkeepers in the marketplace (including, but not limited to, Fidelity, Vanguard, Voya, and Great-West) who are capable of providing a high level of service to the Plan, and who will readily respond to a formal "request for proposal" ("RFP"). These recordkeepers primarily differentiate themselves based on service and price, and vigorously compete for business by offering the best service for the best price.

45. The package of recordkeeping services the Plan received included standard recordkeeping services such as: government reporting services, plan sponsor support services, recordkeeping services, and plan investment services and reporting.

46. The Plan did not receive any unique services or at a level of quality that would warrant fees greater than the competitive fees that would be offered by other

-9-

providers, as reflected in the below table.

47. The market for defined contribution recordkeeping services is highly competitive. Jumbo retirement plans like the Plan here have massive bargaining power to negotiate low fees, but the Defendants failed to do so. In fact, as the amount of assets and number of participants substantially increased since 2016, the per participant annual fees *increased*. This shows that the Defendants failed to properly and annually benchmark the RKA fees or engage in proper, formal requests for proposal at least every 3-5 years.

48. Each year, Defendants reported, via Form 5500 reports for the Plan, the direct payments made to Prudential for RKA. The direct payments to Prudential for RKA, and the cost per plan participant are summarized in the chart below. The data for 2016 is included to show that even compared to itself, the Plan paid unreasonable per participant RKA fees from 2017 forward.[2]

| Year | Number of Participants | Recordkeeping Fees Direct Payments (from Form 5500) | Recordkeeping Fee Per Plan Participant |
|---|---|---|---|
| 2016 | 25,205 | 789,048 | $31.30 |
| 2017 | 26,925 | 1,178,441 | $43.76 |
| 2018 | 29,787 | 1,446,216 | $48.55 |
| 2019 | 30,119 | 1,542,888 | $51.22 |
| 2020 | 30,232 | 1,724,618 | $57.04 |
| 2021 | 33,640 | 1,775,679 | $52.78 |
| 2022 | 36,786 | 1,695,159 | $46.08 |

*Additional Years' data not yet publicly available.

49. Based on Form 5500 filings, the chart below compares the average recordkeeping costs paid during the relevant years by comparable plans with a similar number of participants to those in the Plan, and/or similar amounts of plan assets, receiving substantially similar services as those of the Plan, as reflected by the codes for payment. As shown, the Plan paid excessively more per participant,

---

[2] Plaintiffs do not aver that $31.30 was reasonable in 2016, because even that amount could have been reduced, but 2016 highlights the inexplicably higher annual amounts paid in subsequent years.

SECOND AMENDED CLASS ACTION COMPLAINT        3:22-CV-05667-WHO

compared to similar plans that ranged from $25 - $30 per participant, over the identical time periods:

| Plan | Year | Participants w/ Account Balances at Year End | Recordkeeping Fees Per Participant | Recordkeeping Fees (from Form 5500) | Plan Assets | Recordkeeper |
|---|---|---|---|---|---|---|
| Henry Ford Health System Retirement Savings Plan | 2016 | 29,438 | $15.89 | $468,025 | $1,209,460,322 | Great-West |
| Deseret 401(k) Plan | 2017 | 33,073 | $35.05 | $1,159,361 | $3,633,680,500 | Great-West |
| Henry Ford Health System Retirement Plan | 2017 | 26,711 | $24.43 | $652,691 | $1,422,438,609 | Great-West |
| Deseret 401(k) Plan | 2018 | 34,357 | $22.33 | $767,237 | $3,381,868,127 | Great-West |
| Henry Ford Health System Retirement Savings Plan | 2018 | 27,926 | $22.05 | $616,006 | $1,348,573,429 | Great-West |
| Deseret 401(k) Plan | 2019 | 34,938 | $22.14 | $773,763 | $5,180,251,859 | Great-West |
| Chevron Employee Savings | 2020 | 33,484 | $31.15 | $1,043,072 | $15 billion plus | Fidelity |
| Philips North America 401(k) Plan | 2020 | 28,348 | $25.41 | $720,606 | $5,663,746,665 | Prudential |
| Chevron Employee Savings | 2021 | 33,627 | $26.58 | $893,965 | $15 billion plus | Fidelity |
| Philips North America 401(k) Plan | 2021 | 30,245 | $25.21 | $762,543 | $6,384,324,582 | Prudential |
| Chevron Employee Savings | 2022 | 32,928 | $30.09 | $990,836 | $15 billion plus | Fidelity |
| Philips North America 401(k) Plan | 2022 | 30,811 | $25.56 | $787,617 | $5,180,251,859 | Prudential |

50.    As demonstrated above, the Plan's fiduciaries imprudently permitted the Plan to pay recordkeeping costs that far exceeded the amount charged to similarly situated plans, for the same types of services, on a per-participant basis. The data indicates a flawed process in monitoring the recordkeeper to ensure excessive fees were not paid by participants.

51.    The excessive and unreasonable amount of fees paid on a per participant basis to Prudential is further demonstrated when comparing the RKA fees paid by the Plan to the fees paid by participants in other 401(k) plans with *far fewer* participants, receiving substantially similar RKA services during the course of the

-11-

Class Period.

52.     The table below is based on data in the Form 5500s for plan years 2018 through 2022. The comparator plans each averaged between 7,000 and 10,000 participants over these years, while the Ferguson Plan averaged 32,112 participants over the same time period. This is significant because plans with fewer participants do not have the leverage and bargaining power to negotiate lower RKA fees as the Defendants have with the jumbo Ferguson Plan. Therefore, in comparison, Defendants should have obtained much lower RKA fees on a per participant basis than the 401(k) plans listed below:

| Plan | Avg. Total Plan Assets | Avg. Recordkeeping Fees Per Participant | Average Total Recordkeeping Fees | Recordkeeper |
|---|---|---|---|---|
| Bed Bath & Beyond, Inc. | $513,829,976 | $29 | $236,988 | Empower Annuity Insurance Company |
| Perdue Farms, Inc. | $583,558,988 | $30 | $274,650 | Principal Life Insurance Company |
| FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | $770,290,165 | $30 | $521,754 | Vanguard |
| Pilgrim's Pride Retirement Savings Plan | $321,945,688 | $26 | $486,029 | Great-West |
| JBS 401(k) Savings Plan | $374,330,167 | $25 | $481,539 | Great-West |
| **Ferguson Enterprises, LLC 401(k) Plan** | **$2,458,249,792** | **$51** | **$1,636,912** | **Prudential** |

53.     There is no reasonable basis for why the Ferguson Plan paid such greater fees than other plans receiving the same services on a per participant basis. The Defendants necessarily failed to employ a prudent process by not regularly benchmarking their RKA fees and failing to timely issue formal RFPs to solicit lower price bids for the Plan's RKA services. It is well recognized that RFPs result in lower costs being incurred for recordkeeping and administrative services and

SECOND AMENDED CLASS ACTION COMPLAINT          3:22-CV-05667-WHO

should be conducted every 3-5 years and/or when there are substantial changes to the Plan, including the size of the Plan and the number of participants.

54.    As a result of Defendants' failure to utilize a prudent process for monitoring and paying for RKA services, the Plan and Putative Class suffered millions of dollars of losses.

**B. DEFENDANTS UNLAWFULLY APPROPRIATED PLAN ASSETS FROM THE PLAN'S FORFEITURE ACCOUNT**

55.    During each year of the Class Period, in addition to the excessive RKA fees paid to Prudential, the Plan incurred millions of dollars of additional administrative expenses. These expenses were paid by the Plan and the participants through assessments specifically deducted from participants' accounts.

56.    Based on Form 5500 data, in the following years, the Plan paid total administrative expenses in the following amounts: 2016: $1,315,963; 2017: $2,264,883; 2018: $2,764,599; 2019: $2,110,987; 2020: $2,268,127; 2021: $2,332,911; 2022: $2,103,746.

57.    Under the Plan, the Company was obligated to fund matching contributions for participants in their accounts in the Plan and also make profit-sharing contributions. This is an employment benefit offered to employees to entice them to work for the Company and to remain employed with the Company.

58.    During the Class Period, vesting in the Company's matching contribution and profit-sharing contribution portions of participant accounts, plus actual earnings thereon, is based on years of service. A participant is 100 percent vested after five years.

59.    When Plan participants leave the employ of the Company prior to their matching contributions and profit-sharing contributions becoming fully vested, those unvested funds are transferred into the Plan's Forfeiture account.

60.    All of the assets in the Forfeiture account are Plan assets.

61.    Under the Plan, Defendants have discretionary authority over the

-13-

management and distribution of the assets in the Forfeiture account.

62.   In exercising discretionary control over the assets in the Forfeiture account, Defendants are acting as fiduciaries.

63.   In 2016, the Defendants took $1,657,855 from the Forfeiture account and used it to reduce Company contributions, while paying nothing to offset Plan expenses.

64.   In 2017, the Defendants took $1,804,218 from the Forfeiture account and used it to reduce Company contributions, while paying nothing to offset Plan expenses.

65.   In 2018, the Defendants took $1,925,336 from the Forfeiture account and used it to reduce Company contributions, while paying nothing to offset Plan expenses.

66.   In 2019, the Defendants took $2,650,033 from the Forfeiture account and used it to reduce Company contributions, while using just $48,774 to offset Plan expenses.

67.   In 2020, the Defendants took $3,744,995 from the Forfeiture account and used it to reduce Company contributions, while using just $55,241 to offset Plan expenses.

68.    In 2021, the Defendants took $3,193,117 from the Forfeiture account and used it to reduce Company contributions, while using just $30,462 to offset Plan expenses.

69.   In 2022, the Defendants took $3,170,682 from the Forfeiture account and used it to reduce Company contributions, while using just $36,529 to offset Plan expenses.

70.   As shown above, Defendants used Plan assets to benefit the Company instead of the Plan and the Class.

71.   Defendants' use of the assets in the Forfeiture account to offset future contributions owed by the Company, instead of to pay the annual Plan expenses,

caused the Plan to bear millions of dollars of expenses that it otherwise would not have paid.

## IX. CLASS ACTION ALLEGATIONS

72.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):

> All persons, except Defendants, and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between September 30, 2016 through the date of judgment (the "Class Period").

73.    The members of the Class are so numerous that joinder of all members is impractical. There are thousands of participants in the Plan.

74.    Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class Members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistent with other Class Members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class Members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

75.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class Members. Common legal and factual questions include, but are not limited to:

      A.    Whether Defendants are/were fiduciaries of the Plan;

      B.    Whether Defendants breached their fiduciary duties by engaging in the conduct described herein;

      C.    Whether the Defendants responsible for appointing other fiduciaries failed to adequately monitor their appointees to ensure the Plan was being managed in compliance with ERISA;

-15-

D.    The proper form of equitable and injunctive relief; and

E.    The proper measure of monetary relief.

76.    Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

77.    This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

78.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

<h2 style="text-align:center">FIRST CAUSE OF ACTION</h2>

<strong>Violation of 29 U.S.C. § 1104(a) AND 1105(a)</strong>

<strong>BREACH OF DUTY OF PRUDENCE</strong>

<strong>(Against Ferguson and the Committee)</strong>

79.    Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

80.    ERISA mandates that fiduciaries act with prudence in the disposition of Plan assets and selection and monitoring of investments, as well as in the monitoring

-16-

and minimization of administrative expenses. 29 U.S.C. § 1104(a)(1)(B).

81.    In determining whether an ERISA fiduciary breached its duty of prudence, courts focus on whether the fiduciary engaged in a reasoned decision-making process, consistent with that of a prudent man acting in a like capacity.

82.    In addition to a duty to select prudent investments and CSPs, under ERISA, a fiduciary has a continuing duty to monitor plan investments and CSPs.

83.    At all relevant times, Defendants did not have adequate procedures in place to monitor Plan CSPs and investments, and did not act in the best interests of the Plan participants.

84.    Defendants breached their fiduciary duties in multiple respects. Defendants failed to monitor or control the grossly excessive compensation paid for RKA services.

85.    Based on reasonable inferences from the facts set forth in this Complaint, at all relevant times during Class Period, Defendants failed to have a proper system of review in place to ensure that: (a) participants in the Plan were being charged appropriate and reasonable fees by the Plan's CSPs; and (b) that Plan expenses were reasonable and necessary.

86.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and Class suffered substantial losses.

87.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.

## SECOND CAUSE OF ACTION

### Violation of 29 U.S.C. §§ 1104(a)(1)(A) and 1105

### BREACH OF DUTY OF LOYALTY

### (Against Ferguson and the Committee)

88.    Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

89.    The assets in the Plan's Forfeiture account were all Plan assets.

90.    Defendants had discretion under the Plan to use the assets in the forfeiture account to pay Plan expenses or to reduce future Company contributions.

91.    Because Defendants had discretionary authority over the Plan assets in the forfeiture account, the Defendants were fiduciaries in regard to those funds and were acting in a fiduciary capacity when determining how to allocate those funds.

92.    As fiduciaries of the Plan, Defendants were subject to ERISA's duty of loyalty.

93.    In violation of their duty of loyalty, as set forth above in the Complaint, the Defendants chose to use the assets in the Forfeiture account for the Company's benefit instead of for the benefit of the Plan and the Class.

94.    The Company saved itself millions of dollars each year by utilizing the funds in the Forfeiture account for its own benefit, while forcing the Plan and Class to shoulder millions of dollars in RKA fees and other administrative expenses.

95.    Defendants unlawfully put their own interests ahead of those of the Plan. Had Defendants lawfully allocated the funds in the Forfeiture account to pay Plan expenses, as they were permitted to do, all of the RKA fees paid by the Plan each year would have been eliminated, along with millions of dollars of additional administrative expenses that the Plan was forced to bear.

96.    As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan and Plan participants suffered over $15 million in losses.

## THIRD CAUSE OF ACTION

### Violation of 29 U.S.C. §§ 1106(a)(1)(A) and 1105

### Engaging in Prohibited Transactions

### (Against Ferguson)

97.    Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

98.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable

-18-

to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.

99. By taking the funds in the Forfeiture account every year to be used for its own benefit, the Defendant was engaging in a prohibited practice. Defendant wrongfully took and utilized Plan assets for its own benefit in violation of ERISA.

100. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and Plan participants suffered over $15 million in losses.

**FOURTH CAUSE OF ACTION**

**FAILURE TO MONITOR OTHER FIDUCIARIES**

**(Against Ferguson)**

101. Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

102. The Company had the authority to appoint and remove members of the Board of Directors, the Committee and other fiduciaries to the Plan.

103. As the appointing/selecting fiduciaries, Ferguson had a duty to monitor its appointees and providers it selected to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that they were not fulfilling those duties.

104. The Company also had a duty to ensure that its appointees and Plan service providers it selected and retained possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate resources and information; and maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's assets.

105. The Company breached its fiduciary monitoring duties by, among other things:

    a. Failing to monitor and evaluate the performance of its appointees and CSPs, or have a system in place for doing so, paying excessive

and unreasonable recordkeeping and administrative fees, and standing idly by as the Plan and Class suffered significant losses as a result of their imprudent actions and omissions and wasting of Plan assets;

    b. Failing to monitor the processes by CSPs were paid and Plan assets were used, including funds in the Forfeiture account; and

    c. Failing to remove Committee members and service providers who were incompetent, who charged excessive or unnecessary fees, and/or whose performance was inadequate.

106. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and Class suffered substantial losses.

## PRAYER FOR RELIEF

107. Plaintiffs, on behalf of the Plan and Class, respectfully request the Court:

    a. Certify the Class, appoint Plaintiffs as class representatives, and appoint undersigned counsel as Class Counsel;

    b. Find and declare that Defendants have breached their fiduciary duties as described above;

    c. Find and adjudge that Defendants are liable to make good to the Plan all losses to the Plan resulting from the breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

    d. Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

    e. Order Defendants to provide an accounting necessary to determine the amounts Defendants must make good to the Plan under §1109(a);

    f. Find and adjudge that Defendants must disgorge all sums of money

received from their unlawful use of assets of the Plan;

g. Impose a constructive trust on any monies by which Defendants were unjustly enriched as a result of breaches of fiduciary duty or prohibited transactions, and cause Defendants to disgorge such monies and return them to the Plan;

h. Impose a surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which an accounting reveals were improper, excessive, and/or in violation of ERISA;

i. Order actual damages in the monetary amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

j. Order equitable restitution against Defendants;

k. Award to Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

l. Order the payment of interest to the extent it is allowed by law; and

m. Grant other equitable or remedial relief as the Court deems appropriate.

Dated: September 27, 2024,

**TOWER LEGAL GROUP, P.C.**
**THE SHARMAN LAW FIRM LLC**

By:   */s/ James A. Clark*
James A. Clark
Renee P. Ortega
11335 Gold Express Drive, Ste. 105
Gold River, CA 95670
Telephone: (916) 361-6009
Facsimile: (916) 361-6019

Paul Sharman (Pro Hac Vice)
11175 Cicero Drive, Suite 100
Alpharetta, GA  30022

-21-

SECOND AMENDED CLASS ACTION COMPLAINT          3:22-CV-05667-WHO

Telephone: (678) 242-5297
Facsimile:  (678) 802-2129
Email: paul@sharman-law.com

Attorneys for Plaintiffs

SECOND AMENDED CLASS ACTION COMPLAINT        3:22-CV-05667-WHO